IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | |
| v. | CIVIL ACTION |
| THE STATE OF GEORGIA, *et al.*, | FILE NO. 1:21-CV-02575-JPB |
| *Defendants*, | ORAL ARGUMENT REQUESTED |
| REPUBLICAN NATIONAL COMMITTEE, *et al.*, | |
| *Intervenor-Defendants.* | |

## DEFENDANTS' MOTION TO DISMISS COMPLAINT

Defendants the State of Georgia, the Georgia State Election Board, and Brad Raffensperger, in his official capacity as Secretary of State of Georgia, (collectively, "Defendants"), move to dismiss Plaintiff's complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6). In support of this motion, Defendants rely on their Brief in Support of Motion to Dismiss Complaint, which is filed with this motion.

Respectfully submitted this 28th day of July, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505

Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Riddhi Dasgupta*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
Bryan F. Jacoutot
Georgia Bar No. 668272
Loree Anne Paradise
Georgia Bar No. 382202
**Taylor English Duma LLP**
1600 Parkwood Circle, Suite 200
Atlanta, Georgia 30339
Telephone: (678) 336-7249

btyson@taylorenglish.com

*Counsel for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Defendants' Motion to Dismiss Complaint has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

UNITED STATES OF AMERICA,

        *Plaintiff,*

        v.

THE STATE OF GEORGIA, *et al.*,

        *Defendants,*

REPUBLICAN NATIONAL
COMMITTEE, *et al.*,

        *Intervenor-Defendants.*

CIVIL ACTION

FILE NO. 1:21-CV-02575-JPB

**DEFENDANTS' BRIEF IN SUPPORT OF
MOTION TO DISMISS COMPLAINT**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................ 1

ARGUMENT ..................................................................... 4

   I.  DOJ's Section 2 claim fails because the complaint does not
      allege that SB 202 will produce discriminatory results. ........................ 5

      A.  Congress eliminated the intent test from Section 2 in 1982. ........ 6

      B.  DOJ claims only discriminatory intent, not results. .................... 9

   II.  In any event, the facts as pleaded do not establish a
      discriminatory purpose on the part of the General Assembly. ............. 10

   III. The complaint does not satisfy Section 2's "totality of
      circumstances" requirement................................................. 19

CONCLUSION.................................................................. 25

**TABLE OF AUTHORITIES**

**Cases**

*Ala. Legislative Black Caucus v. Alabama,*
   575 U.S. 254 (2015) ..................................................... 18

*Brnovich v. Democratic Nat'l Comm.,*
   141 S. Ct. 2321 (2021) ...........................................*passim*

*Brooks v. Miller,*
   158 F.3d 1230 (11th Cir. 1998) ....................................... 6

*Chisom v. Roemer,*
   501 U.S. 380 (1991) ..................................................... 9

*Crawford v. Marion Cty. Election Bd.,*
   553 U.S. 181 (2008) ...................................... 16, 19, 24

*Edwards v. Aguillard,*
   482 U.S. 578 (1987) ................................................... 13

*Epperson v. Arkansas,*
   393 U.S. 97 (1968) .................................................... 13

*Greater Birmingham Ministries v. Sec'y of State for Ala.,*
  992 F.3d 1299 (11th Cir. 2021) ...................................................... 5, 11, 17, 19

*Hunter v. Underwood,*
  471 U.S. 222 (1985) ................................................................. 13

*Johnson v. DeSoto Cty. Bd. of Comm'rs,*
  72 F.3d 1556 (11th Cir. 1996) ............................................... 2, 5, 6

*Ketchum v. Byrne,*
  740 F.2d 1398 (7th Cir. 1984) ...................................................... 9

*Luft v. Evers,*
  963 F.3d 665 (7th Cir. 2020) ......................................................... 9

*McDonald v. Bd. of Election Comm'rs of Chi.,*
  394 U.S. 802 (1969) ................................................................. 25

*McMillan v. Escambia Cty., Fla.,*
  748 F.2d 1037 (5th Cir. 1984) ...................................................... 9

*Mims v. Arrow Fin. Servs.,*
  565 U.S. 368 (2012) ................................................................. 13

*Mobile v. Bolden,*
  446 U.S. 55 (1980) .................................................................... 6

*Munro v. Socialist Workers Party,*
  479 U.S. 189 (1986) ................................................................. 16

*New Ga. Project v. Raffensperger,*
  976 F.3d 1278 (11th Cir. 2020) ............................................... 2, 24

*NLRB v. SW Gen., Inc.,*
  137 S. Ct. 929 (2017) ............................................................... 14

*Nw. Austin Mun. Util. Dist. No. One v. Holder,*
  557 U.S. 193 (2009) ................................................................. 17

*Purcell v. Gonzalez,*
  549 U.S. 1 (2006) ..................................................................... 16

*Ricci v. DeStefano,*
  557 U.S. 557 (2009) ................................................................. 12

*Shaw v. Reno,*
  509 U.S. 630 (1993) ................................................................. 18

*Shelby Cty. v. Holder*,
   570 U.S. 529 (2013) .................................................................. 17, 18

*Sixth District AME v. Raffensperger*,
   No. 1-21-cv-01284-JPB (N.D. Ga. May 24, 2021) ........................................ 15

*Thornburg v. Gingles*,
   478 U.S. 30 (1986) ...................................................................... 7, 8

*United States v. Am. Truckers Ass'ns*,
   310 U.S. 534 (1940) .............................................................. 14, 15, 16

*United States v. Marengo Cty. Comm'n*,
   731 F.2d 1546 (11th Cir. 1984) .......................................................... 8

*United States v. McCranie*,
   169 F.3d 723 (11th Cir. 1999) .......................................................... 17

*United States v. O'Brien*,
   391 U.S. 367 (1968) .................................................................... 13

*Wallace v. Jaffree*,
   472 U.S. 38 (1985) .................................................................... 14

## Statutes

17 R.I. GEN. LAWS ANN. § 17-20-2.1 ......................................................... 21

42 U.S.C. § 1973 (1965) .................................................................... 6

52 U.S.C. § 10301 ....................................................................... 4, 7

ARIZ. REV. STAT. ANN. § 16-1018 ........................................................... 21

ARIZ. REV. STAT. ANN. § 16-542 ............................................................ 20

CAL. ELEC. CODE § 18370 ................................................................... 21

CAL. ELEC. CODE § 319.5 ................................................................... 21

COLO. REV. STAT. § 1-13-714 ............................................................... 21

CONN. GEN. STAT. § 9-236 .................................................................. 21

DEL. CODE ANN. tit. 15, § 5402 ............................................................ 22

DEL. CODE ANN. tit. 15, § 7571 ............................................................ 23

IND. CODE ANN. § 3-11-4-3 ................................................................. 20

IOWA CODE § 53.2 ........................................................................... 20

MD. CODE ANN., ELEC. LAW § 9-305 ................................................ 22

MO. ANN. STAT. § 115.279 ............................................................... 20

MONT. CODE ANN. § 13-35-211 ........................................................ 21

N.J. STAT. ANN. § 19:15A-1 ............................................................. 22

N.Y. ELEC. LAW § 17-140 ................................................................ 21

N.Y. ELEC. LAW § 8-400 .................................................................. 23

N.Y. ELEC. LAW § 8-600 .................................................................. 22

NEB. REV. STAT. ANN. § 32-941 ...................................................... 21

SB 202 ................................................................................... *passim*

WIS. STAT. ANN. § 6.87 ................................................................... 23

**Other Authorities**

Clare Foran & Lauren Fox, *Senate Republicans block signature
    Democratic election bill in key test vote*, CNN (June 22, 2021) ..................... 4

Ctr. for Election Innovation & Research, *How Easy is it to Vote Early
    in Your State?* ........................................................................ 24

Feb. 16, 2021 Ltr. from E. Kneedler to S. Harris, *Brnovich v. Democratic
    Nat'l Comm.*, 141 S. Ct. 2321 (2021) (No. 19-1257) .................................... 24

President Joseph R. Biden, Jr., Stmt. on the Attack on the Right
    to Vote in Georgia (Mar. 26, 2021) ................................................. 20

Press Release, U.S. Dep't of Justice, Justice Department Files Lawsuit
    Against the State of Georgia to Stop Racially Discriminatory Provisions
    of New Voting Law (June 25, 2021) ................................................. 10

Richard Pildes, *Further Analysis of the DOJ Suit Against Georgia*, ELECTION
    LAW BLOG (June 25, 2021, 10:43 AM) ............................................. 10

U.S. CONST. art. I, § 4, cl. 1 ......................................................... 1

## INTRODUCTION

This action by the U.S. Department of Justice (DOJ) is a politicized intrusion into the State of Georgia's constitutional authority to regulate the "time, place, and manner" of its elections. U.S. CONST. art. I, § 4, cl. 1. Georgia's election laws, as recently amended by SB 202, are reasonable, non-discriminatory, and well within the mainstream of election laws across the country. As a whole, Georgia law "generally makes it very easy to vote." *Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321, 2330 (2021).

SB 202 implements lessons learned by state and local elections officials through the challenge of administering an election during a global pandemic. During the 2020 election cycle, the Georgia Secretary of State and State Election Board undertook temporary, emergency measures to protect the health and safety of voters amidst unprecedented circumstances. SB 202 makes permanent some of the emergency measures that proved successful, while shoring up the security of the State's numerous and accessible methods of voting. At each turn, Georgia's General Assembly sought to increase voter access and voter confidence—making it "easy to vote and hard to cheat." SB 202 at 6:146-7:147. Compared to prior statutory law, SB 202 significantly *increased* voter access.

Rather than allowing Georgia's officials to implement the commonsense

provisions of SB 202, DOJ asks this Court to undo the considered judgment of Georgia's elected representatives. And DOJ does so even though many of the provisions of SB 202 that DOJ calls "discriminatory" and even "racist" are the law in many states, including Delaware, New York, Rhode Island, New Jersey, Maryland, and Wisconsin. Yet DOJ is not suing those states, nor has it sued others controlled by Democrats that have laws far more restrictive than Georgia's. This merely underscores why this lawsuit should be dismissed: "States—not federal courts—are in charge of setting [the] rules" for the electoral process. *New Ga. Project v. Raffensperger*, 976 F.3d 1278, 1284 (11th Cir. 2020).

Putting aside DOJ's transparently political interference with Georgia's constitutional authority, the complaint must be dismissed because it fails to plead a legally cognizable claim under Section 2 of the Voting Rights Act. *First*, the complaint rests entirely on an alleged discriminatory intent or "purpose," rather than alleging discriminatory *results*. There is no such thing as a standalone "intent" claim under Section 2. Eleventh Circuit precedent holds that "discriminatory intent alone is insufficient to establish a violation of Section 2." *Johnson v. DeSoto Cty. Bd. of Comm'rs*, 72 F.3d 1556, 1561 (11th Cir. 1996). Instead, there must also be a showing of "discriminatory results." *Id*. The Court will search in vain for such allegations in the complaint because

DOJ cannot plausibly allege that SB 202 has any discriminatory results.

*Second*, even if intent had any relevance under Section 2, the complaint fails to allege facts showing discriminatory intent because it fails to allege an act or statement from any Georgia legislator suggesting such an intent behind SB 202. DOJ relies only on innuendo and hyperbole, neither of which can overcome its pleading deficiencies.

*Third,* DOJ's complaint cannot survive the Supreme Court's recent decision in *Brnovich*, which rejected many of the arguments on which DOJ relies here. *Brnovich* emphasized that Section 2 claims must be assessed under the "totality of circumstances," noting that voters must "tolerate the usual burdens of voting" and that "[m]ere inconvenience cannot be enough to demonstrate a violation of [Section] 2." 141 S. Ct. at 2338. *Brnovich* also *upheld* a rule requiring voters to vote in their correct precinct, substantially similar (and even more restrictive) than the rule challenged here. *Id.* at 2350. Further, in contrast to the complaint's dismissal of the legislature's expressed concern about voter fraud, *Brnovich* held that fraud is a "strong and entirely legitimate" reason for enacting voting laws. *Id.*

Indeed, *Brnovich* so forecloses this action that it raises the question why DOJ is still pursuing it. One answer, again, is politics: the complaint was filed just three days after voting reforms advanced by U.S. Senate Democrats and

the administration failed on the Senate floor.[1] But regardless of actual motive, the complaint lacks the most basic allegations to support a Section 2 claim. It must therefore be dismissed.

## ARGUMENT

The legal standards governing pleading of a Section 2 claim are well settled. Section 2 prohibits a voting "standard, practice, or procedure" that "results in the denial or abridgment of the right of any citizen of the United States to vote on account of race or color[.]" 52 U.S.C. § 10301(a). This requires "consideration of 'the totality of circumstances' that have a bearing on whether a State makes voting 'equally open' to all and gives everyone an equal 'opportunity' to vote." *Brnovich*, 141 S. Ct. at 2341. This standard makes room for the "usual burdens of voting," which voters must "tolerate." *Id.* at 2338. It also recognizes that a state may take proactive measures to prevent voter fraud. *Id.* at 2348.

In contrast, a plaintiff does not state a claim under Section 2 merely by alleging a disparate impact from the challenged law. *Id.* at 2341. Nor will recounting a state's "racist history," if any, suffice. *Greater Birmingham*

---

[1] *See* Clare Foran & Lauren Fox, *Senate Republicans block signature Democratic election bill in key test vote*, CNN (June 22, 2021), https://www.cnn.com/2021/06/22/politics/senate-democrats-voting-bill/index.html.

*Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021) ("*GBM*"). Rather, a plaintiff must allege sufficient facts to plausibly show that the challenged laws, when considered alongside the state's "entire system of voting," create a voting system that is not "equally open." *Brnovich*, 141 S. Ct. at 2340, 2341. Without such allegations, a complaint fails to state a claim upon which relief may be granted. As shown below, that is true here, for three independent reasons.

## I.   DOJ's Section 2 claim fails because the complaint does not allege that SB 202 will produce discriminatory results.

At the threshold, DOJ's complaint misses an essential element of a Section 2 claim under the Voting Rights Act: a claim of disparate "results." Rather, the single count in the complaint seeks to invalidate portions of SB 202 as intentionally discriminatory and for no other reason.[2] But there is no such thing as an exclusively intentional-discrimination claim under Section 2. In *Johnson,* the Eleventh Circuit held that "discriminatory intent alone is insufficient to establish a violation of Section 2." 72 F.3d at 1561 (cleaned up). The court explained that "the plain language of [Section] 2" "expressly requires a showing of discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results." *Id*. at

---

[2] A copy of SB 202 is attached as Exhibit A.

1563; *accord Brooks v. Miller*, 158 F.3d 1230, 1237 (11th Cir. 1998) ("[W]e are bound by *Johnson* . . . which held that discriminatory intent alone, in the absence of a showing of discriminatory effect, is insufficient to establish a violation of [Section] 2."). Accordingly, *Johnson* forecloses DOJ's Section 2 claim because Congress eliminated an intent claim from Section 2.

### A.    Congress eliminated the intent test from Section 2 in 1982.

When Congress first adopted the Voting Rights Act in 1965, Section 2 read differently than it does today:

> No voting qualification or prerequisite to voting, or standard, practice, or procedure *shall be imposed or applied* by any State or political subdivision *to deny or abridge* the right of any citizen of the United States to vote on account of race or color.

42 U.S.C. § 1973 (1965) (emphases added). In 1980, the Supreme Court found that this version of Section 2 "no more than elaborates upon that of the Fifteenth Amendment, and the sparse legislative history of [Section] 2 makes clear that it was intended to have an effect no different from that of the Fifteenth Amendment itself." *Mobile v. Bolden*, 446 U.S. 55, 60-61 (1980). This was a serious problem for potential plaintiffs, because the Fifteenth Amendment requires a finding of intentional racial discrimination before invalidating a statute—a very high bar. *Id*. at 62.

Congress leapt into action to address that reading of Section 2. But

Congress did not add a new test alongside the prior statute's intent-based test—it rewrote the statute. The revised Section 2 reads:

> (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner *which results in* a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

> (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

52 U.S.C. § 10301 (emphasis added). This revised language created a new test—the "results" test—that replaced the old intent standard with "shall be imposed or applied . . . in a manner *which results* in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." *Id*. § 10301(a) (emphasis added).

In 1986 the Supreme Court recognized this was a *new* test, explaining that "[t]he intent test was *repudiated*" because it "asks the wrong question"—instead, courts should look at the "*result* of the challenged practice." *Thornburg v. Gingles*, 478 U.S. 30, 44 (1986) (emphases added). The Court was clear: the 1982 amendment to Section 2 "repudiat[ed]," "abandoned," and "rejected the

old intent test." *Id.* at 71, 72.

The Supreme Court re-emphasized this point in *Brnovich*, where it explained that Congress's goal was to "establish a *new* vote-dilution test" in the 1982 amendment. *Brnovich*, 141 S. Ct. at 2332 (emphasis added). Even the *Brnovich* dissent—which vigorously disagreed with the majority opinion— agreed that there is no intent-only test in Section 2, explaining that "[t]his Court, as the majority notes, had construed the original Section 2 to apply to facially neutral voting practices 'only if [they were] motivated by a discriminatory purpose.' . . . Congress enacted the current Section 2 to reverse that outcome—*to make clear that 'results' alone could lead to liability*." *Id.* at 2357 (Kagan, J., dissenting) (emphasis added). A few pages later, Justice Kagan emphasized again: "The [Section 2] inquiry is focused on effects: It asks not about *why* state officials enacted a rule, but about whether that rule *results* in racial discrimination." *Id.* at 2360 (emphasis added).

Other courts, including the Eleventh Circuit, previously agreed that the 1982 amendment deleted the intent test from Section 2: "Congress chose the language of the statute with great care. Congress wished to eliminate any intent requirement from section 2, and therefore changed the terms of § 2(a) . . . to forbid any practice that 'results in' discrimination." *United States v. Marengo Cty. Comm'n*, 731 F.2d 1546, 1563 (11th Cir. 1984); *accord McMillan*

*v. Escambia Cty., Fla.*, 748 F.2d 1037, 1042 (5th Cir. 1984) (same); *Ketchum v. Byrne*, 740 F.2d 1398, 1409 (7th Cir. 1984) (Congress "wisely eliminated the elusive and perhaps meaningless issue of governmental 'purpose' from the calculus of vote dilution claims"); *Luft v. Evers*, 963 F.3d 665, 672 (7th Cir. 2020) ("intent is not an element" of a Section 2 claim). And even before *Brnovich,* the Supreme Court had consistently explained the lack of an intent standard in Section 2: "Section (a) adopts a results test, thus providing that proof of discriminatory intent is no longer necessary to establish *any* violation of the section." *Chisom v. Roemer*, 501 U.S. 380, 395 (1991).

Further, in *Brnovich*, the Supreme Court clarified the standard for vote-denial cases such as this one: Section 2(b) requires that a state's voting system be "equally open"—an analysis that has nothing to do with the intent behind the challenged legislative enactments. 141 S. Ct. at 2337.

**B.    DOJ claims only discriminatory intent, not results.**

Because there is no longer an intent test in Section 2, the sole cause of action DOJ can bring under Section 2 is a *results* claim. That is no doubt why, when DOJ seeks to explain what Section 2 prohibits, it does not quote from the text because it cannot. [Doc. 1 ¶ 160]. Instead, DOJ adds the word "purpose"— a word found nowhere in the text of Section 2. *Id*.

Likewise, DOJ's sole prayer for relief is an injunction based on provisions

of SB 202 that DOJ says "were adopted and are being enforced *with the purpose of* denying or abridging the right to vote on account of race[.]" [Doc. 1 at 44-45] (emphasis added). DOJ has not brought a results claim, only an intentional-discrimination claim under Section 2.[3]

In short, DOJ's sole claim is based on a flawed assumption that Section 2 provides a cause of action for discriminatory intent alone. It does not. And the statement in the complaint that such a claim exists has no support in the text or in binding caselaw. The complaint must therefore be dismissed because it fails to state a claim under the Voting Rights Act.

## II.    In any event, the facts as pleaded do not establish a discriminatory purpose on the part of the General Assembly.

Even if a purpose inquiry were relevant absent a showing of discriminatory results, to establish a discriminatory purpose, DOJ would have to show that "the legislature *as a whole*" acted with such a purpose. *Brnovich*,

---

[3] This is also how DOJ publicly described this lawsuit: as attacking laws "adopted with a racially motivated *purpose*." Press Release, U.S. Dep't of Justice, Justice Department Files Lawsuit Against the State of Georgia to Stop Racially Discriminatory Provisions of New Voting Law (June 25, 2021) (emphasis added), https://www.justice.gov/opa/pr/justice-department-files-lawsuit-against-state-georgia-stop-racially-discriminatory. Scholars likewise recognize the purpose-only nature of this Section 2 case, noting its lack of a results claim. *See* Richard Pildes, *Further Analysis of the DOJ Suit Against Georgia*, ELECTION LAW BLOG (June 25, 2021, 10:43 AM) https://electionlawblog.org/?p=122841.

141 S. Ct. at 2350 (emphasis added). The facts alleged in the complaint, even when accepted as true, do not come close to satisfying this requirement.

Instead, DOJ fills its complaint with innuendo and hyperbole. But such rhetoric does not make up for the lack of any factual allegations demonstrating that the General Assembly acted with a discriminatory purpose when it passed SB 202. In fact, the complaint is notable for its failure to allege an act or statement from *any* Georgia legislator, much less by the legislature as a whole, during or before enacting SB 202, suggesting a discriminatory intent. Rather than support such allegations with facts, DOJ relies on several implausible arguments.

*First*, DOJ identifies several statements allegedly made by individuals who played no role in passing SB 202. For instance, DOJ alleges that a U.S. Senate candidate mispronounced then-Senator Harris' name months earlier. *See* [Doc. 1 ¶ 98]. Elsewhere, DOJ alleges that, over a period of multiple years, some Georgia elections involved a racially tinged "robocall," "digital advertisement," "phone call[ ]," and "GIF." *Id.* ¶¶ 97, 98, 99, 106. But those isolated allegations do nothing to support DOJ's claim of a discriminatory purpose because they are "unconnected to the passage of [SB 202]." *GBM*, 992 F.3d at 1324. DOJ does not allege that any of those isolated events (which spanned several years) involved anyone who played a role in "the passage of"

11

SB 202. *See id.* Surely if a member of the General Assembly made one of those statements, DOJ would have said so in its complaint. The failure to do so underscores the disconnect between those allegations and SB 202. DOJ cannot impute to the General Assembly statements by private individuals, simply because those individuals happen to reside in Georgia.

*Second*, DOJ identifies three statements that legislators allegedly made about absentee voting while the General Assembly was considering SB 202 or its predecessors. Two statements were made outside the legislative process— one in an op-ed and another in an interview. [Doc. 1 ¶¶ 39, 114]. In both, the legislators expressed concern about the absentee voting "process" and its electoral ramifications. *Id.* The third statement was allegedly made during a committee hearing, when a legislator stated that absentee voting is "the portion of the voting process that is most open to foolishness." *Id.* ¶ 122. None of these statements addressed race; each focused on the absentee voting process. Such concerns about absentee voting are hardly surprising, as "[f]raud is a real risk that accompanies mail-in voting[.]" *Brnovich*, 141 S. Ct. at 2348. And concerns about political ramifications are equally unsurprising. *See id.* at 2349 ("partisan motives are not the same as racial motives"); *Ricci v. DeStefano*, 557 U.S. 557, 642 (2009) (Ginsburg, J., dissenting) ("That political officials would have politics in mind is hardly extraordinary, and there are

12

many ways in which a politician can attempt to win over a constituency . . . without engaging in unlawful discrimination."). In sum, these three statements about absentee voting cannot and do not show that the "legislature as a whole" acted with discriminatory purpose. *Brnovich*, 141 S. Ct. at 2350.

Moreover, the Supreme Court has repeatedly cautioned against relying on isolated statements by legislators as indications of "the motivation behind official action." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (Rehnquist, J.); *see also Epperson v. Arkansas*, 393 U.S. 97, 113 (1968) (Black, J., concurring) (same). In fact, the Supreme Court "has recognized from Chief Justice Marshall to Chief Justice Warren that determining the subjective intent of legislators is a perilous enterprise." *Edwards v. Aguillard*, 482 U.S. 578, 636–38 (1987) (Scalia, J., dissenting) (citations omitted). As Chief Justice Warren explained, "[i]nquiries into congressional motives or purposes are a hazardous matter[,]" particularly when a court is "asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968). "What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it[.]" *Id.*; *see also Mims v. Arrow Fin. Servs.*, 565 U.S. 368, 385 (2012) (Ginsburg, J.) ("the views of a single legislator, even a bill's sponsor, are not controlling"); *NLRB v.*

*SW Gen., Inc.*, 137 S. Ct. 929, 943 (2017) (Roberts, C.J.) ("floor statements by individual legislators rank among the least illuminating forms of legislative history"); *Wallace v. Jaffree*, 472 U.S. 38, 74 (1985) (O'Connor, J., concurring) ("a court has no license to psychoanalyze the legislators"). The three statements alleged in the complaint—none of which mentions race—do not come close to suggesting a racially discriminatory purpose behind SB 202.

Of course, the proper source for determining the purpose of the statute is the statute's text. *See United States v. Am. Truckers Ass'ns*, 310 U.S. 534, 543 (1940) ("There is, of course, no more persuasive evidence of the purpose of a statute than the words by which the legislature undertook to give expression to its wishes"). SB 202 is the document on which all legislators voted and expressed their views, and it is the document that was signed into law. And that text offers not even a hint of discriminatory purpose. It contains legislative findings made by the entire General Assembly and states the law's purpose: "to address the lack of elector confidence in the election system on all sides of the political spectrum, to reduce the burden on election officials, and to streamline the process of conducting elections in Georgia by promoting uniformity in voting." SB 202 at 12:79–82. SB 202 also responded to elector "concern[ ] about allegations of rampant voter fraud." *Id.* at 4:72. Those statements are far more representative of SB 202's purpose than isolated

statements about absentee voting made by three (out of more than 230) Georgia state legislators. *See Am. Truckers*, 310 U.S. at 543.

This conclusion is supported by the challenged provisions, which fall within the purposes identified in SB 202. *See id.* (noting that courts may disregard the "literal words" of a stated purpose if it is "plainly at variance with the policy of the legislation as a whole"). For instance, requiring identification for absentee ballots helps streamline the process, making it more objective than the prior signature-matching process. *See* SB 202 at 4:73–75. In restricting approaching voters with something of value, the General Assembly recounted that "many groups" approached voters in line during recent elections, and concluded that "[p]rotecting electors from improper interference, political pressure, or intimidation while waiting in line" was critical to maintaining election integrity. *Id.* at 6:126–29.[4] Further, requiring voters to vote in their correct precincts helps "streamline the process" and, unsurprisingly, the Supreme Court recently upheld Arizona's more restrictive provision requiring voters to vote in their correct precincts. *See Brnovich*, 141

---

[4] Numerous electors complained to the Georgia Secretary of State that they were approached in line to vote by individuals attempting to influence votes. Moreover, plaintiffs in other lawsuits challenging SB 202 refer to these activities—approaching voters in line—as "political speech and expression." *See* Am. Compl. ¶ 28, *Sixth District AME v. Raffensperger*, No. 1-21-cv-01284-JPB (N.D. Ga. May 24, 2021).

S. Ct. at 2350.[5] As the challenged provisions fall squarely in line with SB 202's stated purposes, those are far more representative of the Act's purposes than the isolated statements DOJ alleges. *See Am. Truckers*, 310 U.S. at 543.

*Third*, DOJ alleges that there *must* have been a discriminatory purpose behind SB 202 because there is "a dearth of evidence" of actual "fraud"—one of the General Assembly's expressed concerns. [Doc. 1 ¶ 102]. But concerns about voter fraud were just one of several purposes behind SB 202. *See* SB 202 at 12:79-82. Moreover, the Supreme Court has implicitly rejected the idea that concerns about fraud reflect racism: "A State indisputably has a compelling interest in preserving the integrity of its election process." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam) (quotation marks omitted). And *Brnovich* made clear that when it comes to fraud, a State need not wait to "sustain some level of damage before the legislature [can] take corrective action." *Brnovich*, 141 S. Ct. at 2348; *accord Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 204 (2008) (noting the State's "valid interest in protecting the integrity and reliability of the electoral process") (cleaned up); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195–96 (1986) (legislatures are "permitted to respond to

---

[5] Arizona's law is an absolute ban on out-of-precinct voting. *See Brnovich*, 141 S. Ct. at 2350. In contrast, SB 202 provides opportunities to vote out of precinct if voters arrive after 5 P.M. and are unable to reach their home precinct before the closing of the polls. *See* SB 202 at 74:1891–78:1994.

potential deficiencies in the electoral process with foresight rather than reactively").[6] Moreover, the Eleventh Circuit has expressly recognized that in-person voter fraud sometimes occurs. *See United States v. McCranie*, 169 F.3d 723, 724 (11th Cir. 1999) ("This case involves . . . vote buying, vote selling, multiple voting, and votes cast by felons and deceased voters").

*Fourth*, DOJ focuses on Georgia's history of racial discrimination. *See* [Doc. 1 ¶¶ 30–34]. Putting aside the impropriety and offensiveness of the United States attempting to impute to Georgians of 2021 the racial bigotry of prior generations, the Supreme Court has already ruled that the Voting Rights Act, like the Constitution, is not "designed to punish for the past." *Shelby Cty. v. Holder*, 570 U.S. 529, 553 (2013); *see also Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 202 (2009) (noting that "[t]hings have changed in the South"). As the Eleventh Circuit has explained: Georgia's "racist history" is too remote to prevent it from "enacting otherwise constitutional laws about voting." *GBM*, 992 F.3d at 1325. The relevant question here is not whether legislatures in the past included racists, but whether "the legislature as a

---

[6] DOJ also suggests that without additional factual support, the "justifications proffered by proponents of SB 202 . . . are tenuous." [Doc. 1 ¶ 136(h)]. This is the type of pretext test required for claims under Title VII of the Civil Rights Act that the Supreme Court recently rejected in this context. *Brnovich*, 141 S. Ct. at 2340–41.

whole" acted with a discriminatory purpose in enacting SB 202. *Brnovich*, 141 S. Ct. at 2350. Georgia's history has no bearing on that question.[7]

*Fifth*, DOJ sprinkles innuendo throughout its complaint to suggest something nefarious behind SB 202. For instance, DOJ alleges that SB 202's co-sponsors were white, *see* [Doc. 1 ¶ 115], and that Governor Kemp signed SB 202 without "any people of color" around him, *id.* ¶ 133. Elsewhere, DOJ alleges that "[n]o Black representative" or "Black Senator voted for the bill." *Id.* ¶¶ 130, 132. But surely DOJ is not asking this Court to infer discriminatory animus based solely on the color of these legislators' skin. *Cf. Shaw v. Reno*, 509 U.S. 630, 657 (1993) ("Racial classifications of any sort pose the risk of lasting harm to our society."). And DOJ otherwise fails to include *any* facts connecting those allegations to an actual discriminatory intent by the

---

[7] DOJ's focus on Georgia's history is particularly noteworthy given its request that the Court place Georgia back under "a preclearance requirement" pursuant to Section 3(c) of the Voting Rights Act. [Doc. 1, Prayer for Relief ¶ 4]. Arguments that "the preclearance requirement" is "now unconstitutional . . . have a good deal of force" as "things have changed dramatically" in the past fifty years. *Shelby Cty.*, 570 U.S. at 547; *see also id.* at 557–58 (Thomas, J., concurring) ("I would find § 5 . . . unconstitutional"). Often, efforts to enforce the Voting Rights Act have the effect of "creat[ing] a system that forces States to segregate voters into districts based on the color of their skin." *Ala. Legislative Black Caucus v. Alabama*, 575 U.S. 254, 296 (2015) (Thomas, J., dissenting). Given the constitutional infirmities of the preclearance process, and DOJ's past discriminatory abuse of that system, the Court should reject DOJ's request to reinstate it here.

"legislature as a whole[.]" *Brnovich*, 141 S. Ct. at 2350. DOJ also suggests that the General Assembly "rushed through a hasty process to pass SB 202." [Doc. 1 ¶ 164]. But that allegation cannot hold up against other allegations in the complaint. *See id.* ¶¶ 110, 116, 118, 164 (noting that the General Assembly held hearings and floor debates about voting legislation and SB 202); *see also* SB 202 at 6:139–43 (referring to "hours of testimony"). While Georgia's elected officials may have reached a different conclusion about the facts than the current DOJ leadership wishes, that does not make the decision to vote for SB 202 insincere. And it certainly does not make it discriminatory.

## III. The complaint does not satisfy Section 2's "totality of circumstances" requirement.

The complaint also fails another requirement of Section 2, that is, that it be assessed by the "totality of circumstances." *Brnovich*, 141 S. Ct. at 2332; *see also GBM*, 992 F.3d at 1329 (Section 2 "look[s] into the totality of the circumstances"). This analysis recognizes that voters are expected to "tolerate the 'the usual burdens of voting.'" *Brnovich*, 141 S. Ct. at 2338 (quoting *Crawford*, 553 U.S. at 198 (opinion of Stevens, J.)). Accordingly, "[m]ere inconvenience cannot be enough to demonstrate a violation of [Section] 2." *Id*. Instead, DOJ must establish—and in the complaint must plausibly allege— that SB 202 denies Georgians the right to vote based on race, considering the

totality of circumstances. This DOJ has failed to do.

*First*, DOJ challenges several specific provisions of SB 202, none of which transcends "the usual burdens of voting" or "mere inconvenience." Specifically, DOJ challenges SB 202's: (i) limitation on distributing unsolicited and duplicate absentee ballot applications; (ii) absentee voting identification requirement and time periods; (iii) rules governing drop boxes; (iv) prohibition on approaching and giving something of value to voters in line; and (v) requirement that voters vote in their correct precinct. *See* [Doc. 1 ¶ 35] ("challenged provisions"). While some characterized the challenged provisions as "Jim Crow in the 21st century" (inaccurate hyperbole at best),[8] those provisions mirror voting laws across the country—including in many states where Democrats control the state houses and governorships. For example, SB 202 requires voters to request an absentee ballot "not . . . less than 11 days prior to the date of the primary or election[.]" SB 202 at 38:928–29. And many states have similar (or longer) cut-off periods for requesting ballots by mail.[9]

---

[8] President Joseph R. Biden, Jr., Stmt. on the Attack on the Right to Vote in Georgia (Mar. 26, 2021), https://www.whitehouse.gov/briefing-room/speeches-remarks/2021/03/26/statement-by-president-biden-on-the-attack-on-the-right-to-vote-in-georgia/ (hereinafter, "White House Stmt.").

[9] *See* Ariz. Rev. Stat. Ann. § 16-542(E) (11 days); Ind. Code Ann. § 3-11-4-3(a)(4) (12 days); Iowa Code § 53.2(1)(b) (15 days); Mo. Ann. Stat. § 115.279(3)

The same is true of SB 202's restriction on approaching voters in line to give them something of value. *See id.* at 73:1872–89. In New York, for instance, it is a misdemeanor to provide "any meat, drink, tobacco, refreshment, or provision" with a value over one dollar to a voter standing in line to vote. N.Y. ELEC. LAW § 17-140. So too in Montana, where anyone affiliated with a campaign is prohibited from providing food or drink to voters waiting in line. *See* MONT. CODE ANN. § 13-35-211(2). Many other states also prohibit efforts to influence voters by approaching them in line.[10] Moreover, DOJ's focus on this provision is misguided as the burden, if any, is minimal. SB 202 expressly permits "making available self-service water from an unattended receptacle to an elector waiting in line." SB 202 21:1888-89. And nothing prohibits a voter from bringing her own water or food to consume while in line.[11] Given these facts, DOJ's allegations cannot possibly make out a claim under Section 2.

Georgia also provides greater opportunities to vote in other ways, which

---

(second Wednesday before election); NEB. REV. STAT. ANN. § 32-941 (second Friday before election); 17 R.I. GEN. LAWS ANN. § 17-20-2.1(c) (21 days).

[10] *See*, *e.g.*, ARIZ. REV. STAT. ANN. § 16-1018(1); CAL. ELEC. CODE §§ 319.5, 18370; COLO. REV. STAT. § 1-13-714; CONN. GEN. STAT. § 9-236.

[11] The General Assembly also took proactive measures in SB 202 to address line length, requiring either reduction in precinct size or additional voting equipment for precincts where electors had to wait more than one hour before checking in to vote during the previous election. *See* SB 202 at 29:721-23.

confirms that any burdens imposed by SB 202's requirements are minimal, at best, when compared to the "entire system of voting[.]" *Brnovich*, 141 S. Ct. at 2339. Under SB 202, Georgia provides three full weeks of early voting, with at least two required weekend days. *See* SB 202 at 59:1488–503. Here again, Georgia's law is more expansive than New York's, which allows fewer than ten days of in-person early voting. *See* N.Y. ELEC. LAW § 8-600(1). Delaware, which has never permitted in-person early voting, will begin doing so in 2022, but only for ten days before an election. *See* DEL. CODE ANN. tit. 15, § 5402. And New Jersey permits only nine days of early voting, *see* N.J. STAT. ANN. § 19:15A-1(a)(3), through a law that former Georgia gubernatorial candidate Stacey Abrams heralded as "[s]howing the way to a better democracy[.]"[12] As for SB 202's requirement that a voter include an identification number when requesting an absentee ballot, that also tracks requirements in other states.[13] *Compare* SB 202 38:945–53, *with* MD. CODE ANN., ELEC. LAW § 9-305; WIS.

---

[12] Gov. Phil Murphy (@governorphilmurphy), FACEBOOK (Mar. 30, 2021, 11:04 AM), https://www.facebook.com/governorphilmurphy/videos/355585692414993 (statement by Stacey Abrams at time marker 9:27).

[13] Additionally, "the concept of voter identification has become broadly popular" with Democrats like U.S. Senators Warnock and Manchin, as well as former gubernatorial candidate Stacey Abrams. *See* Jonathan Weisman & Nick Corasaniti, *Why Democrats Are Reluctantly Making Voter ID Laws a Bargaining Chip*, N.Y. TIMES, (June 23, 2021) (retrieved from https://www.nytimes.com/2021).

STAT. ANN. § 6.87(1). Finally, while Georgia has allowed no-excuse absentee voting for more than a decade, states like Delaware and New York require voters to identify a reason for voting by absentee ballot. *See* DEL. CODE ANN. tit. 15, § 7571; N.Y. ELEC. LAW § 8-400(1).

These comparisons show that SB 202 tracks, or is more favorable than, the laws in many other states. Yet DOJ improperly compares SB 202 to emergency provisions in place during the recent election cycles. *See, e.g.*, [Doc. 1 ¶ 70]. That comparison is misguided as those elections took place under COVID-19's temporary emergency rules, rather than the pre-SB 202 statutory regime. For instance, while DOJ claims that SB 202 limited the availability of drop boxes for voting, *see id.* ¶ 2, SB 202 *expanded* Georgians' statutory ability to vote using drop boxes, *see* SB 202 at 5:113–18.

Far from an "un-American," "outrageous" law "pursued by Republicans," *see* White House Statement, SB 202 falls well within the mainstream of election laws across the country. While DOJ relies on inflammatory and shameful rhetoric to criticize Georgia, it is noticeably silent about similar laws in Delaware, New York, Rhode Island, New Jersey, Maryland, and Wisconsin. This rhetoric is particularly surprising because DOJ recently stated that it did "not disagree with the conclusion" that Arizona's rules governing the handling of absentee ballots and out-of-precinct voting did not violate "Section 2's results

23

test[.]" Feb. 16, 2021 Ltr. from E. Kneedler to S. Harris, *Brnovich*, 141 S. Ct. 2321 (2021) (No. 19-1257). But it now castigates similar (and more voter-friendly) rules in Georgia as "un-American." The challenged provisions clearly do not exceed the "usual burdens of voting" and DOJ thus fails to state a claim that SB 202 violates Section 2. *Crawford*, 553 U.S. at 198.

*Second*, DOJ's focus on absentee voting is misplaced. By placing such focus on one voting method, *see* [Doc. 1 ¶¶ 22, 35, 36–42], DOJ overlooks that a potential "burden on some voters" is insufficient. *Crawford*, 553 U.S. at 202–03. Instead, "courts must consider the opportunities provided by a State's entire system of voting[.]" *Brnovich*, 141 S. Ct. at 2339. A review of Georgia's "entire system" shows that its election laws are among the least restrictive in the country for absentee and early voting accessibility.[14] SB 202 affords voters multiple options for voting (early in-person, absentee by mail, and election day), multiple options for returning absentee ballots (by mail, drop box, or in-person at county election offices), and the complaint does not provide any basis for invalidating SB 202 due simply to "the peculiar circumstances of individual voters." *Crawford*, 553 U.S. at 204–06 (Scalia, J., concurring); *see also New Ga. Project*, 976 F.3d at 1281 (noting "numerous avenues" to vote in Georgia);

---

[14] Ctr. for Election Innovation & Research, *How Easy is it to Vote Early in Your State?*, https://electioninnovation.org/research/early-voting-availability-2022/.

*Brnovich*, 141 S. Ct. at 2339 ("where a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means").

DOJ's focus on absentee voting is also misplaced because Congress certainly did not "intend[ ]" Section 2 to require voting methods that did not exist in 1982 when Section 2 was amended. *Brnovich*, 141 S. Ct. at 2339; *see also McDonald v. Bd. of Election Comm'rs of Chi.*, 394 U.S. 802, 807–08 (1969) (limitations on absentee voting "do not themselves deny [voters] the exercise of the franchise"). As *Brnovich* held, "it is relevant that in 1982 States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots." *Brnovich*, 141 S. Ct. at 2339.

Accordingly, in addition to failing to plead any discriminatory effect, the complaint fails to allege facts plausibly establishing a violation of Section 2 under the "totality of circumstances," and should be dismissed.

## CONCLUSION

The complaint rests on political posturing rather than a serious *legal* challenge to SB 202. It fails to state even a colorable claim under Section 2 based on controlling law, and must be dismissed.

Respectfully submitted this 28th day of July, 2021.

Christopher M. Carr
Attorney General
Georgia Bar No. 112505
Bryan K. Webb
Deputy Attorney General
Georgia Bar No. 743580
Russell D. Willard
Senior Assistant Attorney General
Georgia Bar No. 760280
Charlene McGowan
Assistant Attorney General
Georgia Bar No. 697316
**State Law Department**
40 Capitol Square, S.W.
Atlanta, Georgia 30334

*/s/ Gene C. Schaerr*
Gene C. Schaerr*
Special Assistant Attorney General
Erik Jaffe*
H. Christopher Bartolomucci*
Brian J. Field*
Riddhi Dasgupta*
**SCHAERR | JAFFE LLP**
1717 K Street NW, Suite 900
Washington, DC 20006
Telephone: (202) 787-1060
gschaerr@schaerr-jaffe.com
*Admitted pro hac vice*

Bryan P. Tyson
Special Assistant Attorney General
Georgia Bar No. 515411
Bryan F. Jacoutot
Georgia Bar No. 668272
Loree Anne Paradise
Georgia Bar No. 382202
**Taylor English Duma LLP**
1600 Parkwood Circle, Suite 200

26

Atlanta, Georgia 30339
Telephone: (678) 336-7249
btyson@taylorenglish.com

*Counsel for Defendants*

**CERTIFICATE OF COMPLIANCE**

Pursuant to L.R. 7.1(D), the undersigned hereby certifies that the foregoing Brief in Support of Defendants' Motion to Dismiss Complaint has been prepared in Century Schoolbook 13, a font and type selection approved by the Court in L.R. 5.1(B).

*/s/ Gene C. Schaerr*
Gene C. Schaerr