## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff,*

    v.

THE STATE OF GEORGIA, *et al.,*

    *Defendants,*

REPUBLICAN NATIONAL
COMMITTEE, *et al.,*

    *Intervenor-Defendants.*

CIVIL ACTION

CASE NO. 1:21-CV-02575-JPB

## AMICUS BRIEF OF GREATER GEORGIA ACTION, INC. IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS COMPLAINT

MICHAEL BEST & FRIEDRICH LLP
Stefan Passantino, GA SBN 565845
1000 Maine Avenue SW, Suite 400
Washington, D.C. 20024
Telephone: (202) 747-9582
Facsimile: (202) 347-1819
spassantino@michaelbest.com
*Attorney for Greater Georgia Action, Inc.*

## CERTIFICATE OF INTERESTED PERSONS AND CORPORATE DISCLOSURE STATEMENT

**(1)** The undersigned counsel for *Amici*, Greater Georgia Action, Inc., certifies that the following is a full and complete list of all parties in this action, including any parent corporation and any publicly held corporation that owns 10% or more of the stock of a party:

    i.    United States of America, Plaintiff.

    ii.    The State of Georgia, Defendant.

    iii.    The Georgia State Election Board, Defendant.

    iv.    Brad Raffensperger, in his official capacity as Georgia Secretary of State, Defendant.

    v.    Republican National Committee, Intervenor-Defendant.

    vi.    National Republican Senatorial Committee, Intervenor-Defendant.

    vii.    Georgia Republican Party Inc., Intervenor-Defendant.

    viii.    Public Interest Legal Foundation, Movant.

    ix.    Greater Georgia Action, Inc., Movant.

**(2)** The undersigned further certifies that the following is a full and complete list of all other persons, associations, firms, partnerships, or corporations having either a financial interest in or other interest which could be substantially affected by the outcome of this particular case:

    i.     Kelly Loeffler, Chairwoman, Greater Georgia Action, Inc.

    ii.    Rebecca N. Sullivan: Vice Chair, Georgia State Election Board.

    iii.   Sara Tindall Ghazal: Member, Georgia State Election Board.

    iv.   Matthew Mashburn: Member, Georgia State Election Board.

    v.    Anh Le: Member, Georgia State Election Board.

    vi.   Aileen Bell Hughes: Attorney for the Plaintiff.

    vii.   Elizabeth M. Ryan: Attorney for the Plaintiff.

   viii.   Ernest Alan McFarland: Attorney for the Plaintiff.

    ix.   Jasmyn Gabrielle Richardson: Attorney for the Plaintiff.

    x.    John A. Russ, IV: Attorney for the Plaintiff.

    xi.   Thomas Christian Herren, Jr.: Attorney for the Plaintiff.

    xii.   Brian Field: Attorney for the Defendant, The State of Georgia.

    xiii.   Erik Scott Jaffe: Attorney for the Defendant, The State of Georgia.

    xiv.   Gene C. Schaerr: Attorney for the Defendant, The State of Georgia.

    xv.   H. Christopher Bartolomucci: Attorney for the Defendant, The State of Georgia.

    xvi.   Joshua J. Prince: Attorney for the Defendant, The State of Georgia.

    xvii.   Riddhi Dasgupta: Attorney for the Defendant, The State of Georgia.

xviii.   Bryan Francis Jacoutot: Attorney for the Defendant, The State of
Georgia.

xix.   Bryan P. Tyson: Attorney for the Defendant, The State of Georgia.

xx.   Loree Anne Paraside: Attorney for the Defendant, The State of
Georgia.

xxi.   Brian Field:  Attorney for the Defendant, The Georgia State Election
Board.

xxii.   Erik Scott Jaffe:  Attorney for the Defendant, The Georgia State
Election Board.

xxiii.   Gene C. Schaerr:  Attorney for the Defendant, The Georgia State
Election Board.

xxiv.   H. Christopher Bartolomucci:  Attorney for the Defendant, The
Georgia State Election Board.

xxv.   Joshua J. Prince:  Attorney for the Defendant, The Georgia State
Election Board.

xxvi.   Riddhi Dasgupta:  Attorney for the Defendant, The Georgia State
Election Board.

xxvii.   Bryan Francis Jacoutot:  Attorney for the Defendant, The Georgia
State Election Board.

xxviii.   Bryan P. Tyson:  Attorney for the Defendant, The Georgia State
Election Board.

xxix.   Loree Anne Paradise:  Attorney for the Defendant, The Georgia
State Election Board.

xxx.  Brian Field:  Attorney for the Defendant, Brad Raffensperger.

xxxi.  Erik Scott Jaffe:  Attorney for the Defendant, Brad Raffensperger.

xxxii.  Gene C. Schaerr:  Attorney for the Defendant, Brad Raffensperger.

xxxiii.  H. Christopher Bartolomucci:  Attorney for the Defendant, Brad Raffensperger.

xxxiv.  Joshua J. Prince:  Attorney for the Defendant, Brad Raffensperger.

xxxv.  Riddhi Dasgupta:  Attorney for the Defendant, Brad Raffensperger.

xxxvi.  Bryan Francis Jacoutot:  Attorney for the Defendant, Brad Raffensperger.

xxxvii.  Bryan P. Tyson:  Attorney for the Defendant, Brad Raffensperger.

xxxviii.  Loree Anne Paradise:  Attorney for the Defendant, Brad Raffensperger.

xxxix.  Cameron T. Norris: Attorney for the Intervenor Defendant, Republican National Committee.

xl.  Steven Christopher Begakis: Attorney for the Intervenor Defendant, Republican National Committee.

xli.  Tyler R. Green: Attorney for the Intervenor Defendant, Republican National Committee.

xlii.  Alex Benjamin Kaufman: Attorney for the Intervenor Defendant, Republican National Committee.

xliii.  James Cullen Evans: Attorney for the Intervenor Defendant, Republican National Committee.

xliv.   John E. Hall, Jr.: Attorney for the Intervenor Defendant, Republican National Committee.

xlv.   William Bradley Carver: Attorney for the Intervenor Defendant, Republican National Committee.

xlvi.   William Dowdy White: Attorney for the Intervenor Defendant, Republican National Committee.

xlvii.   Cameron T. Norris: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

xlviii.   Steven Christopher Begakis: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

xlix.   Tyler R. Green: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

l.   Alex Benjamin Kaufman: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

li.   James Cullen Evans: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

lii.   John E. Hall, Jr.: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

liii.   William Bradley Carver: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

liv.   William Dowdy White: Attorney for the Intervenor Defendant, National Republican Senatorial Committee.

lv.  Cameron T. Norris: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lvi.  Steven Christopher Begakis: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lvii.  Tyler R. Green: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lviii.  Alex Benjamin Kaufman: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lix.  James Cullen Evans: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lx.  John E. Hall, Jr.: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lxi.  William Bradley Carver: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lxii.  William Dowdy White: Attorney for Intervenor Defendant, Georgia Republican Party, Inc.

lxiii.  Kaylan L. Phillips:  Attorney for Movant, Public Interest Legal Foundation.

lxiv.  Harry W. MacDougald:  Attorney for Movant, Public Interest Legal Foundation.

lxv.  Stefan Passantino:  Attorney for Movant, Greater Georgia Action, Inc.

## INTEREST OF AMICUS CURIAE[1]

GREATER GEORGIA ACTION, INC. ("Greater Georgia"), is a non-profit organization operating under § 501(c)(4) of the Internal Revenue Code.

Greater Georgia has a vital interest in the outcome of this matter and can assist this court in addressing core issues in the case. First, this court's disposition of the issues presented will profoundly affect Greater Georgia's important goals of advocating for and supporting election law reforms, such as Georgia Senate Bill 202 known as the "Election Integrity Act of 2021" (hereinafter, the "Act"), which strengthen election transparency, integrity and uniformity. Second, Greater Georgia can assist this court in addressing several core issues and presenting an important perspective from an organization dedicated to registering and engaging voters in diverse communities.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The inflammatory allegations contained in Plaintiff's Complaint (hereinafter, the "Complaint") are not only demonstrably false and not based in reality, but even if true, fail to state a valid claim under §2 of the Voting

---

[1] No party's counsel authored this brief in whole or in part; and no party, party's counsel, or person (other than amicus or its counsel) contributed money to fund this brief's preparation or submission.

Rights Act of 1965 (hereinafter, the "VRA").  Plaintiff further lacks standing to bring its claims directly under the Fourteenth and Fifteenth Amendments to the United States Constitution.

The recent decision by the Supreme Court in *Brnovich v. Democratic Nat'l Comm.*, 594 U.S. ___, 141 S. Ct. 2321 (2021), is directly on point, binding upon this court and requires the dismissal of the Complaint. In *Brnovich* the Supreme Court, for the first time, addressed a challenge under § 2 of the VRA to state regulations that govern how ballots are collected and counted. *Id.* at *1. The challenges asserted against the Arizona laws in *Brnovich* are virtually identical to the challenges asserted in this case.

The *Brnovich* Court held that a valid claim under §2 of the VRA requires "proof" that the challenged state law or regulation establishes processes that "are not *equally open* to participation" by members of a protected class "*in that its members have less opportunity* than other members of the electorate to participate in the political process and elect representatives of their choice." *Id.* at *6 (emphasis in original). The Court made clear that "the mere fact that there is some disparity in impact," even if shown to exist, does not establish a violation. *Id.* at *18.

Like the parties challenging Arizona's laws in *Brnovich*, Plaintiff in this case would have a violation of §2 of the VRA "turn almost entirely on one

circumstance—disparate impact." *Id.* Because Plaintiff has only *alleged some potential* disparity in impact and because the plain language of Georgia's election law, including the Act, uniformly provide everyone an equal opportunity to vote, the Court should dismiss the Complaint.

Plaintiff further lacks standing to bring this suit directly under the Fourteenth or Fifteenth Amendments to the United States Constitution.

## ARGUMENT

The allegations contained in the Complaint, even if taken as true, cannot result in a violation of §2 of the VRA.  The Complaint is based on alleged "disproportionate effect," which is insufficient as a matter of law to maintain this action. *See Dkt. #1;* Complaint at ¶¶1-2, 162.

Even if this court were to review the merits of the Complaint, there is no case here. Georgia law, including the changes made by the Act, is "equally open" and makes it very easy to vote. The Election Integrity Act of 2021 is attached to Plaintiff's Complaint as Exhibit 1, Dkt. #1-1 (hereinafter "Ex. 1"). Georgia has one of the most open and accessible voting systems in the country and none of Georgia's existing laws are outside of the mainstream.  In fact, many of the reforms contained in the challenged Act expand voters' access to the ballot box.

Instead of asking this court to properly apply §2 of the VRA, as written, Plaintiff asks this court to apply a different standard in order to achieve the political policy goals of the current Administration.

## I.   *Brnovich* Requires Dismissal of Plaintiff's Complaint.

*Brnovich* is controlling and dispositive of the Complaint. Because Plaintiff does not (and cannot) allege that the Act creates a system that provides Black Georgians ***less opportunity than other members*** of the electorate to participate, its Complaint must be dismissed.

The *Brnovich* Court established what is required for a violation of §2 of the VRA. Section 2 of the VRA is violated only if there is a showing that a state's electoral processes "are not 'equally open to participation' by members of the relevant protected group 'in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.'" *Brnovich*, 594 U.S. at *14 (quoting 52 U.S.C. §10301 (§2(b) of the VRA)).  The "mere fact that there is some disparity in impact," even if shown to exist, is insufficient. *Id*. at *18.

The "touchstone" of §2 is "equal openness," meaning that the process of voting "must be 'equally open' to minority and non-minority groups alike . . . without restrictions as to who may participate." *Id*. at *15.

4

In *Brnovich*, the Democratic National Committee (DNC) and its affiliates challenged portions of Arizona's election laws, including a requirement that voters cast ballots at the correct precinct and a common restriction on collecting absentee ballots. *Id.* at *9. Specifically, the DNC, like Plaintiff in this case, alleged that both requirements "adversely and disparately affect Arizona's American Indian, Hispanic, and African American citizens." *Id.* Because Arizona's electoral system, as a whole, including the challenged laws, is equally open to participation by all members of the electorate the Court rejected all of the DNC's claims—establishing that some disparate impact, even if true, is insufficient to maintain a claim under §2 of the VRA. *Id.* at *26.

Similarly, Plaintiff in this case bases its challenges, under §2 of the VRA, on allegations of some potential disparity in impact. Plaintiff claims that several provisions of the Act will have a disparate impact on Black Georgians. While Plaintiff asserts socio-economic statistics and repeats toxic allegations of overt racism with highly inflammatory rhetoric, the legal insufficiency of its Complaint is laid bare within several paragraphs of its cause of action, which relies exclusively on disparate impact: "Black voters will be disproportionately burdened by the challenged provisions." Dkt. #1; Complaint at ¶162.

Plaintiff does not, and cannot, point to any aspect of any challenged provisions that is not equally and uniformly applied to the entire electorate nor

can it identify any special restriction on Blacks' participation in Georgia's electoral process. Like Arizona, Georgia law makes it very easy to vote and the Act establishes reasonable, uniform and non-discriminatory rules that do not violate §2 of the VRA.

## II.   The Election Integrity Act of 2021 Established Reasonable, Uniform and Non-Discriminatory Rules.

The Act expands early and absentee voting in several different ways while codifying election practices, such as ballot drop boxes, instituted as "emergency rules" in 2020 due to the coronavirus pandemic, along with importantly adding safeguards and improving transparency.

The Georgia Legislature set forth express findings and the important and strong state interests that the Act addresses. Following the 2018 and 2020 elections, a significant lack of confidence in the outcomes of elections in Georgia has grown on both sides of the political spectrum. Moreover, the coronavirus pandemic resulted in massive changes in election regulations and exposed a lack of uniformity and lack of adequate safeguards in place for absentee and early voting. Dkt. #1; Ex. 1 at 4:76-83. The lack of uniformity between different counties in Georgia was extreme—some counties had many days of weekend voting including Sundays, whereas over 100 counties never offered any voting

on Sunday. *Id.* at 4:84-90. Some counties received significant private funds for election administration, whereas other counties received none. *Id.* at 4:91-93.

There was also a need to address "emergency rules," instituted because of the coronavirus pandemic, but such "rules" had no statutory framework for uniform application or safeguards. For example, drop boxes for absentee ballots were a creation of temporary emergency rules for 2020 ***and have since expired***. *Id.* at 5:113-118. Claims that the Act directly causes a "precipitous decline in drop box availability" is disingenuous at best. Prior to its enactment no drop boxes were allowed in any county—***the Act actually increases drop boxes*** in Fulton County from zero to about eight, in Gwinnett County from zero to about six and in DeKalb and Cobb Counties from zero to about five each.

The Act appropriately addresses two of Greater Georgia's goals—strengthening election integrity and promoting uniformity in election laws. As an organization committed to engaging communities across the Peach State, Greater Georgia connects with voters daily who feel left out of the political process and lack trust in the administration of elections and the ultimate electoral outcomes. Additionally, because its mission extends throughout all 159 counties, Greater Georgia has seen the confusion and inequities caused by a lack of uniformity in the administration of Georgia's elections. The Act

addresses these issues in a way that maintains the equal openness of Georgia's elections.

### A. Ballot Drop Boxes

For the first time in Georgia's history the challenged Act codifies the ability of counties to provide drop boxes for the collection of absentee ballots—***increasing voter access***. The Act importantly sets forth ***safeguards*** and creates ***uniformity*** in how counties may utilize drop boxes.  In 2020, only as a result of emergency rules, drop boxes were utilized in masse without any standard for safeguards or any uniformity throughout the state.

Greater Georgia witnessed how the unregulated and non-standardized use of drop boxes contributed to a lack of trust in the election process in 2020. While counties in the greater Atlanta region had nearly 100 drop boxes, 35 counties throughout Georgia did not have a single drop box available to voters. Mark Niesse, *Drop box use heavy in Democratic areas before Georgia voting law*, The Atlanta Journal-Constitution, July 12, 2021, *available at* https://www.ajc.com/politics/drop-box-use-soared-in-democratic-areas-before-georgia-voting-law/N4ZTGHLWD5BRBOUKBHTUCFVOEU/.

The Act standardizes the number of drop boxes allowed in each county, while still allowing counties with larger populations to have more drop boxes. Specifically, the Act requires that each county establish at least one drop box

for the delivery of absentee ballots and allows additional drop boxes based on population. Dkt. #1-1; Ex. 1 at 47:1172-1179.

Perhaps more importantly to voters' confidence in the election system, the Act institutes reasonable and equally applied safeguards and security requirements for drop boxes.  In 2020 drop boxes were unregulated and lacked necessary security—the Act secures the drop boxes and the public trust in use of drop boxes. Drop boxes must be adequately lit, under constant supervision by an election official, law enforcement officer or licensed security guard and must be tamper proof and not allow for removal except under specific processes by election officials. *Id.* at 47-48:1179-1219.

The Act's codification of ballot drop boxes will help achieve uniformity of election procedures and, most importantly, restore voters' confidence in the integrity of ballot drop box practices.

## B. Absentee Ballot Applications

As an organization dedicated to voter outreach and expanding voter participation throughout Georgia, Greater Georgia understands the importance of encouraging public participation in elections. However, the 2020 election saw significant confusion caused by outside groups sending multiple absentee ballot applications to voters—often unsolicited and often with incorrectly completed information. *Id.* at 5:102-105. The Act appropriately

addresses this problem by prohibiting outside groups from completing information required from a voter on an application and prohibiting sending applications to voters that have already requested applications. *Id.* at 39-40:965-994. This prevents the confusion caused by incorrectly completed applications and also avoids further confusion by voters receiving duplicate applications.

Before the Act, the safeguard in place to verify the correct identity of an elector voting by absentee ballot was via signature-matching requirements. The subjective nature of signature-matching, however, made the requirements ineffective and open to ongoing challenge and controversy. In order to ensure that an individual requesting and casting an absentee ballot is who they say they are, the Act appropriately requires valid identification. *Id.* at 38-39:944-964. Reasonable measures, such as those in the Act, that require voters to prove they are valid electors are imperative to restoring trust in Georgia's elections.

The Act's restrictions on outside groups and identification requirements will help achieve election integrity and restore voters' confidence.

### C. Out-of-Precinct Voting

The 2018 and 2020 elections also identified problems created by out-of-precinct voting that resulted in confusion, additional burdens on election

officials and a large increase in duplicated ballots. *Id.* at 6:130-138. Reducing confusion and duplicated ballots will increase voters' confidence in election outcomes. The Act appropriately addresses this problem by limiting the use of provisional ballots for out-of-precinct voters. Under the Act a voter attempting to vote in the incorrect precinct must be directed to the correct precinct, unless it is after 5pm (but before the closing of the polls) in which case a voter may cast a provisional ballot. *Id.* at 74-75:1899-1919. This both allows the voter to cast a non-provisional ballot in the correct precinct, but also allows the casting of a provisional ballot when there is insufficient time for the voter to vote in the correct precinct. The new requirements do not impact the ability of any voters to cast a correct ballot, but they do significantly limit the number of provisional ballots and ultimately duplicate ballots generated.

The reasonable limitations placed on out-of-precinct voting will achieve the strong state interest in election integrity and restore voters' confidence in election outcomes while relieving the increasing burdens on election officials.

Viewed objectively and in consideration of the totality of the circumstances, the Act maintains Georgia's place as a state where it is very easy to vote while addressing recent problems, adding reasonable and uniform safeguards and maintaining no-excuse absentee voting. The Act further expands voters' access by increasing hours for early voting and access to

absentee ballots by allowing for 29 days of mail-in voting and up to 19-days of in-person early voting. *Id.* at 49:1234; 59:1488-1489.  Georgia is in the top-tier of all states for access to early voting according to the non-partisan Center for Election Innovation and Research whereas states such as Connecticut and New Hampshire have much more restrictive voting laws requiring an excuse to vote absentee and not allowing all voters to vote early. *See* Center for Election Innovation & Research, *How Easy Is It to Vote Early in Your State?* (July 27, 2021, 3:05 PM), https://electioninnovation.org/research/early-voting-availability-2022/. Currently Delaware, New York and 13 other states, require an excuse to vote absentee. *Id.*

Plaintiff's Complaint is a veiled request for this Court to institute a policy outcome for a perceived political benefit of the current Administration.

## III.   Plaintiff's Action Inappropriately Seeks to Obtain A Policy Outcome.

Although Plaintiff's Complaint is veiled as a claim under §2 of the VRA, in effect Plaintiff is asking this Court to ignore the plain and unambiguous language of §2, overrule both *Shelby County v. Holder*, 570 U.S. 529 (2013) and *Brnovich*, and instead apply a different standard in order to achieve the political policy goals of the current Administration.

The current version of §2 is a result of the last time Congress amended the VRA in 1982. Originally the House of Representatives passed a version of §2 that *would have* based a violation on discriminatory ***effects***. However, as explained in *Brnovich*, "[t]he House bill "originally passed . . . under a loose understanding that §2 would prohibit all discriminatory 'effects' of voting practices . . . met stiff resistance in the Senate." *Brnovich*, 594 U.S. at *6 (citing *Mississippi Republican Executive Committee v. Brooks*, 469 U.S. 1002, 1010 (1984) (Rehnquist, J., dissenting)). Ultimately the disparate impact standard was expressly rejected by the Senate and a compromise was eventually reached to arrive at today's version of §2, which does not base a violation on a showing of disparate impact. *Id.* Plaintiff in this case would have this court ignore the plain and unambiguous text of the statute and instead apply the standard desired by the House in 1982 and which failed to become law. In fact, the legislative history makes clear that the Senate expressly rejected a disparate impact standard before today's version of §2 was ultimately passed. *Id.*

In addition to Plaintiff's desire to undo the compromise reached by the House and Senate when §2 was amended in 1982, Plaintiff seeks to effectively overturn *Shelby*. Plaintiff asks this court to apply the much higher standard previously used under §§4 and 5 of the VRA. Section 4 of the VRA provided a coverage formula for determining states or political subdivisions that could not

enact certain new election laws without obtaining "preclearance" from Washington D.C. under §5 of the VRA. *Shelby*, 570 U.S. 529, 537-40 (2013).  In stark contrast to §2 at issue here, the standard under §§4 and 5 was whether or not the challenged law "***will have the effect of*** diminishing the ability of any citizens of the United States on account of race or color," *i.e.* disparate impact. 52 U.S.C. § 10304(b).  Because the United States Supreme Court held in *Shelby* that §4 of the VRA was unconstitutional and could no longer be used as a basis for subjecting jurisdictions to preclearance under §5, Plaintiff improperly asks this Court to instead apply the old §5 standard to its challenge under §2 despite the divergent language. *Shelby*, 570 U.S. at 557.

The current Administration may desire for a more stringent standard, would prefer the original House version of §2 and that *Shelby* is overruled, but this case and this court are not the proper forums for such political policy determinations. This court should abide by *Brnovich*, "follow the law as written and leave the policy decisions for others." *Ga. Ass'n of Latino Elected Officials, Inc. v. Gwinnett Cty. Bd. Of Reg. & Elections,* 499 F. Supp 3d 1231, 1235 (N.D. Ga. 2020).

**IV.    Plaintiff Does Not Have Standing to Bring Claims Directly Under the Fourteenth or Fifteenth Amendments.**

In addition to insufficient allegations that the Act violates the VRA, Plaintiff attempts to assert general claims directly under the U.S. Constitution. *See, e.g.,* Complaint at ¶158 (asserting that the Act violates "the voting guarantees of the Fourteenth and Fifteenth Amendments") and at p. 45 (asserting that the Act violates "the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution."). The VRA expressly confers standing upon Plaintiff to bring a civil action *to enforce §2 of the VRA*. 52 U.S.C. §10308(d). However, without a valid claim under the appropriate standard of §2 of the VRA, as explained above, all that remains in Plaintiff's Complaint are generalized grievances under the Fourteenth and Fifteenth Amendments for which it lacks standing.

The "bedrock requirement" for any action in federal court is that there must be an actual "case" or "controversy" brought by a plaintiff with "standing." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 471 (1982). As this court is very familiar, a plaintiff has the burden of establishing standing on all claims, which requires allegations of

"*personal injury* fairly traceable to the defendant's allegedly unlawful conduct . . ." *Allen v. Wright*, 468 U.S. 737, 751 (1984) (emphasis added). The Supreme Court has stressed that such injury must be "particularized" to the individual plaintiff—meaning that "the injury must affect the plaintiff in a personal and individual way." *Raines v. Byrd*, 521 U.S. 811, 819 (1997) (citing *Lujan*, 504 U.S. at 560-61; *Bender v. Williamsport Area School Dist.*, 475 U.S. 534, 543-44 (1986)). Strict compliance with this requirement for jurisdictional standing is required. *Raines*, 521 U.S. at 819.   A "generalized grievance" asserting a violation of some provision of the structural Constitution does not provide standing, a plaintiff must demonstrate a separate concrete injury-in-fact. *Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990). It is wholly insufficient for a plaintiff to raise "only a generally available grievance about government." *Lujan*, 504 U.S. at 573-74. Claiming only harm to "every citizen's interest in proper application of the Constitution and laws . . . does not state an Article III case or controversy." *Id.*

In this case Plaintiff has not alleged any personal and/or particularized injury.  Plaintiff has simply alleged that the Act violates "the voting guarantees of the Fourteenth and Fifteenth Amendments to the United States Constitution." This is exactly the type of general and amorphous claimed "harm" to every citizen's interest in the proper application of the Constitution

the Supreme Court has consistently held does not present a justiciable case or controversy. Moreover, the claim is not even made by a citizen whose right to vote is protected by the Fourteenth and Fifteenth Amendments—it is being made by the current Administration for political purposes. The Constitution "divides power among sovereigns and among branches of government" for the protection of *individual* liberties. *New York v. United States*, 505 U.S. 144, 187 (1992). Institutions formed under the Constitution, such as the Executive in this case, are not the beneficiaries of its protections—individual citizens are.

Because Plaintiff has simply alleged a generalized grievance that the voting rights of others may be impacted, it has failed to present a justiciable case or controversy and lacks standing for its Constitutional claims.

## CONCLUSION

For these reasons, the court should grant the Defendants' motion to dismiss.

Respectfully submitted this 29th day of July 2021

MICHAEL BEST & FRIEDRICH LLP

By: */s/ Stefan Passantino*
Stefan Passantino, Georgia Bar No. 565845
1000 Maine Avenue SW, Suite 400
Washington, D.C. 20024
Telephone: (202) 747-9582
Facsimile: (202) 347-1819
spassantino@michaelbest.com

*Attorney for Greater Georgia Action, Inc.*

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 29, 2021, I electronically filed the foregoing ***Amicus Brief of Greater Georgia Action, Inc. in Support of Defendants' Motion to Dismiss Complaint*** with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

Dated this 29th day of July 2021.

MICHAEL BEST & FRIEDRICH LLP

By: *_/ s/ Stefan Passantino___*
 Stefan Passantino,
Georgia Bar No. 565845
*Attorney for Greater Georgia Action, Inc.*

18

## <u>CERTIFICATE OF COMPLIANCE WITH LR 5.1</u>

I hereby certify that the foregoing document is written using computer processing software in 13-point Century Schoolbook font, double-spaced and in accordance with the other requirements of Local Rule 5.1.

Dated this 29th day of July 2021.

MICHAEL BEST & FRIEDRICH LLP

By: _/s/ Stefan Passantino_
Stefan Passantino
Georgia Bar No. 565845
*Attorney for Greater Georgia Action, Inc.*