# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

UNITED STATES OF AMERICA,

    *Plaintiff,*

v.

THE STATE OF GEORGIA, *et al.*,

    *Defendants*.

Case No. 1:21-cv-02575-JPB

**Amici Curiae Brief of the American Center for Law and Justice, and
57 Members of Congress, in Support of Defendants' Motions to Dismiss**

EDWARD L. WHITE III*
ERIK M. ZIMMERMAN*
AMERICAN CENTER FOR LAW & JUSTICE
3001 Plymouth Rd., Ste. 203
Ann Arbor, MI 48105

 * not admitted to this Court

*Counsel for Amici*

JAY ALAN SEKULOW (Ga. Bar #634900)
  *Lead Counsel for Amici*
STUART J. ROTH*
ANDREW J. EKONOMOU
JORDAN SEKULOW*
AMERICAN CENTER FOR LAW & JUSTICE
201 Maryland Ave, NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309
sekulow@aclj.org

# Table of Contents

Introduction...........................................................................................................1

Argument................................................................................................................2

I.  The Elections Clause of the United States Constitution gives state legislatures broad authority to regulate the times, places, and manner of elections. ...............................................................................................2

II.  The Elections Clause gives Congress, *not the executive branch or the federal courts*, the authority to override state laws regulating the times, places, and manner of elections if a State abuses its Elections Clause power....................6

III.  In light of the Elections Clause and the constitutional principles of federalism and separation-of-powers, Section 2 of the VRA must be interpreted and applied in a manner that sufficiently respects the broad authority of state legislatures. ........................................................12

    A.  Georgia's substantial state interests, such as preventing voter intimidation and fraud, must be given significant weight.................13

    B.  Allegations that some voters may experience minor inconveniences and unremarkable burdens are insufficient to override Georgia's important interests. ...........................................................17

    C.  The political partisanship that is often part and parcel of the process of regulating elections does not constitute discrimination on the basis of race, nor does it provide a basis for a viable VRA Section 2 cause of action. ................................................................................19

Conclusion ..........................................................................................................22

Font Certification Under Local Rule 7.1(D)..........................................................22

i

## Table of Authorities

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305 (2018) ...................................................21

*Anderson v. Celebrezze*, 460 U.S. 780 (1983) ...............................9, 16, 20

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*,
  576 U.S. 787 (2015) ...................................................................5, 6, 11

*Arizona v. Inter Tribal Council of Ariz., Inc.*, 570 U.S. 1 (2013) .........................2, 7

*Bond v. United States*, 564 U.S. 211 (2011) .............................................5

*Bond v. United States*, 572 U.S. 844 (2014) ..........................................5, 8

*Brnovich v. DNC*, Nos. 19-1257 and 19-1258, 2021 U.S. LEXIS 3568
  (U.S. July 1, 2021) ...........................................................................*passim*

*Burdick v. Takushi*, 504 U.S. 428 (1992) ............................... 4, 14, 16-18

*Burson v. Freeman*, 504 U.S. 191 (1992) ........................................ 15-16

*Bush v. Gore*, 531 U.S. 98 (2000) ..........................................................1

*Chisom v. Roemer*, 501 U.S. 380 (1991) ...............................................12

*Clingman v. Beaver*, 544 U.S. 581 (2005) ............................................17

*Cook v. Gralike*, 531 U.S. 510 (2001) ....................................................3

*Cooper v. Harris*, 137 S. Ct. 1455 (2017) ............................................21

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008)............. 11, 13, 15-19

*DNC v. Wis. State Legis.*, 141 S. Ct. 28, 2020 U.S. LEXIS 5187
  (U.S. Oct. 26, 2020) .........................................................9, 14, 18, 19

*FEC v. Wis. Right to Life*, 551 U.S. 449 (2007) ........................................................1

*Frank v. Walker*, 768 F.3d 744 (7th Cir. 2014) ......................................................13

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)...........................................................5, 8

*Griffin v. Roupas*, 385 F.3d 1128 (7th Cir. 2004)................................... 3, 10-11, 14

*Jacobson v. Florida Sec'y of State*, 974 F.3d 1236 (11th Cir. 2020) ............9, 10, 21

*Lee v. Va. State Bd. of Elections*, 843 F.3d 592 (4th Cir. 2016).............................17

*McConnell v. FEC*, 540 U.S. 93 (2003).....................................................................1

*Munro v. Socialist Workers Party*, 479 U.S. 189 (1986).........................................16

*O'Brien v. Skinner*, 414 U.S. 524 (1974).................................................................14

*Ohio Democratic Party v. Husted*, 834 F.3d 620 (6th Cir. 2016) .....................10, 18

*Purcell v. Gonzalez*, 549 U.S. 1 (2006) .............................................................13, 14

*Roudebush v. Hartke*, 405 U.S. 15 (1972) .................................................................3

*Rucho v. Common Cause*, 139 S. Ct. 2484 (2019) ........................................ 7-10, 20

*Shelby Cnty. v. Holder*, 570 U.S. 529 (2013) ........................................................5, 8

*Smiley v. Holm*, 285 U.S. 355 (1932) ........................................................................3

*Storer v. Brown*, 415 U.S. 724 (1974) ..........................................................4, 17, 18

*Sugarman v. Dougall*, 413 U.S. 634 (1973) ..............................................................5

*Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986)............................3, 11

*Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) .............................15

*Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136
   (5th Cir. 2020)..................................................................................5, 10, 14, 15

*Timmons v. Twin Cities Area New Party*, 520 U.S. 351 (1997).........................4, 16

*U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779 (1995) ..............................3, 6, 13

## Constitutions and Statutes

U.S. Const. art. I, § 4, cl. 1.............................................................................*passim*

U.S. Const. Amend. X......................................................................................5

Voting Rights Act, § 2 (52 U.S.C. § 10301)...................................................... 12-13

## Other Authorities

The Federalist No. 45.......................................................................................5

The Federalist No. 59.......................................................................................7

iv

## Introduction

Amicus the American Center for Law and Justice (ACLJ) is an organization dedicated to the defense of constitutional liberties secured by law. Counsel for the ACLJ have presented oral argument, represented parties, and submitted amicus curiae briefs before the Supreme Court of the United States and numerous federal and state courts around the country in cases concerning constitutional issues and election law. *See, e.g., FEC v. Wis. Right to Life*, 551 U.S. 449 (2007); *McConnell v. FEC*, 540 U.S. 93 (2003); *Bush v. Gore*, 531 U.S. 98 (2000). This brief is filed on behalf of over 647,000 supporters of the ACLJ who have expressed their support for defending the integrity of elections and the right to vote.

Amici Representatives Rick W. Allen, Robert B. Aderholt, Jodey C. Arrington, Brian Babin, Jim Banks, Andy Barr, Andy Biggs, Dan Bishop, Lauren Boebert, Ted Budd, Ken Calvert, Buddy Carter, Madison Cawthorn, Andrew S. Clyde, Rodney Davis, Jeff Duncan, Neal Dunn, Ron Estes, Drew Ferguson, Virginia Foxx, Bob Gibbs, Louie Gohmert, Bob Good, Paul A. Gosar, D.D.S., Marjorie Taylor Greene, Glenn Grothman, Diana Harshbarger, Vicky Hartzler, Jody Hice, Richard Hudson, Ronny L. Jackson, Mike Johnson, Doug Lamborn, Barry Loudermilk, Nancy Mace, Mariannette Miller-Meeks, M.D., Alex X. Mooney, Ralph Norman, Scott Perry, August Pfluger, Bill Posey, Tom Rice, John Rose, David

Rouzer, Chip Roy, Steve Scalise, Austin Scott, Pete Sessions, Adrian Smith, Jason Smith, Elise Stefanik, W. Gregory Steube, Claudia Tenney, William Timmons, Tim Walberg, Randy Weber, and Joe Wilson are currently serving Members of the 117th United States Congress.

The proper resolution of this case is a matter of utmost concern to the ACLJ, its supporters, and the above-listed Members of Congress because of the case's impact on the ability of the State of Georgia to properly exercise its constitutional authority to ensure that its elections are free from fraud and intimidation. Additionally, the resolution of this case will likely impact similar pending, and future, lawsuits filed around the country.

## Argument

### I.   The Elections Clause of the United States Constitution gives state legislatures broad authority to regulate the times, places, and manner of elections.

The Constitution's Elections Clause (Article I, Section 4, Clause 1) states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations. . . ." This provision not only gives state legislatures the *authority* to prescribe the times, places, and manner of elections, but imposes upon them "*the duty*" to do so. *Arizona v. Inter*

2

*Tribal Council of Ariz., Inc.*, 570 U.S. 1, 8 (2013) (emphasis added). The Supreme Court has noted that "the context of federal elections provides one of the few areas in which the Constitution *expressly requires action by the States*. . . . These Clauses are express delegations of power to the States to act with respect to federal elections." *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804-05 (1995) (emphasis added).

The Court has regularly described the authority delegated to the States by the Elections Clause as "*a broad power*."[1] The Court has often

> recognized the breadth of [the States' Elections Clause] powers: "It cannot be doubted that these comprehensive words embrace authority to provide a complete code for congressional elections, not only as to times and places, but in relation to notices, registration, supervision of voting, protection of voters, prevention of fraud and corrupt practices, counting of votes, duties of inspectors and canvassers, and making and publication of election returns; in short, to enact the numerous requirements as to procedure and safeguards which experience shows are necessary in order to enforce the fundamental right involved."

*Roudebush v. Hartke*, 405 U.S. 15, 24-25 (1972) (quoting *Smiley v. Holm*, 285 U.S. 355, 366 (1932)); *Cook*, 531 U.S. at 523-24.

---

[1] *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 217 (1986) (emphasis added); *Cook v. Gralike*, 531 U.S. 510, 523-24 (2001) (same); *see also Griffin v. Roupas*, 385 F.3d 1128, 1130 (7th Cir. 2004) ("The Constitution . . . confers on the states broad authority to regulate the conduct of elections, including federal ones. . . . [A]n unregulated election system would be chaos, [and] state legislatures may without transgressing the Constitution impose extensive restrictions on voting.").

Further, the Court has observed that

> there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes. . . . [T]he States have evolved comprehensive, and in many respects complex, election codes regulating in most substantial ways, with respect to both federal and state elections, the time, place, and manner of holding primary and general elections, the registration and qualifications of voters, and the selection and qualification of candidates.[2]

The Court has noted that the Elections Clause's assignment of comprehensive, primary authority to the States to regulate the times, places, and manner of elections—while providing Congress with a residual power to curb any abuses—is consistent with the Constitution's overall system of federalism and separation-of-powers. The Court has explained that

> [o]utside the strictures of the Supremacy Clause, States retain broad autonomy in structuring their governments and pursuing legislative objectives. . . . [The] "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States." . . . But the federal balance "is not just

---

[2] *Storer v. Brown*, 415 U.S. 724, 729-30 (1974); *see also Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (same); *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 358 (1997) ("States may, and inevitably must, enact reasonable regulations of parties, elections, and ballots to reduce election- and campaign-related disorder."); *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citations omitted) ("States retain the power to regulate their own elections. . . . Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections. . . . [T]o subject every voting regulation to strict scrutiny . . . would tie the hands of States seeking to assure that elections are operated equitably and efficiently.").

an end in itself: Rather, federalism secures to citizens the liberties that derive from the diffusion of sovereign power."[3]

Further, the Court noted in an Elections Clause case that it had

"long recognized the role of the States as laboratories for devising solutions to difficult legal problems." . . . Deference to state lawmaking "allows local policies 'more sensitive to the diverse needs of a heterogeneous society,' permits 'innovation and experimentation,' enables greater citizen 'involvement in democratic processes,' and makes government 'more responsive by putting the States in competition for a mobile citizenry.'"

*Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 817 (2015) (citations omitted); *see also Gregory*, 501 U.S. at 458; *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 154 (5th Cir. 2020) (Ho, J., concurring) ("The Constitution vests control over federal election laws in state legislatures, and

---

[3] *Shelby Cnty. v. Holder*, 570 U.S. 529, 543 (2013) (quoting *Bond v. United States*, 564 U.S. 211, 221 (2011)); *see also* U.S. Const. Amend. X ("The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people."); *Bond v. United States*, 572 U.S. 844, 854 (2014) ("[T]he National Government possesses only limited powers; the States and the people retain the remainder. The States have broad authority to enact legislation for the public good."); *Gregory v. Ashcroft*, 501 U.S. 452, 457-58, 461-62 (1991) ("'The powers delegated by the proposed Constitution to the federal government are few and defined. Those which are to remain in the State governments are numerous and indefinite.' . . . '[T]he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections.'") (quoting, *inter alia*, The Federalist No. 45); *Sugarman v. Dougall*, 413 U.S. 634, 647 (1973) (same).

for good reason—that's where we expect the voice of the people to ring most loudly and effectively.").

In sum, the Constitution gives the Georgia General Assembly broad authority to regulate how Georgia elections will take place, and the statutory provisions challenged in this case are well within the State's power to enact.

## II.   The Elections Clause gives Congress, *not the executive branch or the federal courts*, the authority to override state laws regulating the times, places, and manner of elections if a State abuses its Elections Clause power.

While the Elections Clause provides the state legislatures with primary authority to regulate elections, it also "act[s] as a safeguard against manipulation of electoral rules by politicians and factions in the States" by permitting citizens to "seek Congress' correction of regulations prescribed by state legislatures." *Ariz. State Legislature*, 576 U.S. at 814-15, 824. "[T]he Framers created a safeguard against state abuse by giving Congress the power to 'by Law make or alter such Regulations.' . . . [T]he Framers' overriding concern was the potential for States' abuse of the power to set the 'Times, Places and Manner' of elections." *U.S. Term Limits*, 514 U.S. at 808-09.

The Constitution's drafters anticipated that there would often be contentious political disputes over the setting of election-related rules, and they extensively

6

debated whether—and the extent to which—Congress should be given supervisory authority over state election time, place, and manner laws. *Rucho v. Common Cause*, 139 S. Ct. 2484, 2495-96 (2019). "Antifederalists predicted that Congress's power under the Elections Clause would allow Congress to make itself 'omnipotent,' setting the 'time' of elections as never or the 'place' in difficult to reach corners of the State. Federalists responded that . . . the revisionary power was necessary to counter state legislatures set on undermining fair representation." *Id.* at 2495.

The Constitution's drafters ultimately provided Congress with a revisionary power out of a concern that "a State would refuse to provide for the election of representatives to the Federal Congress." *Inter Tribal Council*, 570 U.S. at 8 (quoting The Federalist No. 59). The Supreme Court has emphasized that *legislatures*—not courts (or executive branch officers)—have been entrusted with the constitutional authority to determine the times, places, and manner of elections:

> The Framers . . . settled on a characteristic approach, assigning the issue to the state legislatures, expressly checked and balanced by the Federal Congress. As Alexander Hamilton explained, "it will . . . not be denied that a discretionary power over elections ought to exist somewhere. It will, I presume, be as readily conceded that there were only three ways in which this power could have been reasonably modified and disposed: that it must either have been lodged wholly in the national legislature, or wholly in the State legislatures, or primarily in the latter, and ultimately in the former." The Federalist No. 59, p. 362 (C. Rossiter ed. 1961). *At no point was there a suggestion that the federal courts had a role to play. Nor was there any indication that the Framers had ever heard of courts doing such a thing.*

7

*Rucho*, 139 S. Ct. at 2496 (emphasis added).

Congress has exercised its Elections Clause authority on occasion. *Id.* at 2495 (discussing examples). The Supreme Court has emphasized, however, that "basic principles of federalism embodied in the Constitution" dictate that federal courts should assume that Congress has *not* "radically readjust[ed] the balance of state and national authority" unless it is clear that Congress has intended to do so. *Bond*, 572 U.S. at 857-59; *Gregory*, 501 U.S. at 460-61. Although the Voting Rights Act (VRA) "represents an 'extraordinary departure from the traditional course of relations between the States and the Federal Government,'" *Shelby Cnty.*, 570 U.S. at 545 (citations omitted), the statute *does not* wholly displace the broad discretion of the States to regulate elections through non-discriminatory time, place, and manner rules. *See Brnovich v. DNC*, Nos. 19-1257 and 19-1258, 2021 U.S. LEXIS 3568 at *35 (U.S. July 1, 2021) ("We doubt that Congress intended to uproot facially neutral time, place, and manner regulations that have a long pedigree or are in widespread use in the United States.").

In light of the Constitution's delegation of the power to regulate elections to the state legislatures—and delegation of the power to curb potential abuses to Congress—courts must "give appropriate weight" to the "important state interests" that an election regulation serves. *Id.* at *48. "The Constitution provides that *state*

*legislatures*—not federal judges, not state judges, not state governors, not other state officials—bear primary responsibility for setting election rules." *DNC v. Wis. State Legis.*, 141 S. Ct. 28, 2020 U.S. LEXIS 5187 at *29-30 (U.S. Oct. 26, 2020) (Gorsuch, J., concurring in denial of application to vacate stay) (emphasis added). "Assessing the complicated tradeoffs involved in changing or retaining . . . election rules . . . is primarily the responsibility of state legislatures and falls outside the competence of federal courts." *Id.* at *32-33 (Kavanaugh, J., concurring in denial of application to vacate stay).

Last year, the U.S. Court of Appeals for the Eleventh Circuit emphasized that courts should be skeptical of partisan attempts to overturn a State's exercise of its Elections Clause authority. In *Jacobson v. Florida Secretary of State*, 974 F.3d 1236 (11th Cir. 2020), the Eleventh Circuit held that a lawsuit challenging a Florida election law—which was premised on the claim that the statute gave Republicans an unfair partisan advantage—raised non-justiciable political questions. *Id.* at 1260-61 (citing *Rucho*, 139 S. Ct. 2484). The court held that "the district court . . . assumed for itself the 'discretionary power over elections' that the Constitution assigns to the state and federal legislatures, in contravention of clear Supreme Court precedent that should have prevented it from reaching the merits of this dispute." *Id.* at 1269.

9

Additionally, the Eleventh Circuit stated that, although the Supreme Court's

*Rucho* decision

> may seem counterintuitive to federal judges who are used to usurping the authority of state legislatures to regulate elections, it should not. The Constitution commits the "Times, Places and Manner" of holding congressional elections to legislatures—the state legislatures in the first instance, subject to any regulations Congress prescribes. U.S. Const. art. I, § 4, cl. 1. Our founding charter never contemplated that federal courts would dictate the manner of conducting elections—in this lawsuit, down to the order in which candidates appear on a ballot.

*Id.*

> Another federal court of appeals decision stated:

> This case presents yet another appeal . . . asking the federal courts to become entangled, as overseers and micromanagers, in the minutiae of state election processes. . . . [O]ur Constitution . . . defines the relationship between spheres of government, state and federal, and their responsibilities for protecting the rights of the people. The genius of this balance of power is no less deserving of vigilant respect [than the right to vote]. . . .

> [O]ur task (especially with respect to minimally burdensome laws) is neither to craft the "best" approach, nor "to impose our own idea of democracy upon the . . . state legislature." . . . Rather, we simply call balls and strikes and apply a generous strike zone when the state articulates legitimate and reasonable justifications for minimally burdensome, non-discriminatory election regulations.[4]

---

[4] *Ohio Democratic Party v. Husted*, 834 F.3d 620, 622-23, 633-34 (6th Cir. 2016) (citations omitted); *see also Tex. League*, 978 F.3d at 150, 154 (Ho, J., concurring) ("[I]t is the state legislature—not the governor or federal judges—that is authorized to establish the rules that govern [elections]. . . . [I]t is for the Texas Legislature . . . and not for . . . the judiciary by . . . judicial fiat . . . to determine how best to maximize voter access as well as ballot security."); *Griffin*, 385 F.3d at 1131 ("[T]he striking of the balance between discouraging fraud and other abuses and encouraging turnout

In sum, the role of federal courts in disputes over state regulations of the times, places, and manner of elections is quite limited. For instance, in appropriate cases (*e.g.*, one in which a plaintiff has standing and raises justiciable questions), federal courts may review whether the States' power is being exercised in a manner that violates individuals' fundamental constitutional rights, *Tashjian*, 479 U.S. at 217, or whether a legislature has violated provisions of the State's constitution. *Ariz. State Legislature*, 576 U.S. at 817-18. Federal courts may not, however, engage in "detailed judicial supervision of the election process," which "would flout the Constitution's express commitment of the task to the States." *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 208 (2008) (Scalia, J., concurring). As discussed in the next section, this lawsuit presents no viable basis for overturning the will of the citizens of Georgia, expressed through their elected representatives who have been given the constitutional authority and duty to regulate elections.

---

is quintessentially a legislative judgment with which we judges should not interfere unless strongly convinced that the legislative judgment is grossly awry.").

III.   **In light of the Elections Clause and the constitutional principles of federalism and separation-of-powers, Section 2 of the VRA must be interpreted and applied in a manner that sufficiently respects the broad authority of state legislatures.**

"Section 2 of the Voting Rights Act of 1965 is not some all-purpose weapon for well-intentioned judges to wield as they please in the battle against discrimination. It is a statute." *Chisom v. Roemer*, 501 U.S. 380, 404 (1991) (Scalia, J., dissenting). Plaintiff's VRA Section 2 claim fails under the plain language of the statute. The challenged provisions of Georgia law do not deprive any protected class of persons of equal opportunity to participate in "the political processes leading to nomination or election in the State," 52 U.S.C. § 10301(b), nor do they "result[] in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 52 U.S.C. § 10301(a).

Moreover, it would be improper to broadly interpret Section 2 in a manner that would "invalidat[e] a great many neutral voting regulations with long pedigrees that are reasonable means of pursuing legitimate interests," which would "transfer much of the authority to regulate election procedures from the States to the federal courts."[5] The Supreme Court recently reiterated that neither Section 2's text nor its

---

[5] *Brnovich*, 2021 U.S. LEXIS 3568 at *38-39, 49; *see also id.* at *43 ("§ 2 does not deprive the States of their authority to establish non-discriminatory voting rules. . . . [T]here is nothing democratic about the dissent's attempt to bring about a wholesale transfer of the authority to set voting rules from the States to the federal courts.");

legislative history supports the view that it sets "a high bar for States to pursue their legitimate interests." *Brnovich*, 2021 U.S. LEXIS 3568 at *40-43.

### A.   Georgia's substantial state interests, such as preventing voter intimidation and fraud, must be given significant weight.

There are many substantial government interests that state laws regulating elections may protect. For instance, the Supreme Court recently reiterated that "[a] State indisputably has a compelling interest in preserving the integrity of its election process." *Id.* at *52. The Court also stated that

> [o]ne strong and entirely legitimate state interest is the prevention of fraud. Fraud can affect the outcome of a close election, and fraudulent votes dilute the right of citizens to cast ballots that carry appropriate weight. Fraud can also undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome. Ensuring that every vote is cast freely, without intimidation or undue influence, is also a valid and important state interest.[6]

_____

*Frank v. Walker*, 768 F.3d 744, 754 (7th Cir. 2014) (rejecting an interpretation of Section 2 that would "dismantle every state's voting apparatus," and noting that "it would be implausible to read §2 as sweeping away almost all registration and voting rules.").

[6] *Id.* at *37; *see also Crawford*, 553 U.S. at 196-97 (plurality op.) (citation omitted) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters. . . . [T]he 'electoral system cannot inspire public confidence if no safeguards exist to deter or detect fraud or to confirm the identity of voters.'"); *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (citation omitted) ("Confidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy. Voter fraud drives honest citizens out of the democratic process and breeds distrust of our government. Voters who fear their legitimate votes will be outweighed by fraudulent ones will feel disenfranchised."); *U.S. Term Limits*, 514 U.S. at 832-35 (citations omitted) (States have substantial

13

Non-discriminatory state laws that are designed to protect election integrity do not infringe upon the right to vote; to the contrary, "the right to vote is the right to participate in an electoral process that is necessarily structured to maintain the integrity of the democratic system." *Burdick*, 504 U.S. at 441; *DNC*, 2020 U.S. LEXIS 5187 at *31 (Kavanaugh, J., concurring) (noting the importance of "the State's interest in running an orderly, efficient election and in giving citizens (including the losing candidates and their supporters) confidence in the fairness of the election"). In fact, the Court has concluded that the potential for lawful votes to be diluted by fraudulent votes is itself a threat to the right to vote.[7] Numerous federal

---

authority to enact evenhanded safeguards and procedural requirements that are "designed to ensure that elections are 'fair and honest'" and that "'protect the integrity and reliability of the electoral process itself'"); *O'Brien v. Skinner*, 414 U.S. 524, 534 (1974) (Marshall, J., concurring) ("[P]rotection of the integrity of the ballot box is surely a legitimate state concern.").

[7] *Purcell*, 549 U.S. at 4 (citation omitted); *see also Tex. League*, 978 F.3d at 146-47 ("States have critically important interests in the orderly administration of elections and in vigilantly reducing opportunities for voting fraud," such as by "policing how its citizens' votes are collected and counted."); *Griffin*, 385 F.3d at 1130-31 ("Voting fraud is a serious problem in U.S. elections . . . and it is facilitated by absentee voting. . . . In this respect absentee voting is to voting in person as a take-home exam is to a proctored one.").

court decisions have discussed well-documented examples of election fraud across the country.[8]

Additionally, the Supreme Court has observed that "[v]oter intimidation and election fraud are successful precisely because they are difficult to detect." *Burson v. Freeman*, 504 U.S. 191, 208 (1992) (plurality op.). As such, and in light of the States' substantial authority to regulate elections, States have significant leeway to enact prophylactic laws designed to prevent voter fraud and intimidation; States need not wait until such activities are rampant in their jurisdictions before they take action. In *Crawford v. Marion County Election Board*, although "[t]he record contain[ed] no evidence of any [in-person voter impersonation at polling places] actually

---

[8] *See, e.g., Brnovich*, 2021 U.S. LEXIS 3568 at *52-54 (discussing absentee ballot abuses, including the invalidation of the results of a 2018 North Carolina election "for evidence of fraudulent mail-in ballots"); *Crawford*, 553 U.S. at 194-96 (plurality op.) (fraud and multiple voting "both occur, and . . . could affect the outcome of a close election"; discussing examples of fraudulent voting involving the use of absentee ballots, election day activities at polling places, and "ghost voters"); *Tex. League*, 978 F.3d at 153 n.4 (Ho, J., concurring) (quoting a 2012 *New York Times* article that stated there is a "'bipartisan consensus' that 'voting by mail . . . is more easily abused than other forms' of voting and that '[a]bsentee ballots remain the largest source of potential voter fraud,' which is 'why all the evidence of stolen elections involves absentee ballots and the like'"); *Tex. Democratic Party v. Abbott*, 961 F.3d 389 (5th Cir. 2020) (Ho, J., concurring) ("[C]ourts have repeatedly found that mail-in ballots are particularly susceptible to fraud.").

occurring in Indiana at any time in its history," the Court nevertheless upheld the

statute in light of documented evidence of fraud in other parts of the country:

> It remains true . . . that flagrant examples of such fraud in other parts of the country have been documented throughout this Nation's history by respected historians and journalists, that occasional examples have surfaced in recent years, and that Indiana's own experience with fraudulent voting in the 2003 Democratic primary for East Chicago Mayor—though perpetrated using absentee ballots and not in-person fraud—demonstrate that not only is the risk of voter fraud real but that it could affect the outcome of a close election.

553 U.S. at 194-96 (plurality op.). The Court reiterated this holding in other cases.[9]

---

[9] *See, e.g., Brnovich*, 2021 U.S. LEXIS 3568 at *54 ("[I]t should go without saying that a State may take action to prevent election fraud without waiting for it to occur and be detected within its own borders. Section 2 . . . does not demand that a State's political system sustain some level of damage before the legislature [can] take corrective action."); *Crawford*, 553 U.S. at 189-90 (plurality op.) (there is a "general rule that 'evenhanded restrictions that protect the integrity and reliability of the electoral process itself'" are constitutional) (quoting *Anderson*, 460 U.S. at 788, n.9); *Timmons*, 520 U.S. at 364 (citation omitted) (federal courts do not "require elaborate, empirical verification of the weightiness of the State's asserted justifications" when election regulations are challenged); *Burson*, 504 U.S. at 208-09 (plurality op.) ("[B]ecause a government has such a compelling interest in securing the right to vote freely and effectively, this Court never has held a State 'to the burden of demonstrating empirically the objective effects on political stability that [are] produced' by the voting regulation in question.") (citation omitted); *Burdick*, 504 U.S. at 434 (citation omitted) ("[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions."); *Munro v. Socialist Workers Party*, 479 U.S. 189, 195-96 (1986) ("Legislatures . . . should be permitted to respond to potential deficiencies in the electoral process with foresight rather than reactively, provided that the response is reasonable and does not significantly impinge on constitutionally protected rights.").

**B.     Allegations that some voters may experience minor inconveniences and unremarkable burdens are insufficient to override Georgia's important interests.**

The Supreme Court has noted that "[t]o deem ordinary and widespread burdens . . . severe would subject virtually every electoral regulation to strict scrutiny, hamper the ability of States to run efficient and equitable elections, and compel federal courts to rewrite state electoral codes. The Constitution does not require that result." *Clingman v. Beaver*, 544 U.S. 581, 593 (2005). As such, although a higher level of scrutiny may be warranted if an election law imposes "severe," "serious," or "excessively burdensome" requirements,[10] where, as here, any burdens imposed would be "modest," "limited," "unremarkable," or a "[m]ere inconvenience," or would fall within "the usual burdens of voting," voters are not deprived of an equal opportunity to cast a ballot.[11]

Moreover, the hypothetical burdens that a plaintiff asserts could be caused by a particular statutory provision cannot be viewed in isolation, but must be considered

---

[10] *Crawford*, 553 U.S. at 197-98, 202-03 (plurality op.); *Clingman*, 544 U.S. at 592; *Burdick*, 504 U.S. at 434, 439; *Storer*, 415 U.S. at 738.

[11] *Brnovich*, 2021 U.S. LEXIS 3568 at *32-33, 44-45, 50-51; *Crawford*, 553 U.S. at 202-03 (plurality op.); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 600-601 (4th Cir. 2016) ("[T]he plaintiffs . . . make an unjustified leap from <u>the disparate inconveniences</u> that voters face when voting to <u>the denial or abridgement of the right to vote</u>.").

in light of other provisions of the election code that may *alleviate or wholly eliminate such purported burdens*.[12] Additionally, when a plaintiff brings a facial challenge to a statute that regulates the voting process, courts should focus on "the statute's broad application to all . . . voters," and should rarely invalidate a statute based upon hypothetical special burdens that could be experienced by a small subset of voters.[13] As such, since Georgia election law, as a whole, provides ample and equal opportunities to vote, Plaintiffs' facial challenge fails. It is also worth noting, given the Complaint's focus on Georgia's regulation of absentee ballots, that "[t]he Constitution does not require *any* opportunities for early voting."[14]

---

[12] *See, e.g., Brnovich*, 2021 U.S. LEXIS 3568 at *37 ("[C]ourts must consider the opportunities provided by a State's entire system of voting when assessing the burden imposed by a challenged provision. . . . [W]here a State provides multiple ways to vote, any burden imposed on voters who choose one of the available options cannot be evaluated without also taking into account the other available means."); *id.* at *13, 22, 45-46, 50-51 (noting that various provisions of Arizona law made it easy for residents to vote); *Crawford*, 553 U.S. at 197-99 (plurality op.) (concluding that "the availability of the right to cast a provisional ballot provides an adequate remedy" for those who would have significant difficulties obtaining a photo ID); *Burdick*, 504 U.S. at 436-39 (a ban on write-in voting imposed only a limited burden "in light of the adequate ballot access afforded under Hawaii's election code"); *Storer*, 415 U.S. at 736 (concluding that a challenged provision was "an essential part of [the State's] overall mechanism to achieve its acceptable goals").

[13] *Crawford*, 553 U.S. at 199-203 (plurality op.); *DNC*, 2020 U.S. LEXIS 5187 at *39 (Kavanaugh, J., concurring); *Burdick*, 504 U.S. at 436-39; *Storer*, 415 U.S. at 742.

[14] *Ohio Democratic Party*, 834 F.3d at 623; *see also Brnovich*, 2021 U.S. LEXIS 3568 at *33-34 (neutral laws that are no more burdensome to voters than "the rules

C.   **The political partisanship that is often part and parcel of the process of regulating elections does not constitute discrimination on the basis of race, nor does it provide a basis for a viable VRA Section 2 cause of action.**

The fact that a state law regulating elections was opposed by one major political party, and supported by the other, does not give rise to a VRA claim. In *Crawford*, the Court upheld a law that required those voting in person on election day to present government-issued photo ID. The plaintiffs "stress[ed] the fact that all of the Republicans in the General Assembly voted in favor of [the statute] and the Democrats were unanimous in opposing it." 553 U.S. at 203-04 (plurality op.). The plurality opinion stated that, although "[i]t is fair to infer that partisan considerations may have played a significant role in the decision to enact" the statute, "if a nondiscriminatory law is supported by valid neutral justifications, those justifications should not be disregarded simply because partisan interests may have

---

in widespread use" in 1982—when "States typically required nearly all voters to cast their ballots in person on election day and allowed only narrow and tightly defined categories of voters to cast absentee ballots"—are likely to be upheld); *DNC*, 2020 U.S. LEXIS 5187 at *34 (Kavanaugh, J., concurring) ("[T]he States requiring that absentee ballots be received by election day do so for weighty reasons that warrant judicial respect. Federal courts have no business disregarding those state interests simply because the federal courts believe that later deadlines would be better."); *Crawford*, 553 U.S. at 209 (Scalia, J., concurring) ("That the State accommodates some voters by permitting (not requiring) the casting of absentee or provisional ballots, is an indulgence—not a constitutional imperative.").

provided one motivation for the votes of individual legislators." *Id.* The Court held that the statute was supported by "neutral and sufficiently strong" interests, and was "amply justified by the valid interest in protecting 'the integrity and reliability of the electoral process.'" *Id.* at 204 (quoting *Anderson*, 460 U.S. at 788, n.9).

Additionally, in *Rucho*, the Court emphasized that political partisanship—even "[e]xcessive partisanship"—in the enactment of election laws should not be conflated with racial discrimination. 139 S. Ct. at 2495-96, 2502-07. Racially discriminatory laws are invalid and can be successfully challenged in court. *Id.* By contrast, "a jurisdiction may engage in constitutional political gerrymandering," and claims that a law was the result of "[e]xcessive partisanship" are not justiciable in federal courts. *Id.* at 2496, 2506-07. The Court explained:

> To hold that legislators cannot take partisan interests into account when drawing district lines would essentially countermand the Framers' decision to entrust districting to political entities.
>
> . . . A permissible intent—securing partisan advantage—does not become constitutionally impermissible, like racial discrimination, when that permissible intent "predominates."
>
> . . . Federal judges have no license to reallocate political power between the two major political parties, with no plausible grant of authority in the Constitution, and no legal standards to limit and direct their decisions.[15]

---

[15] *Id.* at 2496, 2503, 2507; *see also Brnovich*, 2021 U.S. LEXIS 3568 at *25-26, 56-57 ("The spark for the debate over mail-in voting may well have been provided by one Senator's enflamed partisanship, but partisan motives are not the same as racial motives. . . . [T]he voting preferences of members of a racial group may make the

Similarly, although the extent to which there may be "disparities in a rule's impact on members of different racial or ethnic groups is . . . an important factor to consider," *it is not a case-determinative factor*; rather, "the mere fact there is some disparity in impact does not necessarily mean that a system is not equally open," and "[s]mall disparities are less likely than large ones to indicate that a system is not equally open." *Brnovich*, 2021 U.S. LEXIS 3568 at *19, 35-36. Even the dissenters in *Brnovich* acknowledged that "Section 2 demands proof of a statistically significant racial disparity in electoral opportunities (not outcomes) resulting from a law not needed to achieve a government's legitimate goals. That showing is hardly insubstantial, and as a result, Section 2 vote denial suits do not often succeed." *Id.* at *84-85 (Kagan, J., dissenting). Here, as in *Brnovich*, "the State's justifications would suffice to avoid § 2 liability" even if Plaintiff could eventually prove a disparate burden caused by the challenged provisions. *Id.* at *48-52 (majority op.).

---

former look like the latter, but it carefully distinguished between the two."); *Abbott v. Perez*, 138 S. Ct. 2305, 2314 (2018) ("[A] voter's race sometimes correlates closely with political party preference."); *Cooper v. Harris*, 137 S. Ct. 1455, 1473 (2017) ("[R]acial identification is highly correlated with political affiliation."); *Jacobson*, 974 F.3d at 1263-66 (noting that partisan disputes over a state's election-related policy choices often "pose[] basic questions that are political, not legal," and federal courts are not "responsible for vindicating generalized partisan preferences"; "[P]artisan considerations are not entirely off limits in election administration.").

## Conclusion

This lawsuit is without merit and should be dismissed.

Respectfully submitted on August 2, 2021.


EDWARD L. WHITE III*                     /s/ Jay Alan Sekulow
ERIK M. ZIMMERMAN*                     JAY ALAN SEKULOW (Ga. Bar #634900)
AMERICAN CENTER FOR LAW & JUSTICE       *Lead Counsel for Amici*
3001 Plymouth Rd., Ste. 203            STUART J. ROTH*
Ann Arbor, MI 48105                    ANDREW J. EKONOMOU
                                       JORDAN SEKULOW*
                                       AMERICAN CENTER FOR LAW & JUSTICE
 * Not admitted to this Court          201 Maryland Ave, NE
                                       Washington, DC 20002
                                       Phone: (202) 546-8890
*Counsel for Amici*                    Fax: (202) 546-9309
                                       sekulow@aclj.org


## Font Certification Under Local Rule 7.1(D)

This brief has been prepared with Times New Roman, 14-point font.

Dated August 2, 2021.

/s/ Jay Alan Sekulow
JAY ALAN SEKULOW (Ga. Bar #634900)
 *Lead Counsel for Amici*
AMERICAN CENTER FOR LAW AND JUSTICE
201 Maryland Ave, NE
Washington, DC 20002
Phone: (202) 546-8890
Fax: (202) 546-9309
sekulow@aclj.org

22