## IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF GEORGIA

UNITED STATES OF AMERICA,    :
     *Plaintiff,*    :
         :    Case No. 1:21-cv-2575-JPB
v.    :
THE STATE OF GEORGIA, *et al.*,    :
     *Defendants,*    :    Judge J.P. Boulee
         :
         :
REPUBLICAN NATIONAL    :
COMMITTEE, *et al.*,    :
     *Intervenors.*    :
         :
         :

---

## BRIEF OF *AMICI CURIAE* OHIO, ALABAMA, ALASKA, ARIZONA, ARKANSAS, INDIANA, KANSAS, KENTUCKY, MONTANA, NEBRASKA, OKLAHOMA, SOUTH CAROLINA, TENNESSEE, TEXAS, UTAH, and WEST VIRGINIA IN SUPPORT OF THE DEFENDANTS

---

# TABLE OF CONTENTS

**Page**

TABLE OF CONTENTS ........................................................................... i

TABLE OF AUTHORITIES ................................................................... ii

INTRODUCTION AND STATEMENT OF *AMICI* INTERESTS ............................. 1

ARGUMENT ........................................................................................ 5

    I.     The history of Jim Crow voting restrictions .................................. 5

    II.    Election laws in the modern era. ................................................ 11

    III.   The Department has provided no basis for inferring that the run-of-the-mill provisions it challenges were motivated by racial animus ....... 25

CONCLUSION ...................................................................................... 36

LOCAL RULE 7.1(D) CERTIFICATION ..................................................... 38

CERTIFICATE OF SERVICE ................................................................... 39

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*A. Philip Randolph Inst. of Ohio v. LaRose*,
    831 F. App'x 188 (6th Cir. 2020) ....................................................................... 16, 21

*Adarand Constructors v. Pena*,
    515 U.S. 200 (1995) ............................................................................................... 29

*Brnovich v. DNC*,
    141 S. Ct. 2321 (2021) ................................................................................... *passim*

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ............................................................................................... 12

*Burson v. Freeman*,
    504 U.S. 191 (1992) .................................................................................... 15, 22, 32

*Crawford v. Marion Cnty. Election Bd.*,
    553 U.S. 181 (2008) ......................................................................................... 13, 32

*DNC. v. Hobbs*,
    948 F.3d 989 (9th Cir. 2020) (*en banc*) ........................................................ 16, 32, 33

*DNC v. Wis. State Legislature*,
    141 S. Ct. 28 (2020) ................................................................................................. 3

*Ga. Muslim Voter Project v. Kemp*,
    918 F.3d 1262 (11th Cir. 2019) .............................................................................. 23

*George v. Hargett*,
    879 F.3d 711 (6th Cir. 2018) .................................................................................. 16

*Griffin v. Roupas*,
    385 F.3d 1128 (7th Cir. 2004) ...................................................................... 2, 14, 32

*Guinn v. United States*,
    238 U.S. 347 (1915) ................................................................................................. 7

*Hunter v. Hamilton Cnty. Bd. of Elections*,
    635 F.3d 219 (6th Cir. 2011) ..................................................................... 18

*John Doe No. 1 v. Reed*,
    561 U.S. 186 (2010) ................................................................................... 12

*King v. Burwell*,
    576 U.S. 473 (2015) ................................................................................... 33

*Lane v. Wilson*,
    307 U.S. 268 (1939) ................................................................................ 6, 7

*League of Women Voters v. Brunner*,
    548 F.3d 463 (6th Cir. 2008) ..................................................................... 17

*Lopez v. Monterey Cnty.*,
    525 U.S. 266 (1999) ..................................................................................... 7

*Marks v. Stinson*,
    No. 93-6157, 1994 U.S. Dist. LEXIS 5273 (E.D. Pa. Apr. 26, 1994) ..................... 32

*Mays v. LaRose*,
    951 F.3d 775 (6th Cir. 2020) ............................................................... 17, 22

*Moore v. Circosta*,
    141 S. Ct. 46 (2020) ................................................................................... 30

*Ne. Ohio Coal. for the Homeless v. Husted*,
    837 F.3d 612 (6th Cir. 2016) ................................................................. 8, 17

*New Ga. Project vs. Raffensperger*, 484 F.Supp.3d 1265 (N.D. Ga. 2020) ................... 30

*Nw. Austin Mun. Util. Dist. No. One v. Holder*,
    557 U.S. 193 (2009) ............................................................................. *passim*

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ..................................................................... 17

*Ohio Democratic Party v. Husted*,
    834 F.3d 620 (6th Cir. 2016) ............................................................... 17, 24

*Pa. Democratic Party v. Boockvar,*
   238 A.3d 345 (Pa. 2020) ........................................................................ 30

*Paynes v. Lee,*
   377 F.2d 61 (5th Cir. 1967) ..................................................................... 8

*Purcell v. Gonzalez,*
   549 U.S. 1 (2006) ................................................................................... 19

*Republican Party of Pa. v. Boockvar,*
   141 S. Ct. 1 (2020) ................................................................................ 30

*Rice v. Cayetano,*
   528 U.S. 495 (2000) ............................................................................... 10

*Schuette v. Coal. to Defend Affirmative Action,*
   572 U.S. 291 (2014) ................................................................................. 4

*Shaw v. Reno,*
   509 U.S. 630 (1993) ............................................................................... 29

*Shelby Cnty. v. Holder,*
   570 U.S. 529 (2013) ............................................................... 9, 10, 25, 26

*South Carolina v. Katzenbach,*
   383 U.S. 301 (1966) ........................................................................ 5, 6, 7

*Tademy v. Union Pac. Corp.,*
   614 F.3d 1132 (10th Cir. 2008) ............................................................... 9

*Terry v. Adams,*
   345 U.S. 461 (1953) ............................................................................ 6, 7

*Tex. League of United Latin Am. Citizens v. Hughs,*
   978 F.3d 136 (5th Cir. 2020) ................................................................. 16

*U.S. Student Ass'n Found. v. Land,*
   546 F.3d 373 (6th Cir. 2008) ................................................................. 32

*United States v. McElveen,*
   180 F. Supp. 10 (E.D. La. 1960) ........................................................ 6, 7

iv

*Veasey v. Abbott*,
    830 F.3d 216 (5th Cir. 2016) ..................................................... 32

*Wrinn v. Dunleavy*,
    186 Conn. 125 (1982) ............................................................... 32

**Statutes**

Ariz. Rev. Stat. §16-542 ............................................................... 23

Fla. Stat. §101.62 ......................................................................... 23

Idaho Code §34-1002 ................................................................... 23

Ind. Code §3-11-4-3 ..................................................................... 23

Iowa Code 53.2 ............................................................................ 23

Kan. Stat. Ann. §25-1122 ............................................................. 23

N.C. Gen Stat. §163-230.2 ........................................................... 23

N.D. Cent. Code §16.1-07-06 ....................................................... 23

Neb. Rev. Stat. §32-041 ............................................................... 23

O.C.G.A. §21-2-381(a)(1)(A) ...................................................... 23

O.C.G.A. §21-2-381(a)(1)(C)(i) ................................................... 23

O.C.G.A. §21-2-381(a)(1)(C)(ii) .................................................. 24

O.C.G.A. §21-2-381(a)(3)(A) ...................................................... 24

O.C.G.A. §21-2-382(c) ................................................................ 21

O.C.G.A. §21-2-382(c)(1) ...................................................... 20, 21

O.C.G.A. §21-2-385(d) .......................................................... 19, 20

O.C.G.A. §21-2-414(a) ................................................................ 22

O.C.G.A. §21-2-414(e) ................................................................ 22

O.C.G.A. §21-2-417 ........................................................................................ 23

O.C.G.A. §21-2-418(a) ................................................................................... 24

Ohio Rev. Code §3501.05 ............................................................................. 24

Ohio Rev. Code §3509.02 ............................................................................. 14

Ohio Rev. Code §3509.03 ....................................................................... 15, 23

Ohio Rev. Code §3509.06 ............................................................................. 15

R.I. Gen Laws §17-20-2.1 ............................................................................. 23

Tex. Elec. Code §84.007 ................................................................................ 23

Va. Code §24.2-701 ....................................................................................... 23

**Other Authorities**

Abigail Thernstrom, *Section 5 of the Voting Rights Act: By Now, a Murky Mess*, 5 Geo. J.L. & Pub. Pol'y 41 (2007) ..................................... 25

Darrel Rowland & Anna Staver, *A dozen numbers that set the 2020 election apart in Ohio as Frank LaRose certifies vote*, Columbus Dispatch (Nov. 27, 2020) .......................................................................... 21

Directive 2020-16, Ohio Secretary of State ................................................ 21

Edward B. Foley, *Assessing the Validity of an Election's Result: History, Theory, and Present Threats*, 95 N.Y.U. L. Rev. Online 171 (Oct. 2020) ................................................................................................. 13, 14, 18

*Electioneering Prohibitions*, Nat'l Conf. of State Legislatures .................... 22

Enrico Cantoni & Vincent Pons, *Strict ID Laws Don't Stop Voters: Evidence from a U.S. Nationwide Panel, 2008–2018*, Nat'l Bureau of Economic Research (revised May 2021) .................................................. 29

Fed. Election Reform, *Building Confidence in U.S. Elections* (Sept. 2005) ......................................................................................... 13, 15, 19, 32

Glenn Kessler, *Biden falsely claims the new Georgia law 'ends voting hours early'*, Wash. Post (Mar. 30, 2021) ................................................................. 26

Joe Hotchkiss, *As election nears, Georgia counties, including Columbia, lack absentee ballot dropboxes*, The Augusta Chronicle (Oct. 16, 2020) ........................................................................................................ 21

Jonathan Easley, *Pennsylvania's Allegheny County pauses ballot counting until Friday*, The Hill (November 5, 2020) ............................................... 30

Joshua S. Sellers & Roger Michalski, *Democracy on a Shoestring*, 74 Vand. L. Rev. 1079 (May 2021) ................................................................. 16

Kelly Frankovic, *Belief in conspiracy theories depends largely on which side of the spectrum you fall on*, YouGovAmerica (Dec. 27, 2016) ........................ 13

Lu-in Wang, *The Complexities of "Hate"*, 60 Ohio St. L.J. 799 (1999)........................... 9

Mark Weiner and Patrick Lohman, *Absentee ballots in limbo over lost sticky notes in Brindisi-Tenney House race*, Syracuse.com Blog (Nov. 23, 2020) ........................................................................................................ 31

Miles Parks, *NPR/Marist Poll:  1 In 3 Americans Thinks A Foreign Country Will Change Midterm Votes*, NPR (Sept. 17, 2018) .................................. 13

Nate Cohn, *Georgia's Election Law, and Why Turnout Isn't Easy to Turn Off*, NY Times (Apr. 3, 2021, edited July 1, 2021) ................................................. 26

Pamela S. Karlan, *Contracting the Thirteenth Amendment:* Hodges v. United States, 85 B.U. L. Rev. 783 (2005) ................................................................. 7

Paul Gronke, *Early Voting and Turnout*, PS Online 639 (2007) ................................ 11

State Election Board Rule 183-1-14-0.6-.14 ....................................................... 20, 30

*State Laws Governing Early Voting*, Nat'l Conf. of State Legislatures (June 11, 2021) ....................................................................................... 11, 20

Statement by President Joe Biden on the House of Representatives Passage of H.R. 1, The White House (Mar. 4, 2021) ............................................... 26

Steve Peoples & Lisa Mascaro, *Biden attacks new Georgia voting law, calling it 'Jim Crow in the 21st century'*, Pittsburgh Post-Gazette (Mar. 27, 2021) .............................................................................. 5

Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944–1960* (1976) .................................................................................... 6, 8

U.S. Comm'n on Civil Rights, *Political Participation* (1968).................... 8, 9

*Voter Identification Requirements | Voter ID Laws*, Nat'l Conference of State Legislatures........................................................................ 23

Voting Rights Act:  Criminal Violations, *Hearings Before Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 98th Cong. 1st Sess. 4 (1983)........................................................................ 32

*What does Jim Crow 2.0 mean? A look at the history of segregation laws*, The Atlanta Journal-Constitution (May 25, 2021) .................................. 3

William E. Forbath, *Constitutional Change and the Politics of History*, 108 Yale L.J. 1917 (1999) ............................................................ 7

### INTRODUCTION AND STATEMENT OF *AMICI* INTERESTS

One prerequisite for a functioning democracy is the ability to hold free and fair elections.  But the question of how to go about assuring such elections is quite complex.  One reason why is that States must balance competing goals when enacting election laws.  On the one hand, States must ensure that everyone has an opportunity to vote; elections reflect the People's will only if all eligible electors have a chance to make their voices heard.  On the other hand, States must make certain that their elections are not tainted by fraud, improper influence, or mistakes; they must ensure that their elections reflect voter choices, as opposed to random chance or the preferences of election administrators, party machines, and those most capable of gaming the system.  These two goals can be in tension with one another.  After all, the need for accurate, verifiable counting of ballots cast by qualified electors necessarily imposes some small burdens on those who wish to vote.  But it is not acceptable to eliminate the tension simply by pursuing one goal rather than the other.  We must achieve both.

As it happens, voting has never been easier, meaning our elections are freer than ever before.  Voting options unheard of not long ago—like early in-person voting for weeks before Election Day, no-fault absentee voting, and more besides—are now commonplace.  These new opportunities present new questions

1

that require new laws.  A State that allows early voting, for example, must decide *when* early voting is to begin.  (That is an important matter, since voters who cast their ballots long before Election Day are "deprived of any information pertinent to their vote that surfaces in the late stages of the election campaign." *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).)  But in general, States today are debating the precise contours of these new voting opportunities, not whether to offer new opportunities at all.

Every new voting opportunity, however, introduces a new opportunity for error and misconduct.  Consider absentee voting.  The same thing that makes absentee voting desirable—voters can complete ballots on their own time, wherever they want—allows bad actors to employ deceitful tactics free from official supervision.  As a result, "[f]raud is a real risk that accompanies" absentee voting.  *Brnovich v. DNC*, 141 S. Ct. 2321, 2348 (2021).  In 2018, for example, North Carolina officials invalidated an election after discovering fraudulent mail-in ballots.  *Id.* States must pass laws to prevent such misconduct from tainting their elections and (just as important) to assure the public that the elections are not tainted by fraud.  Elections must be fair—and seen to be fair—or the entire democratic enterprise collapses.

The *amici* States have significant experience striking the balance between

voting opportunities and election safeguards.  Through this experience, they have learned many lessons.  One in particular bears on this case:  just about every time a State declines to make voting slightly easier than it is already, and just about every time a State does anything to prevent fraud, intimidation, or human error, it will be attacked in the media and in court with the "rhetoric of disenfranchisement."  *DNC v. Wis. State Legislature*, 141 S. Ct. 28, 38 (2020) (Kavanaugh, J., concurring in denial of application to vacate stay).  On each such occasion, partisans accuse the State of seeking to suppress voter turnout—never mind that these laws, almost without exception, regulate only the contours of the most widely available voting opportunities in our history.  These same partisans brand their fellow citizens as racists and Klansmen for supporting election laws that promote fairness and integrity.  That is what it means to label as "Jim Crow 2.0" the laws that those Americans support. *What does Jim Crow 2.0 mean?  A look at the history of segregation laws*, The Atlanta Journal-Constitution (May 25, 2021), https://perma.cc/T86S-UW8M.

Indeed, this shrill rhetoric suggests a complete misapprehension of what Jim Crow entailed.  The original Jim Crow laws are a stain on the American soul.  In the years between the Civil War and the mid-twentieth century, some state and local governments carefully drafted and arbitrarily enforced laws so as to ensure

that black Americans received, at best, second-class citizenship. Terrorist groups and vigilantes, most of whom acted with impunity, supplemented these laws with conscience-shocking racial violence. Americans are aware of that history. That awareness—not to mention Americans' deeply held belief in human equality—makes false charges of racism among the most personally and societally destructive one can level. Americans rightfully, and understandably, resent and fear being made to wear the albatross of racism if they dare come out in favor of election-integrity reforms.

The claim that all election reforms are motivated by racism thus detracts from the debate about how best to navigate the tensions between freedom and fairness in elections. "People can disagree in good faith" about the merits of these laws. *Schuette v. Coal. to Defend Affirmative Action*, 572 U.S. 291, 315–16 (2014) (Roberts, C.J., concurring). And it "does more harm than good to question the openness and candor of those on either side of the debate." *Id*.

With this brief, the *amici* States hope to provide a bit of context—historical context regarding the horrors of Jim Crow, and modern-day context about election laws and reforms across the country. This context will make obvious the absurdity of the administration's attempt to portray Georgia's law as a tool for suppressing minority voters.

## ARGUMENT

### I.   The history of Jim Crow voting restrictions.

The Department of Justice's complaint portrays SB 202 as a revival of Geor-gia's Jim Crow past—"Jim Crow in the 21st Century," to quote the President.  *See* Steve Peoples & Lisa Mascaro, *Biden attacks new Georgia voting law, calling it 'Jim Crow in the 21st century'*, Pittsburgh Post-Gazette (Mar. 27, 2021), https:// perma.cc/WJ44-S2XL.  It is worth pausing, then, to examine the history of Jim Crow.  History shows that the federal government's characterization of SB 202 reprehensibly likens modern-day Georgians to the racial terrorists of the early-to-mid twentieth century, while simultaneously (and just as reprehensibly) minimiz-ing the oppression that black Americans faced in those years.

**1.**  The American people ratified the Fifteenth Amendment, which prohibits denying or abridging the right to vote on account of race, in 1870.  Many then spent the better part of a century evading the Amendment through "unremitting and ingenious defiance."  *South Carolina v. Katzenbach*, 383 U.S. 301, 309 (1966).  By the 1890s, numerous States had "enacted tests" that "were specifically designed to prevent" black citizens "from voting."  *Id*. at 310.  Typically, these laws "made the ability to read and write a registration qualification and also required completion of a registration form."  *Id*. at 310–11.  That conduct disenfranchised many black

adults, "more than two-thirds" of whom were illiterate. *Id.* at 311. States also adopted alternatives to these tests, such as "grandfather clauses" and "property qualifications," to ensure "that white illiterates would not be deprived of the franchise." *Id.*

As time went on, States hostile to equal suffrage developed still more ways to deprive black citizens of their voting rights. *See* Steven F. Lawson, *Black Ballots: Voting Rights in the South, 1944–1960* at 11–22, 87–110 (1976). They enacted procedural hurdles. One law, for example, passed at a time when few black citizens were registered to vote, froze the rolls in their disproportionately white form by allowing new registrations only during an exceptionally brief twelve-day period. Those who missed the window permanently lost the right to register. *Lane v. Wilson*, 307 U.S. 268, 271 (1939). Political parties adopted rules permitting only whites to participate in their primary elections. *Terry v. Adams*, 345 U.S. 461, 462 (1953). Officials purged the voter rolls of minority voters. *United States v. McElveen*, 180 F. Supp. 10, 11 (E.D. La. 1960). State officials applied voter-qualification rules in a discriminatory fashion, ensuring that black registrants failed for the slightest error while white voters passed with ease. *Katzenbach*, 383 U.S. at 312–13. To this end, "whites were given easy questions," while "blacks were given more difficult questions, such as 'the number of bubbles in a soap bar, the news contained in a copy

of the *Peking Daily*, the meaning of obscure passages in state constitutions, and the definition of terms such as *habeas corpus*.'"  *Lopez v. Monterey Cnty.*, 525 U.S. 266, 297 (1999) (Thomas, J., dissenting) (quoting Abigail Thernstrom, *Whose Votes Count?, Affirmative Action and Minority Voting Rights* 15 (1987)).  In other jurisdictions, officials simply refused to allow new registrations.  *Katzenbach*, 383 U.S. at 313.

Courts eventually began to see these efforts for what they were:  blatant constitutional violations.  *See, e.g.*, *Guinn v. United States*, 238 U.S. 347, 363 (1915); *Lane*, 307 U.S. at 276–77; *McElveen*, 180 F. Supp. at 11, *judgment aff'd by* 362 U.S. 58; *Terry*, 345 U.S. at 462.  That did not stop States from enacting such laws or adopting such practices.  And attempts at "case-by-case eradication" of discriminatory practices proved "woefully inadequate to ensure that the franchise extended to all citizens regardless of race."  *Nw. Austin Mun. Util. Dist. No. One v. Holder*, 557 U.S. 193, 220 (2009) (Thomas, J., concurring in the judgment and dissenting in part).

What is more, private citizens—sometimes with state assistance or acquiescence—disenfranchised black voters through terroristic means.  From the start, "white harassment and brutality against blacks were almost inseparable incidents of Jim Crow."  Pamela S. Karlan, *Contracting the Thirteenth Amendment:* Hodges v.

United States, 85 B.U. L. Rev. 783, 807 (2005); *see also* William E. Forbath, *Constitutional Change and the Politics of History*, 108 Yale L.J. 1917, 1924 (1999).  "Almost immediately following Reconstruction, blacks attempting to vote were met with coordinated intimidation and violence."  *Nw. Austin*, 557 U.S. at 218–19 (Thomas, J., concurring in the judgment and dissenting in part).  As late as the 1960s, vigilantes threatened to kill, beat, and destroy the possessions of, blacks who attempted, or whose family members attempted, "to become a registered voter." *Paynes v. Lee*, 377 F.2d 61, 63 (5th Cir. 1967); *see also, e.g.*, U.S. Comm'n on Civil Rights, *Political Participation* 117–18 (1968); Lawson, *Black Ballots* at 7, 53–54, 119. They bombed, fired bullets into, and showed up unannounced at the homes of black citizens who ran for office, black citizens who registered to vote, and individuals who registered black voters.  *See Political Participation* at 115–118, 126.  Police in some areas would detain black voters on trumped-up charges, either to discourage the voters from exercising their rights or to guarantee their inability to do so.  *See, e.g., id*. at 118–24, 126.  In some cases, vigilantes murdered those who refused to be intimidated into giving up the "precious right to vote."  *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 639, 640, 647, 648 (6th Cir. 2016) (Keith, J., concurring in part, dissenting in part).

All that is bad enough.  The context in which it occurred makes it even

worse.   Between 1882 and 1968, mobs lynched *at least* 3,446 black Americans. *Tademy v. Union Pac. Corp.*, 614 F.3d 1132, 1145 (10th Cir. 2008).   The real number is almost certainly higher.   *Id*.   And even that number does not capture the many more race-motivated murders and violent acts perpetrated against black Americans.   *See* Lu-in Wang, *The Complexities of "Hate"*, 60 Ohio St. L.J. 799, 833 (1999). Nor does it capture the innumerable acts of intimidation—cross burnings, for example—used to remind black Americans that they were never safe.   Nor does it capture the *economic* intimidation wielded against black Americans.   Men and women who wished to deny blacks the full benefits of citizenship would evict, fire, and boycott businesses run by black voters, black candidates, and proponents of black registration.   *See Political Participation* at 116, 124–24, 127–30.

**2.**   "Things have changed in the South," and in the rest of the nation too. *Nw. Austin*, 557 U.S. at 202.   The brief historical summary shows that the America of 2021 is not the America of 1965.   In part, law forced the changes.   Take, for example, the Voting Rights Act, which Congress passed in 1965.   The Act forbids laws that deny or abridge the right to vote on account of race—a prohibition that both the government and individuals have sued to enforce.   *Shelby Cnty. v. Holder*, 570 U.S. 529, 536–37 (2013) (citing 42 U.S.C. §1973(a)).   And, as originally enacted,

it required jurisdictions with an especially pronounced history of racially discrim-
inatory voting laws to seek "preclearance" from the federal government before
amending their voting laws.  *Id*. at 537–38.  Together, these provisions made it
harder to enact and enforce racially discriminatory laws.  But the changes in this
country cannot be attributed to law alone.  They are also moral and societal in
nature.  Americans came to better appreciate what sounds obvious to modern ears:
"it demeans the dignity and worth of a person to be judged by ancestry" and race
"instead of by his or her own merit and essential qualities."  *Rice v. Cayetano*, 528
U.S. 495, 517 (2000).

Through fits and starts, the self-evident truth of human equality carried the
day.  "Voter turnout and registration rates now approach parity.  Blatantly dis-
criminatory evasions of federal decrees are rare.  And minority candidates hold
office at unprecedented levels."  *Nw. Austin*, 557 U.S. at 202.  In some elections,
black voters have turned out to vote at higher rates than white voters.  *Shelby Cnty.*,
570 U.S. at 548.  In Georgia, as even the Department of Justice acknowledges, Geor-
gia's black and white voting-age citizens register to vote at roughly equal rates.
(The difference is less than one half of one percent.  Compl. ¶¶14, 18.)

Some "voting discrimination still exists; no one doubts that."  *Shelby Cnty.*,
570 U.S. at 536.  And "any racial discrimination in voting is too much."  *Id*. at 557.

Still, while "the existence of discrete and isolated incidents of interference with the right to vote" cannot be ignored, neither can the tremendous strides this country has made. *Nw. Austin*, 557 U.S. at 228 (Thomas, J., concurring in the judgment in part and dissenting in part). The America of 2021 is nothing like the America of the Jim Crow era. We should acknowledge that success.

## II.   Election laws in the modern era.

**1.** Of all the equality-assuring changes to America's election laws, perhaps the most significant is this: States have made it so easy to vote that everyone, regardless of race, income, or work schedule, is guaranteed a meaningful opportunity to vote. In particular, States have adopted new voting methods and greatly increased the number of days during which citizens may vote. One need only go back to the 1980s to find a time when nearly all States allowed early and absentee voting *only* for voters with a qualifying excuse, if they allowed it at all. Paul Gronke, *Early Voting and Turnout*, PS Online 639, 641 (2007), https://perma.cc/8FNN-W79K. That number steadily grew in the 1990s, though most States still allowed in-person voting only on Election Day. *Id.* By the aughts, a majority of States allowed early voting in some form. *Id.* Today, forty-four States allow early voting for all voters, with Delaware poised to follow suit. *State Laws Governing Early Voting*, Nat'l Conf. of State Legislatures (June 11, 2021),

https://perma.cc/Z6VY-M7Y4.  And SB 202, the law the Department caricatures as a revival of the Jim Crow South, is part of this trend.  For example, the bill expands the number of early voting days available to many Georgians.  S.B. 202, §28.

These new voting opportunities require new voting laws.  "Common sense, as well as constitutional law, compels the conclusion that government must play an active role in structuring elections; as a practical matter, there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes."  *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (quotation omitted).  Thus, States that adopt new voting methods must set the rules of the road.  For example, States that allow early voting must determine the hours of operation at early-in-person voting locations, the length of time during which early voting will be permitted, and so on.

States must also enact laws that ensure bad actors do not abuse these new opportunities so as to compromise the public's faith in election results.  *See John Doe No. 1 v. Reed*, 561 U.S. 186, 197 (2010).  Preserving public faith in elections requires taking steps to prevent fraud and error *before* it occurs—States need not, and certainly should not, wait to suffer "'some level of damage before'" protecting election integrity.  *Brnovich*, 141 S. Ct. at 2348 (quoting *Munro v. Socialist Workers Party*, 479 U.S. 189, 195 (1986)).  It is not enough for States merely to ensure the

integrity of their elections—States must also ensure *the public's confidence* in the integrity of elections. *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (Stevens, J., op.). Confidence in elections assures that the winner can "legitimately assume office," and assures that losers can accept defeat as "the will of the voters." Comm'n on Fed. Election Reform, *Building Confidence in U.S. Elections* ("*Carter-Baker Report*") 7 (Sept. 2005).

Preserving the public's trust in elections, however, has proven difficult in recent years. Take, for instance, the aftermath of the 2016 election. With widespread allegations of Russian interference during that election, *roughly half* of those who voted for Hillary Clinton falsely believed that Russia tampered with vote tallies to help Donald Trump. Kelly Frankovic, *Belief in conspiracy theories depends largely on which side of the spectrum you fall on*, YouGovAmerica (Dec. 27, 2016), https://perma.cc/M9SA-WZGB. And going into the 2018 midterm, one poll showed that *a third* of Americans believed that a foreign county was "likely to change vote tallies." Miles Parks, *NPR/Marist Poll: 1 In 3 Americans Thinks A Foreign Country Will Change Midterm Votes*, NPR (Sept. 17, 2018), https://perma.cc/7E4Z-GZ7R. The 2020 election, in large part due to the COVID-19 pandemic, saw its own set of problems. And with growing "polarization and acrimony in contemporary American politics," it becomes more and more difficult to land on "a

13

shared conception" of what constitutes a valid election.  Edward B. Foley, *Assessing the Validity of an Election's Result: History, Theory, and Present Threats*, 95 N.Y.U. L. Rev. Online 171, 172–73 (Oct. 2020).  Some, no doubt, are too quick to allege fraud during the election process.  But others are too quick to decry as "disenfranchisement" and "vote suppression" every election rule that States adopt to ensure broad confidence in election results.  *See id.* at 184–85.

What does it take to ensure public confidence in election results?  First, States must give voters sufficient opportunities to make their voices heard.  Elections must be *free*—freely open to participation, free of intimidation, free of unjustifiable barriers.  The tremendous expansion of voting opportunities largely takes care of that concern.  But States must also assure the public that their elections are *fair*—well-managed, transparently and uniformly administered, and untainted by fraud and improper influence.

Consider fraud prevention, which is especially important when it comes to absentee voting.  States can, and Ohio does, *see* Ohio Rev. Code §3509.02(A), make absentee voting widely available without compromising election integrity.  But it takes great care.  Absentee ballots are the "take-home exam" of elections, as they are completed outside the presence of election officials.  *Griffin v. Roupas*, 385 F.3d 1128, 1131 (7th Cir. 2004).  Without proper regulation and safeguards, a lack of

official supervision provides greater cover for would-be fraudsters.  That is why the leading report on election integrity concluded that "[a]bsentee ballots remain the largest source of potential voter fraud."  *Carter-Baker Report* at 46.  In 2018, the report's concerns proved prescient:  after discovering "evidence of fraudulent mail-in ballots," North Carolina officials had to invalidate the results of a special election for the U.S. House of Representatives.  *Brnovich*, 141 S. Ct. at 2348.  States can vastly reduce the opportunities for fraud by, among other things, requiring absentee voters to provide identification during each stage of the process, *see* Ohio Rev. Code §3509.06(D)(3)(a), and by requiring voters to submit applications early enough that officials have time to confirm voters' identities, *see* Ohio Rev. Code §3509.03.  Failing to pass such laws invites election-corrupting fraud.

Even setting aside blatant fraud, absentee voting opens the door for interested groups to exert subtle pressure on voters.  *Brnovich*, 141 S. Ct. at 2347–48; *accord Carter-Baker Report* at 46.  To understand the problem, consider the fact that States have long prevented undue influence on voters by regulating conduct near polling places.  *Burson v. Freeman*, 504 U.S. 191, 206 (1992) (Blackmun, J., op.).  Now consider that an absentee voter's polling place may be his home, his vehicle, or his place of work.  This creates an opportunity for interested parties—be they campaign volunteers or employees at a nursing home—to exert precisely the form of

undue influence that laws regulating electioneering near voting centers are designed to prevent.  Voters confronted by a volunteer may feel pressured to complete their ballots in a particular way, *especially* if the person on their doorstep offers to collect the ballot and turn it in.  Many States thus ban "ballot harvesting" to protect every voter's right to vote his or her conscience free from undue pressure — the very essence of a secret ballot.  *See DNC. v. Hobbs*, 948 F.3d 989, 1068 (9th Cir. 2020) (*en banc*) (Bybee, J., dissenting), *rev'd by Brnovich*, 141 S. Ct. 2321.

In addition to preventing fraud and pressure, States can bolster confidence in elections by ensuring that election opportunities are administered uniformly across the State.  *Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 149 (5th Cir. 2020); *A. Philip Randolph Inst. of Ohio v. LaRose*, 831 F. App'x 188, 192 (6th Cir. 2020).  States have a strong interest in treating their citizens equally during all phases of the election process, so as not to "'value one person's vote over that of another.'"  *George v. Hargett*, 879 F.3d 711, 728 (6th Cir. 2018) (quoting *Bush v. Gore*, 531 U.S. 98, 104–05 (2000) (*per curiam*)).  Thus, States can and do aspire to give "all voters … roughly the same level of voting-related services."  *See* Joshua S. Sellers & Roger Michalski, *Democracy on a Shoestring*, 74 Vand. L. Rev. 1079, 1082 (May 2021).  That can be hard, as "the American electoral system [is] decentralized" and relies heavily on the work of local governments.  *Id.* at 1085.  But by doing what

they can to promote uniformity, States can avoid creating the perception that voters are being treated unequally—a perception that does nothing to bolster the public's faith in elections as accurate measurements of the People's will.  Thus, as States adopt new voting methods, they reasonably consider how best to ensure that those methods are available on equal terms throughout the State.

Uniformity also helps ward off legal attacks.  That is important, because even unsuccessful legal challenges can damage the public perception of election fairness.  Ohio's experience drives home the point.  The Buckeye State is "a national leader when it comes to early voting."  *Ohio Democratic Party v. Husted*, 834 F.3d 620, 623 (6th Cir. 2016).  Nonetheless, Ohio has seen more than its fair share of lawsuits "asking the federal courts to become entangled, as overseers and micromanagers, in the minutiae of [Ohio's] election processes."  *Id.* at 622.  Among other things, Ohio has been sued (sometimes successfully) for making small distinctions between certain categories of absentee voters.  *See, e.g.*, *Mays v. LaRose*, 951 F.3d 775 (6th Cir. 2020) (deadlines for jailed voters); *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012) (deadlines for military voters).  Along similar lines, Ohio has been sued by plaintiffs alleging that a lack of uniformity across localities "deprives citizens of the right to vote based on where they live."  *Ne. Ohio Coal. for the Homeless*, 837 F.3d at 635 (absentee and provisional-voting procedures); *see also*

17

*League of Women Voters v. Brunner*, 548 F.3d 463, 477–78 (6th Cir. 2008) (wait times and allocation of voting machines); *cf. also Hunter v. Hamilton Cnty. Bd. of Elections*, 635 F.3d 219, 235 (6th Cir. 2011) (provisional-voting procedures).  The message from lawsuits like these is that any disparity in the treatment of voters exposes States to lawsuits.  States are thus well advised to assure uniformity—not only with respect to in-person Election Day voting, but also with respect to newly adopted voting methods.

**2.**  SB 202 addresses these concerns.  The law continues the modern trend of providing ample opportunities for everyone to vote.  The law even expands the period of time in which Georgians may cast early in-person votes.  And it protects the actual and perceived integrity of Georgia's elections through amendments addressing fraud, undue influence, and uniformity.

It is unsurprising that Georgia lawmakers decided to address election integrity and public confidence.  After the 2018 election, supporters of gubernatorial candidate Stacey Abrams questioned the legitimacy of Governor Kemp's victory. They even attributed Kemp's win to disenfranchisement "without evidence that denial of the franchise was actually responsible for his victory."  Foley, *Assessing the Validity of an Election's Result*, 95 N.Y.U.L. Rev. Online at 185.  Two years later,

Georgia faced criticism from the other side, with former President Trump's supporters questioning the State's election results.  *See* Compl. ¶104.  With just about all sides questioning the integrity of Georgia's elections, Georgia's lawmakers no doubt thought it time to amend the election laws in ways that might increase the public's confidence in future elections.  *See* S.B. 202, §2.  It is to Georgia's credit, moreover, that it enacted legislation at the start of the election cycle.  *See Carter-Baker Report* at 7.  That leaves ample time for the inevitable litigation (including this case) that now seems to come with every change to election laws.  And that, in turn, will hopefully prevent an eve-of-election change to Georgia's election rules—the type of change that can sow confusion, diminish voter confidence, and deter voter participation.  *See Purcell v. Gonzalez*, 549 U.S. 1, 4–5 (2006) (*per curiam*).

So, how does SB 202 address election integrity?  Certain provisions ensure uniformity.  Take, for example, the (unchallenged) provisions governing early-voting hours.  Because Georgia's prior law gave local election officials "broad discretion" over early-voting hours, there were "significant variations" among counties with respect to early-voting hours.  S.B. 202, §2(5).  Many counties, for instance, offered only one weekend day of early voting.  *Id.*  Thus, to increase the total number of early-voting hours across the State, and to improve uniformity among coun-

ties, the challenged law requires that each county offer two Saturdays of early voting while leaving counties the option to add two Sundays as well.  O.C.G.A. §21-2-385(d).  The end result is that all Georgia voters will receive at least seventeen days of early voting in the twenty-two days before an election.  *See id.*  That puts Georgia at least in the middle of the early-voting spectrum, if not on the more-accommodating end.  *See State Laws Governing Early Voting*, Nat'l Conf. of State Legislatures, https://perma.cc/Z6VY-M7Y4.  And it makes Georgia infinitely more accommodating to early voting than States, like Connecticut, that do not offer *any* excuse-free early voting.  *Id.*

Section 26 of SB 202, *see* Compl. ¶161(e), also promotes uniformity by setting rules regarding the use of dropboxes.  Last year, and for the first time, Georgia allowed absentee voters to deliver their ballots to dropboxes.  *See* State Election Board Rule 183-1-14-0.6-.14.  But Georgia officials created the dropbox option through a limited, emergency rule.  *Id.*  SB 202 thus expands voting options by *requiring* that, in all future elections, every Georgia county will "establish at least one drop box as a means for absentee by mail electors to deliver their ballots."  O.C.G.A. §21-2-382(c)(1).  Section 26 guarantees uniformity in another way, as well.  While the 2020 emergency rule offered a convenient option for some voters to deliver ballots, it also created significant disparities between voters in different

counties:  voters in Georgia's most populous county had almost forty dropboxes to choose from, Compl. ¶63, but voters in dozens of other counties had *no* drop-boxes, in part because local officials viewed the dropbox option as too costly.  *See* Joe Hotchkiss, *As election nears, Georgia counties, including Columbia, lack absentee ballot dropboxes*, The Augusta Chronicle (Oct. 16, 2020), https://perma.cc/7GC5-L8NZ.  The challenged provision equalizes voting opportunities by requiring that all counties have at least one dropbox and then keying the number of "additional drop boxes" that a county may allow to a county's population and the number of early-voting locations it maintains.  O.C.G.A. §21-2-382(c)(1).  Section 26 thus expands the availability of absentee voting, secures a fair degree of uniformity, and leaves local officials in larger counties with flexibility to add dropboxes if that is what residents desire.  Incidentally, Ohio in 2020 allowed only one dropbox per county, regardless of county population.  Directive 2020-16, Ohio Secretary of State, https://bit.ly/3ekyk65; *compare* O.C.G.A. §21-2-382(c).  Some feared that Ohio's one-dropbox-per-county approach would prove insufficient.  *See A. Philip Randolph Inst. of Ohio*, 831 F. App'x at 190.  But that fear proved unfounded:  Ohio saw record turnout in 2020, driven in large part by record absentee voting.  *See* Darrel Rowland & Anna Staver, *A dozen numbers that set the 2020 election apart in Ohio as Frank LaRose certifies vote*, Columbus Dispatch (Nov. 27, 2020), https://

perma.cc/Y4QX-68QM.

Now consider the much-maligned and much-mischaracterized Section 33. That law forbids non-election officials from giving voters gifts, including food or drinks, at the polls. O.C.G.A. §21-2-414(a). (The statute, at the same time, goes out of its way to make clear that election officials may set up self-service water stations to accommodate thirsty voters. O.C.G.A. §21-2-414(e).) Georgia's approach is hardly novel. All States impose some form of restriction on what can occur near a polling place to prevent undue pressure on voters. *Electioneering Prohibitions*, Nat'l Conf. of State Legislatures, https://perma.cc/C3H9-9LLK. And the Supreme Court has already concluded that, given the country's early experiences with "voter intimidation and election fraud" at the polls, these types of "common sense" restrictions survive even heightened scrutiny. *Burson*, 504 U.S. at 202, 211 (Blackmun, J., op.); *see also id.* at 213–14 (Kennedy, J., concurring); *id.* at 216 (Scalia, J., concurring in the judgment).

Then there are the provisions designed to prevent fraud and promote order. Take, for example, the challenged provision requiring Georgians to request absentee ballots no later than eleven days before the election. SB 202, §25. This gives election officials time to verify the applicant's registration status and to send the

ballot to the voter with enough time for thoughtful completion.  It also keeps officials from being flooded with last-minute requests "during the already busy preelection period," *Mays*, 951 F.3d at 788, which means that officials will be less likely to err and will have a better head start in assuring themselves that they have sufficient resources to handle the number of absentee ballots they expect to receive. Perhaps because an eleven-day deadline serves these functions, States across the country impose similar deadlines.  *Compare* O.C.G.A. §21-2-381(a)(1)(A); *with, e.g.*, Ariz. Rev. Stat. §16-542(E); Idaho Code §34-1002(7); Ind. Code §3-11-4-3(a)(4); Iowa Code 53.2(1)(b), (11); Neb. Rev. Stat. §32-041; R.I. Gen Laws §17-20-2.1(c); Tex. Elec. Code §84.007(c); Va. Code §24.2-701(B)(2).

Another challenged provision requires that absentee voters submit identification (such as a driver's license number or a copy of a utility bill) when applying for a ballot.  O.C.G.A. §21-2-381(a)(1)(C)(i).  This allows election officials to confirm an absentee voter's identity in a manner similar to that used on Election Day.  *See* O.C.G.A. §21-2-417.   Many States have comparable laws. *See, e.g.*, Fla. Stat. §101.62(b); Iowa Code §53.2(4)(a); Kan. Stat. Ann. §25-1122(b)-(c); N.C. Gen Stat. §163-230.2(a)(4); N.D. Cent. Code §16.1-07-06(1)(k); Ohio Rev. Code §3509.03.  And thirty-five states have some sort of ID requirement.  *See Voter Identification Requirements | Voter ID Laws*, Nat'l Conference of State Legislatures, https://perma.cc

/K8LN-6HAY.  Georgia has special reason for relying on some form of identifica-
tion—rather than, say, a signature—to confirm a voter's identity:  its previous re-
liance on signature matching had been the subject of litigation.  *See Ga. Muslim
Voter Project v. Kemp*, 918 F.3d 1262 (11th Cir. 2019); S.B. 202, §2(2).

 The remaining provisions that the Department challenges dive even further
into the weeds of election administration; and, like the matters discussed already,
these provisions look nothing like the tools of voter suppression.  For example,
Georgia now bars government entities from mailing unsolicited absentee ballot
applications to voters.  O.C.G.A. §21-2-381(a)(1)(C)(ii).  That saves Georgia taxpay-
ers at least some money by preventing the mailing of unwanted applications, *see
Ohio Democratic Party*, 834 F.3d at 634 n.8, and it keeps voters on an even playing
field by promoting uniformity among the counties.  For the same reasons, Ohio
also limits the circumstances under which state officials may mail unsolicited ap-
plications for absentee ballots.  *See* Ohio Rev. Code §3501.05(EE).

 A separate challenged provision of SB 202 requires that people involved in
get-out-the-vote efforts take some minimal precautions to avoid sending absentee-
ballot applications to voters who have already requested an absentee ballot—pre-
cautions that, if taken, reduce the odds that voters will submit duplicative requests
or become confused as to whether an earlier request was received.  *See* O.C.G.A.

§21-2-381(a)(3)(A).

The last challenged provision requires voters who go to the wrong precinct on Election Day, but who still have time to go to the right precinct, to go to the correct location rather than casting a provisional ballot.  O.C.G.A. §21-2-418(a). That imposes no more than "the usual burdens of voting" and "induces compliance with the requirement that [Georgians] who choose to vote in-person on election day do so at their assigned polling places."  *Brnovich*, 141 S. Ct. at 2344, 2345. More generally, "precinct-based voting" helps "distribute voters more evenly among polling places and thus reduces wait times," puts "polling places closer to voter residences," and "ensure[s] that each voter receives a ballot that lists only the candidates and public questions on which he or she can vote."  *Id.* at 2345.

*

The takeaway point is this:  Georgia's law is part of the decades-long trend of expanding voting opportunities while taking steps to prevent bad actors from abusing those new opportunities.

### III.   The Department has provided no basis for inferring that the run-of-the-mill provisions it challenges were motivated by racial animus.

"In 1965, it was perfectly reasonable to believe that *any* move affecting black enfranchisement in the Deep South was deeply suspect."  Abigail Thernstrom, *Section 5 of the Voting Rights Act:  By Now, a Murky Mess*, 5 Geo. J.L. & Pub. Pol'y 41,

44 (2007).  Not anymore.  While some "voting discrimination still exists," and while *any* voting discrimination is too much, modern voting laws in no way resemble "the pervasive, flagrant, widespread, and rampant discrimination" of the Jim Crow era.  *Shelby Cnty.*, 570 U.S. at 536, 554 (internal quotation marks and citations omitted).  The misdeeds of that era have "no logical relation to the present day."  *Id.*

Although there is no reason to assume an illicit motive, the Department of Justice assumes one regardless.  Before filing suit, the Department presumably boiled the ocean to find anything that would support its claims of purposeful discrimination.  It came up empty; one searches the complaint in vain for *any* alleged statement or action suggesting that *anyone* involved with SB 202's passage acted with the purpose of denying or abridging anyone's right to vote on account of race.  Nonetheless, the Department forged ahead.  Perhaps it did so in response to political pressure fueled by false and "exaggerat[ed]" claims about SB 202's contents.  Nate Cohn, *Georgia's Election Law, and Why Turnout Isn't Easy to Turn Off*, NY Times (Apr. 3, 2021, edited July 1, 2021), https://perma.cc/JAC9-W7SM; *see, e.g.*, Glenn Kessler, *Biden falsely claims the new Georgia law 'ends voting hours early'*, Wash. Post (Mar. 30, 2021), https://perma.cc/275M-B9U3.  Or perhaps the Department filed this suit in hopes of winning through litigation some of the federal control over

26

elections that the current administration has failed to win through the political process—the complaint reads like an attempt to legislate by lawsuit.  *Cf.* Statement by President Joe Biden on the House of Representatives Passage of H.R. 1, The White House (Mar. 4, 2021), https://perma.cc/SQ3A-SN7K.  Regardless of the reason, in trying to establish a plausible connection between Georgia's history and SB 202, the complaint relies on strained, implausible, and downright offensive inferences.

**1.**  The Department relies primarily on its assertion that the challenged provisions of SB 202, "both individually and collectively, will weigh more heavily on Black voters."  Compl. ¶137.  Since the legislators were warned of this disparate impact, the thinking goes, they must have acted with a discriminatory purpose.  Compl. ¶138.  That entails quite a leap of logic.  The more plausible inference is that the legislators simply did not believe the rhetoric from the bill's opponents.  And for good reason.  The disparate-impact allegations rest on the implausible assumption that black voters (if they really are disparately impacted at all) will fail or refuse to adjust their voting practices to the law.  Take, for example, the Department's assertion that, because black voters were disproportionately likely to request an absentee ballot between four and ten days before the election, requiring

voters to make their requests within eleven days of the election will disproportion-ately burden black voters.  Compl. ¶58.  Is it not more reasonable to predict that black voters will adjust their conduct?  Voters could, for example, request absentee ballots before the new deadline—the law gives them sixty-seven days before a reg-ular election, and seventeen days before a run-off, in which to do so.  Or perhaps voters will vote in some other way, including by availing themselves of SB 202's expanded early-voting option.  Presumably campaigns and other groups will widely advertise the new rules, adapting their get-out-the-vote tactics in the same way they adapted to the addition of early voting and no-fault absentee voting in the past.

The same logic applies to the Department's baseless assumption that black voters will be uniquely incapable of finding the proper precinct, Compl. ¶80, of producing one of the numerous forms of identification (such as a utility bill) that voters can use when requesting or submitting an absentee ballot, Compl. ¶54, or retrieving water set out by election officials instead of having it delivered while they stand in line to vote, Compl. ¶75.  (The Department does not explain why preventing duplicate absentee applications disproportionately harms black voters, and the *amici* States will not hazard a guess as to the Department's thinking.)

In addition to implausibly assuming that a voter's race defines his or her

ability to comply with easy-to-satisfy voting requirements, the Department draws unsupportable assumptions based on the races of the legislators who voted to enact the bill.  The complaint repeatedly stresses the skin tone of the legislators who supported or voted for SB 202.  Compl. ¶¶115, 117, 122, 130, 132.  But animus is judged by the content of one's character, not the color of one's skin.  To infer racial animus based on the color of the legislators' skin is, quite literally, racist.

In the end, the Department's position is deeply ironic.  In attempting to link SB 202 to the laws of the Jim Crow era, the complaint appears to endorse "the belief, held by too many for too much of our history, that individuals should be judged by the color of their skin."  *Shaw v. Reno*, 509 U.S. 630, 657 (1993).  The complaint's attempts to allege a disparate impact implicitly rest on the offensive, paternalistic, and disproven view that minority voters are disproportionately incapable of overcoming the same minor burdens that all voters face.  *See Brnovich*, 141 S. Ct. at 2334; Enrico Cantoni & Vincent Pons, *Strict ID Laws Don't Stop Voters: Evidence from a U.S. Nationwide Panel, 2008–2018*, Nat'l Bureau of Economic Research (revised May 2021), https://perma.cc/QM36-4THZ.  And its focus on the races of legislators who opposed and supported SB 202 treats individuals as though they were members of monolithic race-based tribes.  That is not the view our Constitution takes.  "In the eyes of government, we are just one race here.  It

is American." *Adarand Constructors v. Pena*, 515 U.S. 200, 239 (1995) (Scalia, J., concurring in part and concurring in the judgment).

**2.**  The Department's complaint also points to supposedly pretextual statements regarding SB 202's purpose, along with the procedural history of the bill's enactment.  But these allegations provide no plausible basis for inferring a discriminatory purpose.

Begin by recalling the circumstances in which Georgia's legislature began considering SB 202.  The November 2020 election occurred in the midst of a once-in-a-century pandemic.  States and their political subdivisions responded by altering their absentee-voting rules, sometimes by law, but often by administrative or judicial decree and often quite late in the election cycle.  *See, e.g.*, *New Ga. Project vs. Raffensperger*, 484 F.Supp.3d 1265 (N.D. Ga. 2020), *stay granted by* 976 F.3d 1278 (11th Cir. 2020); *Republican Party of Pa. v. Boockvar*, 141 S. Ct. 1, 1 (2020) (statement of Alito, J.); *Moore v. Circosta*, 141 S. Ct. 46, 47 (2020) (Gorsuch, J., dissenting from denial of application for injunctive relief).  Georgia, for example, adopted administrative rules allowing (but not requiring) absentee-ballot dropboxes.  *See* Ga. State Election Board Rule 183-1-14-0.6-.14.  Other States were forced by court order to accept absentee ballots submitted in violation of state statutes. *See, e.g.*, *Pa. Dem-*

ocratic Party v. Boockvar, 238 A.3d 345, 372 (Pa. 2020).  These late alterations to voting procedures—many of which were adopted and implemented on the fly—understandably caused many to wonder about the security of the upcoming elections.  The slow, seemingly disorganized manner in which officials in some jurisdictions tabulated the votes did nothing to improve anyone's confidence.  *See, e.g.,* Jonathan Easley, *Pennsylvania's Allegheny County pauses ballot counting until Friday,* The Hill (November 5, 2020), https://perma.cc/W2TJ-AW22.  Even today, with the benefit of hindsight, we know that officials attempting to navigate this chaotic period committed egregious errors.  For example, New York officials irreparably tainted one election by losing the color-coded sticky notes that they used to track absentee ballots.  *See* Mark Weiner and Patrick Lohman, *Absentee ballots in limbo over lost sticky notes in Brindisi-Tenney House race,* Syracuse.com Blog (Nov. 23, 2020), https://perma.cc/WY98-8CHM.

In light of this context, the purpose of SB 202 is obvious:  restoring the public's confidence in Georgia's elections.  The bill does so by pursuing the twin aims of every election system:  making it easy to vote while promoting uniformity and taking steps to prevent fraud, intimidation, and mistake.  *See above* 11–25.

The Department insists that Georgia's concerns with voting fraud were en-

tirely pretextual.  But its allegations do not support that inference.  The Department cites a few statements from legislators who raised concerns about voter fraud.  *See* Compl. ¶110, 114, 122.  The Department asserts that, because widespread voter fraud has not been proven, any individual legislator's belief that voter fraud is a problem must be insincere and pretextual.  Compl. ¶136(h).  Wrong.  Regardless of whether the lawyers who wrote the Department's complaint believe that voter fraud is a problem worth addressing, many Americans do.  Americans have seen elections tainted by fraud.  *See Brnovich*, 141 S. Ct. at 2348; *Marks v. Stinson*, No. 93-6157, 1994 U.S. Dist. LEXIS 5273, at *31 (E.D. Pa. Apr. 26, 1994); Voting Rights Act:  Criminal Violations, *Hearings Before Subcomm. on the Constitution of the S. Comm. on the Judiciary*, 98th Cong. 1st Sess. 4 (1983) (testimony of Dan Webb, U.S. Attorney for the N.D. Ill.).  And they have learned from esteemed public servants—including former President Carter, former Secretary of State Baker, and numerous distinguished jurists—that voter fraud is a serious risk that election systems must guard against.  *See Carter-Baker Report* at 46; *Brnovich*, 141 S. Ct. at 2348; *Crawford*, 553 U.S. at 196 (op. of Stevens, J.); *Burson*, 504 U.S. at 208 (Blackmun, J., op.); *Veasey v. Abbott*, 830 F.3d 216, 263 (5th Cir. 2016) (*en banc*); *Hobbs*, 948 F.3d at 1071 (Bybee, J. dissenting); *Griffin*, 385 F.3d at 1130–31; *U.S. Student Ass'n Found. v. Land*, 546 F.3d 373, 394 (6th Cir. 2008) (Vinson, J., dissenting);

*Wrinn v. Dunleavy*, 186 Conn. 125, 143-44 (1982).

The question here is not whether fraud in fact changed the results of the 2020 General Election or the 2021 runoff. *See* Compl. ¶107, 108. As the Supreme Court recently recognized, States need not wait for fraud to infect an election before taking steps to prevent it. *See Brnovich*, 141 S. Ct. at 2348. In essence, the Department asks this Court to "assume[] that a legislature's stated desire to prevent voter fraud must be pretextual when there is no direct evidence of voter fraud in the legislative record," *Hobbs*, 948 F.3d at 1058 (O'Scannlain, J., dissenting), which is exactly what the Court in *Brnovich* reversed the Ninth Circuit for doing.

The Department also makes much of the fact that Georgia's legislature allegedly "departed from its normal procedural practice in passing the bill." Compl. ¶157. For example, it alleges that the substitute version of SB 202, which contains the bulk of the bill as passed, was not widely available prior to its introduction. Compl. ¶¶118–20. It further alleges that "all election bills" were initially considered by a "Special Committee set up for that purpose," rather than by the "standing House Committee." Compl. ¶157. And it stresses that legislators "declined to include a fiscal note with the omnibus bill." Comp. ¶157. Even assuming these allegations are true, they are irrelevant. Controversial bills are often drafted and passed outside of "the traditional legislative process." *King v. Burwell*, 576 U.S.

473, 491 (2015) (quotation omitted) (discussing the Affordable Care Act's passage). Further, the Georgia legislature had good reason to act swiftly with respect to SB 202: doing so ensured that the bill would be passed, and that any litigation challenging the law could be wrapped up, well before the 2022 midterms. It is impossible to understand how any of the Department's process gripes suggest that Georgia's legislature acted with a racially discriminatory purpose. If these allegations serve any function, it is to fill space and distract from the absence of any plausible claim for relief.

*

In sum, the Department of Justice's theory boils down to this: Because Georgia officials decades ago acted to deny black citizens the right to vote, and because black voters *might* be disproportionately impacted by some of SB 202's changes *if* they continue trying to vote in exactly the same way without regard to the changes to state law, this Court should hold that SB 202 was passed with the purpose of discriminating on the basis of race. Yet the complaint does not allege *anything* that would justify this Court in inferring that this implausible string of contingencies will come to pass.

This is not 1890 or 1965. Georgia's law is a reasonable updating of the rules of the road in a greatly expanded voting environment, and successfully balances

the tensions between two virtues: free *and* fair elections.  The Court should dismiss

the Department's complaint.

## CONCLUSION

The Court should grant Georgia's motion to dismiss.

STEVE MARSHALL
Attorney General of Alabama

TREG R. TAYLOR
Attorney General of Alaska

MARK BVNOVICH
Attorney General of Arizona

LESLIE RUTLEDGE
Attorney General of Arkansas

THEODORE E. ROKITA
Attorney General of Indiana

DEREK SCHMIDT
Attorney General of Kansas

DANIEL CAMERON
Attorney General of Kentucky

AUSTIN KNUDSEN
Attorney General of Montana

DOUGLAS J. PETERSON
Attorney General of Nebraska

JOHN M. O'CONNOR
Attorney General of Oklahoma

Respectfully submitted,

DAVE YOST
Ohio Attorney General

*/s/Carey A. Miller*
Carey A. Miller
Georgia Bar No. 976240
Robbins Ross Alloy Belinfante
Littlefield LLC
500 14th Street NW
Atlanta, Georgia 30318
Telephone: (678) 701-9381
Facsimile: (404) 856-3250
cmiller@robbinsfirm.com

BENJAMIN M. FLOWERS
   (*pro hac vice pending*)
Solicitor General
MAY MAILMAN
   (*pro hac vice pending*)
Deputy Solicitor General
30 East Broad Street, 17th Floor
Telephone:  (6l4) 466-8980
Facsimile:  (614) 466–8087
benjamin.flowers@OhioAGO.gov

*list continued on next page*

36

ALAN WILSON
Attorney General of South Carolina

HERBERT H. SLATERY III
Attorney General and Reporter
of Tennessee

KEN PAXTON
Attorney General of Texas

SEAN D. REYES
Attorney General of Utah

PATRICK MORRISEY
Attorney General of West Virginia

## LOCAL RULE 7.1(D) CERTIFICATION

As required by Local Rule 7.1(D), the undersigned counsel certifies that this brief was prepared in Book Antiqua, 13-point font, in compliance with Local Rule 5.1.

_/s/Carey A. Miller_
Carey A. Miller

**CERTIFICATE OF SERVICE**

I hereby certify that on August 3, 2021, a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to all parties for whom counsel has

entered an appearance by operation of the Court's electronic filing system.

/s/Carey A. Miller
Carey A. Miller