**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

---

**UNITED STATES OF AMERICA,**

Plaintiff,

v.

**THE STATE OF GEORGIA; THE GEORGIA STATE ELECTION BOARD;
and BRAD RAFFENSPERGER, in his official capacity as Georgia
Secretary of State,**

Defendants.

---

Case No. 1:21-cv-02575-JPB
The Honorable J.P. Boulee

---

**BRIEF OF THE FOUNDATION FOR GOVERNMENT
ACCOUNTABILITY AS *AMICUS CURIAE***

*This brief is filed with the consent of Defendants and is unopposed by Plaintiff.*

---

**THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY**

Holly Pierson, GA Bar # 579655
Pierson Law LLC
3127 Maple Drive NE
Atlanta, GA 30305
Telephone: 404-353-2316
Fax: 404-261-2842
hpierson@piersonlawllc.com

Chase Martin, ME Bar #005358
Stewart L. Whitson, MN Bar #0391405
Foundation for Government Accountability
15275 Collier Blvd., Suite 201
Naples, FL  34119
Telephone:  239-244-8808
Chase@TheFGA.org
Stewart@TheFGA.org
*pro hac vice admission pending*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................……iv-vi

STATEMENT OF INTEREST ................................................ …….1-2

INTRODUCTION AND SUMMARY OF ARGUMENT................................. 2-6

ARGUMENT ..................................................................... 6-24

I.    THE DOJ FAILS TO STATE A CLAIM BECAUSE IT CANNOT
      SUFFICIENTLY PLEAD A DISCRIMINATORY PURPOSE BEHIND
      SB 202; VOTING REMAINS "EQUALLY OPEN" TO ALL GEORGIANS
      REGARDLESS OF RACE ......................................................6-20

      A. The DOJ Has Not And Cannot Sufficiently Plead A Discriminatory
         Intent Behind SB 202...................................................6-11

      B. SB 202 Does Not Violate The "Results Test" of the VRA § 2 Because
         The Voting Process Remains "Equally Open" To All Georgians
         Regardless of Race...................................................11-20

         1. *The Disparate Impact Alleged By the DOJ Is Legally
            Insufficient*..................................................12-14

         2. *The Challenged Provisions Impose Only The Usual Burdens of
            Voting*........................................................14-18

            a. Change to deadline to request absentee ballot.............15-16

            b. Verification requirements for absentee ballot
               applications ......................................... 16-17

            c. Prohibition on providing free food and drinks
               in voter line .......................................17-18

         3. *Strong State Interests Support SB 202*...............................18-19

         4. *The Totality of the Circumstances Establishes That
            Voting Remains Equally Open Under SB 202*.................    19-20

II.    THIS DOJ TEST CASE INVOLVES SERIOUS FEDERALISM AND
       SEPARATION OF POWERS PRINCIPLES WITH NATIONAL
       IMPLICATIONS…….....……..……………………………………20-24

       A.  The DOJ's Lawsuit Is A Threat to Federalism……………….21-22

       B.  The DOJ Would Be Incentivized to Continue to Weaponize Civil
           Rights Laws and Divert Taxpayer Resources for Improper Political
           Ends……………………………………………………….…...22-24

CONCLUSION……………………………………………... ……..….…....…25

# TABLE OF AUTHORITIES

## *Cases*

*Brnovich v. DNC*, 141 S. Ct. 2321 (2021) …………………………..……………*passim*

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181 (2008) ………………….. *passim*

*Mobile v. Bolden*, 446 U.S. 55 (1980) …………………………………………………..11

*Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013) …………………………...…..20-21


## *Constitutional Provisions, Statutes, and Regulations*

U.S. CONST. amend. X……………………………………………………..…………21

52 U.S.C. 10301……………………………………………………………………..11

SB 202……………………………………………………………...…………………… *passim*

SB 202, § 2…………………………………………………………….……….4, 10, 19

SB 202, §18 ………………………………………………………………………….18

SB 202, § 25……………………………………………………………………  14-15

SB 202, § 26…………………………………………………………………….  15

SB 202, § 28 …………………………………………………………………….  20

SB 202, § 33 ……………………………………………………………………  15

SB 202, § 34 ……………………………………………………………………  15


## *Other*

Boyd & Markman, *The 1982 Amendments to the Voting Rights Act:*
*A Legislative History*, 40 WASH. & LEE L. REV. 1347, 1352-1353 (1983)………  11

Brief for States of Ohio, et al. as Amici Curiae,
*Brnovich v. DNC*, No. 19-1257, 2020 WL 2999190, at *11 (S. Ct. 2021) .......... 20

Building Confidence in U. S. Elections §2.5 (Sept. 2005), App. 136-137 .......... 2

Daniel P. Tokaji, *Applying Section 2 to the New Vote Denial*,
50 HARV. C.R.-C.L. L. REV. 439, 440 (2015) ................................................ 20

Emma Hurt, *Trump Hasn't Conceded Georgia. Neither Did Stacey Abrams.
What Changed?* NPR (Nov. 18, 2020), *available at* n.pr/3wOx8hx ................ 2

Georgia Voter Identification Requirements, Ga. Sec'y of State,
*available at* bit.ly/3hNVXGd .................................................................. 16

Letter from E. Kneedler, Deputy Solicitor General, to S. Harris, Clerk of Court
(Feb. 16, 2021) .................................................................................. 22

Scott Detrow, *Georgia Elections Official Responds to Bills that Would
Make Voting Harder*, NPR (Mar. 9, 2021), *available at* n.pr/3rmfbpI ............ 16

Special Committee on Election Integrity, Ga. House of Representatives
(2021), *available at* bit.ly/3ilBV54 ....................................................... 7, 10

Special Committee on Election Integrity, Ga. House of Representatives
(Feb. 4, 2021), *available at* bit.ly/3wIwoe1 ............................................. 8

Special Committee on Election Integrity, Ga. House of Representatives
(Feb. 18, 2021), *available at* bit.ly/2UPKehk .................................... 2, 8-9, 16

Special Committee on Election Integrity, Ga. House of Representatives
(Feb. 19, 2021), *available at* bit.ly/3BfviK7 ........................................... 4, 10

Special Committee on Election Integrity, Ga. House of Representatives
(Feb. 22, 2021), *available at* bit.ly/3hKFti7 ........................................... 8, 10

Special Committee on Election Integrity, Ga. House of Representatives
(Mar. 24, 2021), .................................................................................. 13

Statement by President Biden on the Attack on the Right to Vote in Georgia,
White House Briefing Room (Mar. 26, 2021), bit.ly/3rjJUUn ......................... 24

Statement of Representative Jan Jones at 17:00-30:08; *available at* bit.ly/3evBvbg......................................................................................13

## STATEMENT OF INTEREST

The Foundation for Government Accountability ("FGA") is a nonpartisan, nonprofit organization that seeks to improve the lives of all Americans by improving welfare, workforce, healthcare, and election integrity policy at the state and federal levels. Launched in 2011, FGA promotes policy reforms that seek to free individuals from government dependence, restore dignity and self-sufficiency, and empower individuals to take control of their futures, including through free, fair elections that inspire confidence and encourage participation.

Since its founding, FGA has helped achieve more than 500 policy reforms in 42 states in policy areas related to welfare, healthcare, workforce, and election integrity. FGA supports its mission by conducting innovative research, deploying outreach and education initiatives, and equipping policymakers with the information they need to achieve meaningful reforms. FGA recently filed an *amicus* brief with the United States Supreme Court in *Gresham v. Azar*, and another before the Missouri Supreme Court in *Doyle v. Tidball*.

In this case, the State of Georgia has passed election reforms that strike a legal and proper balance between making it easy to vote, but hard to cheat. Now, the United States Department of Justice (the "DOJ") has stepped in, opposing these commonsense state reforms. This case directly implicates FGA's core

mission relating to election integrity reforms. Accordingly, FGA files this *amicus curiae* brief in support of Georgia's SB 202.

## INTRODUCTION AND SUMMARY OF ARGUMENT

All citizens, regardless of political party, benefit from and should demand election integrity. While this principle has historically been bipartisan,[1] of late it has been politicized and weaponized for reasons that have everything to do with political posturing and almost nothing to do with election integrity.

Georgia's recent electoral experience is one example of this politization. In 2018, for example, when Democrat Stacey Abrams lost her bid for Governor to Republican Brian Kemp, she refused to concede and indicated that her loss was a result of the lack of election integrity in Georgia. She publicly called for "reform of our election systems in Georgia."[2] After the 2020 election, the news was again

---

[1] For example, in 2005, a bipartisan Commission on Federal Election Reform chaired by former President Jimmy Carter and former Secretary of State James A. Baker III, recognized the importance of election integrity: "There is no evidence of extensive fraud in U.S. elections or of multiple voting, *but both occur*, and it could affect the outcome of a close election. The electoral system *cannot inspire public confidence if no safeguards exist* to *deter or detect fraud* or to confirm the identity of voters." [emphasis added]. *See* BUILDING CONFIDENCE IN U. S. ELECTIONS § 2.5 (Sept. 2005), App. 136-137 ("CARTER-BAKER REPORT").

[2] Emma Hurt, *Trump Hasn't Conceded Georgia. Neither Did Stacey Abrams. What Changed?*, NPR (Nov. 18, 2020), *available at* n.pr/3wOx8hx; *see also* Special Committee on Election Integrity, Ga. House of Representatives ("Special Committee") (Feb. 18, 2021), Statement of Chairman Barry Fleming, 00:3:25, *available at* bit.ly/2UPKehk.

dominated by claims of election fraud and other irregularities, with calls for election reform again being raised, this time from the right side of the aisle. Despite these recent calls for election reform from both political parties in Georgia, however, the Georgia Legislature's recent efforts to expand access to voting while making Georgia's elections more secure through SB 202 has been misbranded as an effort to suppress minority votes, first by political activists and now, shockingly, by the Department of Justice ("DOJ").  As the plain language of SB 202 makes abundantly clear, however, these claims are entirely specious.  The provisions of SB 202 work together to *expand* access to voting for all Georgians while simultaneously making it more difficult to cheat the electoral system.

Enacting election reforms is not just about preventing voter fraud; it is also about inspiring public confidence in the electoral system:  "Fraud can [not only] affect the outcome of a close election, … [but also] undermine public confidence in the fairness of elections and the perceived legitimacy of the announced outcome." *Brnovich v. DNC*, 141 S. Ct. 2321, 2340 (2021).   "[P]ublic confidence in the integrity of the electoral process has independent significance, because it encourages citizen participation in the democratic process." *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008).  Confidence in the integrity of

elections drives people to the polls, much more so than even the ease and convenience of voting (which SB 202 also enhances in many material ways).[3]

Inspiring voter confidence in secure elections is what SB 202 was designed to do and is precisely what it does.  It was specifically crafted for the purpose of making it "easy to vote and hard to cheat," while addressing "the lack of elector confidence in the election system on all sides of the political spectrum," reducing "burden[s] on election officials," and streamlining "the process of conducting elections in Georgia by promoting uniformity in voting."[4]  SB 202 is also designed to make it easier, more efficient, and less costly for county election officials to effectively run elections. As the Supreme Court has made clear, these are all legitimate state interests that justify reasonable, non-discriminatory burdens on voters. *Crawford*, 553 U.S. at 191-197.

In its lawsuit, however, the DOJ claims that seven of SB 202's provisions violate Section 2 of the VRA because they were supposedly "adopted with the purpose of denying or abridging Black citizens' equal access to the political process ...." [ECF No. 1,  Compl. ¶¶161-62].   This wholly conclusory allegation not only

---

[3] CARTER-BAKER REPORT at § 2.5, App. 136-137; *see also See, e.g.*, Special Committee (Feb. 19, 2021), 1:27:10, *available at* bit.ly/3BfviK7.

[4] SB 202, § 2.  The State's interests also include protecting Georgians waiting in line to vote from "improper interference, political pressure, or intimidation."  SB 202, § 2, ln. 127-129, *available at* https://legiscan.com/GA/text/SB202/2021.

lacks factual support, but it is also refuted by the plain language and provisions of SB 202 itself.  The DOJ attempts to support its discriminatory intent claim by alleging that the General Assembly knew that "Black voters will be disproportionately burdened by the challenged provisions of SB 202" when they passed SB 202. This unsupported, conclusory, and false allegation is not entitled to the presumption of truth or any deference under the *Iqbal/Twombly* standard. Regardless, because SB 202 makes clear on its face that the voting process in Georgia remains "equally open" to all Georgians regardless of race, this theory fails as a matter of law under the "results test" of Section 2 of the VRA.

In short, the DOJ has wholly failed to allege any facts (because such facts simply do not exist) from which this Court could possibly discern even speculative, much less plausible, liability under the VRA.    Under the Rule 8 and *Iqbal/Twombly* standards, the DOJ has not even come close to meeting its burdens.  In its anemia, the DOJ lawsuit exposes itself as a politically based empty suit, not a legitimate challenge to SB 202.  Candidly, had a Democratic legislature passed these exact provisions, neither the DOJ nor the other groups who are challenging Georgia's law would have raised these spurious challenges. Indeed, many states controlled by Democratic legislatures and Governors have similar, even much less generous, voting laws.  Tellingly, however, neither the activists nor the DOJ are challenging those laws as violations of the VRA.

The DOJ's political attack on Georgia's sovereignty has national implications beyond the State of Georgia.  If allowed to proceed, it will be the model that DOJ (and others) use to attack other validly enacted election security reforms across the country, with material federalism and Separation of Powers implications.  In short, SB 202 is the Georgia Legislature's entirely constitutional and lawful effort to improve Georgia's voting laws to ensure free and fair elections. It expands access and ease of voting, and the minimal burdens it imposes are reasonable and applied equitably to all Georgia voters.   Because it cannot, the DOJ's complaint does not state a claim upon which relief can be granted, and its complaint should be dismissed.

## ARGUMENT

### I.   THE DOJ FAILS TO STATE A CLAIM BECAUSE IT CANNOT SUFFICIENTLY PLEAD A DISCRIMINATORY PURPOSE BEHIND SB 202; VOTING REMAINS "EQUALLY OPEN" TO ALL GEORGIANS REGARDLESS OF RACE.

#### A. The DOJ Has Not And Cannot Sufficiently Plead A Discriminatory Intent Behind SB 202.

The DOJ has failed to sufficiently allege that the seven challenged provisions of SB 202 "were adopted with the purpose of denying or abridging Black citizens' equal access to the political process" in violation VRA §2, [ECF 1, Compl. at ¶ 161].  The DOJ provides none of the factual allegations necessary to support this conclusory allegation.

A key question under the VRA is whether "the legislature as a whole" acted with discriminatory intent. *Brnovich*, 141 S. Ct. at 2348-50. Discriminatory motives do not include "partisan motives" or "sincere" (even if mistaken) beliefs about the existence of fraud or the wisdom of election reforms. *Id.* But the DOJ has alleged no facts that demonstrate that the Legislature, as a whole, acted with such intent. And it cannot do so, because the Georgia General Assembly followed the normal legislative process in enacting SB 202, the legislative history disproves any discriminatory motive, and the law does not affect voters on the basis of race. *See, e.g., Brnovich*, 141 S. Ct. at 2348-50 (court should examine historical background and sequence of events leading to law's enactment, looking for departures from the normal legislative process while considering relevant legislative history and ultimately weighing the law's impact on different racial groups.)

Specifically, a bipartisan Special Committee on Election Integrity was formed and met for the first time in a public setting on February 4, 2021.[5] The Committee held at least twelve public hearings, with an additional four hearings held by subcommittees, all of which were available to the public through audio and video recordings uploaded to YouTube.[6]

---

[5] Special Committee (Feb. 4. 2021), *available at* bit.ly/3ilBV54.

[6] *Id.* From the hearings, the purpose behind SB 202, including the seven provisions which DOJ has challenged, were discussed. First, the hearings identified a need to rein in the number of duplicate absentee ballots sent to counties by multiple groups which overwhelmed many counties in 2020 causing

In the first hearing, multiple witnesses testified in support of one or more of the reforms, providing practical and non-racial reasons for them. Those witnesses included Todd Edwards of the non-partisan Association County Commissioners of Georgia ("ACCG"),[7] and Debra Presswood, the Registration and Election Supervisor for Houston County,[8] and they identified legitimate, non-racial reasons for these commonsense reforms. At the close of the first hearing,

---

significant delays in finalizing results. Special Committee (Feb. 4, 2021), 53:00; *available at* bit.ly/3wIwoe1. Second, the need to move from a subjective verification system that compares signatures to an objective system that compares ID numbers instead was also identified. *Id.* (Feb. 18, 2021), 10:00-14:05, *available at* bit.ly/2UPKehk. Third, the need to submit absentee ballot applications with enough time to allow the individual to receive their ballot, fill it out, and send it back to actually have their vote counted was discussed. *Id.* at 16:26. Fourth, the need to protect drop boxes and the ballots they hold from vandalism and tampering, while making it as easy as possible for election officials to comply with the new requirements and efficiently process and count absentee ballots was noted. *Id.* at 18:33. Fifth, the need to encourage voting in the proper precinct to help shorten lines, improve efficiency at the polls, and ensure voters are able to cast a vote for their local officials was noted. *Id.* at 33:50. Sixth, the need to ensure that the area close to the polls is secure and free from outside influence or harassment was identified. *Id.* at 57:00. Seventh, to help reduce confusion and voter complaints, the need to limit the number of absentee ballot applications received by voters. *Id.* (Feb. 22, 2021) at 16:45, *available at* bit.ly/3hKFti7.

[7] Mr. Edwards testified that "Following the 2020 primary and the various challenges that were encountered by counties," his group, ACCG, began meeting with "*election directors and counties across the state to see how we can better improve the [election] process.*" Special Committee (Feb 4., 2021), 25:00-26:15 (emphasis added), *available at* bit.ly/3wIwoe1.

[8] Ms. Presswood testified that, "in our opinion, [the old law] sets the voter up for failure … of not getting the ballot back in on time … we're trying to get to the point where we don't have to reject the ballot." *Id.* at 30:50.

Representative Calvin Smyre, the ranking Democrat and the longest serving member of the Georgia Legislature stated, "[t]his is a fundamental issue of voting, and it is dear to everybody, and to the State of Georgia to have a fair election … as we go forward … I hope we can have the kind of dialogue we had today."[9]

During the second hearing, Representative Demetrius Douglas, a Democrat, applauded the Chairman's effort to take the recommendations of the Democrats into account stating, "I see you took my recommendation that everything be put into a single bill … I love that."[10]  Later, another Democrat member of the bipartisan committee also applauded the Chairman for following the recommendation of Representative Douglas.[11]

In the third hearing, Chairman Barry Fleming reiterated that "[t]here has been controversy surrounding our election system … the goal of our process here should be to attempt to restore the confidence of our public in our election system …. to attempt to the extent that we can … to bring the left and the right to a position where they have confidence overall in our election system."[12]  Other

---

[9] *Id.* at 1:22:15-58

[10] *Id.* at 58:11.

[11] *Id.* at 1:11:00.

[12] Special Committee (Feb. 18, 2021), 2:00-4:11 *available at* bit.ly/2UPKehk.

9

members echoed this sentiment.[13]

During the fourth public hearing, when ranking Democrat Representative Smyre requested that the committee meet again the following week after a full day of hearings so that more witnesses opposing SB 202 might be heard, the Chairman immediately agreed to the request.[14] During the fifth public hearing, the Chairman held the meeting open for 45 minutes longer than originally scheduled to enable additional witnesses to testify.[15]

Indeed, in the more than 19 hours of testimony and debate conducted by the Special Committee and its subcommittees, all publicly available, not a single comment can be found that even suggests a discriminatory intent on the part of the Georgia Legislature.[16]   In fact, the Legislature expressly articulated its entirely non-discriminatory state interests in enacting SB 202:  to "boost voter confidence"; "streamline … elections" by promoting "uniformity"; "reduce the burden on election officials"; prevent "improper interference, political pressure, or intimidation"; and make it "hard to cheat." SB 202, § 2. No facts even remotely suggest that these legitimate state interests are pretexts for discrimination or

---

[13] Representative Alan Powell, a Republican, stated, "we need to find a common ground … what's in the benefit of one political party should be in the benefit of the other." *Id.* at 56:00

[14] Special Committee (Feb. 19, 2021), 6:37:30, *available at* bit.ly/3BfviK7.

[15] Special Committee (Feb. 22, 2021), 2:40:00, *available at* bit.ly/3hKFti7.

[16] Special Committee (Feb. 4 – Mar. 24, 2021), *available at* bit.ly/3ilBV54.

that the "legislature as a whole" acted with discriminatory intent, and the DOJ's conclusory allegations to the contrary are implausible and legally insufficient.

### B. SB 202 Does Not Violate The "Results Test" of the VRA § 2 Because The Voting Process Remains "Equally Open" To All Georgians Regardless of Race.

Following the Supreme Court's decision in *Mobile v. Bolden*, 446 U.S. 55 (1980), Congress amended § 2 of the Voting Rights Act to its current statutory language.[17] In its current form, VRA § 2 prohibits voting practices or procedures from being "imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or [membership in a language minority group]." 52 U.S.C. § 10301(a).

In § 2(b), Congress outlined what specifically must be shown to prove a violation:  a violation occurs only where "based on the *totality of circumstances*, it is shown that the political processes leading to nomination or election in the State or political subdivision are not *equally open* to participation [to certain individuals based on their race, color, or language minority group] … in that its members have less *opportunity* than other members of the electorate to participate in the political process and to elect representatives of their choice." 52 U.S.C. §10301(b)

---

[17] Boyd & Markman, *The 1982 Amendments to the Voting Rights Act:  A Legislative History*, 40 WASH. & LEE L. REV. 1347, 1352-1353 (1983).

(emphasis added). Thus, for DOJ to survive a motion to dismiss, it must sufficiently plead plausible facts that establish beyond a speculative level that, based on the totality of the circumstances, Black Georgians have less opportunity than other Georgian voters such that voting in Georgia is not "equally open" to all races. This it has not and cannot do.

1. *The Disparate Impact Alleged By the DOJ Is Legally Insufficient.*

Unable to satisfy this burden, DOJ instead tries to bootstrap an effect/result claim, alleging in conclusory fashion that the Legislature *must* have acted with a discriminatory intent because "Black voters will be disproportionately burdened by the challenged provisions of SB 202." [ECF 1, Compl. at ¶ 162]. This conclusory allegation is simply insufficient under *Iqbal/Twombly*.

In *Brnovich*, decided in June, the Supreme Court considered for the first time how § 2 applies to general time, place, or manner voting rules, such as those at issue here. 141 S. Ct. at 2330. The Court examined two Arizona voting rules alleged to violate § 2 of the VRA. The first rule requires voters in some counties voting in person on election day to vote in their own precincts to have their ballots counted. The second rule criminalized ballot harvesting (i.e., prohibited anyone other than a postal worker, elections official, or a voter's family member, household member, or caregiver to knowingly collect an early ballot). *Id.* at 2334.

Ultimately, the *Brnovich* Court reversed the Ninth Circuit's decision that had struck down the laws under § 2 of the VRA.  In so doing, the Court held that neither AZ statute violated the VRA because neither measure was based on a discriminatory purpose, neither measure exceeded the "usual burdens of voting" based on the totality of the circumstances, both measures applied equally to all voters, and they furthered strong and legitimate state interests, including the prevention of election fraud.  *Id.* at 2343-48.[18]

Applying the *Brnovich* Section 2 analysis in this case, the DOJ has not and cannot plead sufficient plausible, non-conclusory facts to survive the State's motion to dismiss.   By its plain terms, SB 202 applies equally to all voters.  It also *increases* the number of required voting hours in the vast majority of Georgia's counties and *increases* the number of drop boxes in at least 38 counties. In fact, the new law requires drop boxes in every county, which was previously not codified, and it ensures that drop boxes are better secured and located in each county in a place that is fair to its voters.[19]   And, of course, because absentee ballots can always be mailed, every person's mailbox is still its own drop box.

---

[18] The *Brnovich* Court emphasized that even when a voting regulation has a disparate impact on a racial group, that is insufficient to invalidate a law under § 2 of the VRA:  "Differences in employment, wealth, and education may make it virtually impossible for a State to devise rules that do not have some disparate impact … §  2 does not deprive the States of their authority to establish non-discriminatory voting rules." *Id.* at 2343.

[19] Special Committee (Mar. 24, 2021), at 17:00-30:08, *available at* bit.ly/3evBvbg.

The DOJ bases its claims, in essence, on alleged disparate impact.  But the *Brnovich* Court rejected this theory: "[T]he mere fact there is some disparity in impact does not necessarily mean that a system is not equally open or that it does not give everyone an equal opportunity to vote." 141 S. Ct. at 2339. The size of any purported disparity is also relevant: "[t]he size of any disparity matters … very small differences should not be artificially magnified." *Id.*  Here, that is exactly what the DOJ seeks to do – to artificially magnify imagined disparities and interpose a non-existent racial motive onto these concocted discrepancies. Under any application of Rule 8 and *Iqbal/Twombly* framework, the DOJ's conclusory, unsupportable, and speculative allegations are insufficient.

2. *The Challenged Provisions Impose Only The Usual Burdens of Voting.*

"[B]ecause voting necessarily requires some effort and compliance with some rules, the concept of a voting system that is 'equally open' and that furnishes an equal 'opportunity' to cast a ballot must tolerate the 'usual burdens of voting.' … Mere inconvenience cannot be enough to demonstrate a violation of § 2." *Id.* at 2338 (quoting *Crawford*, 553 U.S. at 198).  Here, the seven provisions that the DOJ challenges[20] impose only the usual burdens of voting and, at most, may cause present some minor inconvenience to *all* Georgia voters.

---

[20] The seven provisions DOJ challenges are

  (i)     Banning government entities from mailing unsolicited absentee ballot request forms to voters (SB 202, §25, ln. 966-970);

### a) Change to deadline to request absentee ballot.

The DOJ has not and cannot plausibly allege to the contrary.  For instance, the rule requiring absentee ballot requests to be submitted 11 days prior to the election actually *increases* the odds of that vote being counted.[21]  Given the time it takes for voters to receive absentee ballots and for the State to process them when returned, the old law, which allowed ballots to be requested up until the Friday before an election, set many voters (of all races) up for failure. Pushing the

---

(ii)    Fines on third party groups that distribute duplicate or follow-up absentee ballot request forms to voters (SB 202, §25, ln, 1037-1043);

(iii)   Requiring voters who do not possess a Georgia driver's license or personal identification card to provide a copy of another form of identification such as a utility bill in order to request an absentee ballot (SB 202, §25, ln. 944-953);

(iv)    Requiring absentee ballot requests to be received 11 days before Election Day (SB 202, §25, ln. 933-936);

(v)     Limiting the number of drop boxes and prohibiting their use after hours and in the days leading up to the election (SB 202, §26, ln. 1175-1185);

(vi)    Banning food and water, other than self-service water available from an unattended receptacle, from being given to persons waiting in line to vote (SB 202, §33, ln. 1873-1875; 1887-1889);

(vii)   Prohibiting local jurisdictions from counting out-of-precinct ballots cast before 5pm on Election Day (SB 202, §34, ln. 1902-1907).

[21] DOJs only "support" for its challenge to this change to the absentee ballot request deadline is its bald assertion that Black voters "were more likely than white voters to request absentee ballots between ten and four days before Election Day." [ECF 1, Compl. at  ¶ 58]. Even if this allegation were not conclusory, it is, nevertheless, irrelevant to the VRA analysis here. Nothing suggests that moving the deadline for requesting absentee ballots by one week would cause Black voters who were capable of complying with the old deadline to not be able to comply with the new deadline, or that white voters would. The DOJ's presumption that Black voters are less capable than white voters of understanding and/or following voting deadlines is both implausible and offensive.

due date back a week is a slightly different, but no greater, burden on voters, it is facially "minimal," and it applies equally to *all* voters, regardless of race.

### b) Verification requirements for absentee ballot applications.

The DOJ also challenges Georgia's voter verification requirement for absentee vote-by-mail ballot applications, which has Registrars confirm the identity of a would-be absentee voter by comparing identification card numbers rather than signatures. Specifically, the DOJ alleges, again in wholly conclusory form, that Black voters are less likely to have the means with which to properly identify themselves.  [ECF 1, Compl. at ¶ 54].  Similar arguments, however, have been rejected by both the United States Supreme Court, *see Crawford*, 553 U.S. at 198, and the Georgia Supreme Court, *see Democratic Party of Georgia, Inc. v. Perdue*, 288 Ga. 720, 730, 707 S.E.2d 67, 75 (2011).  Additionally, given that Georgia voter ID is universally available to all Georgians for free, that 97% of Georgia voters already possess an identification card they can use to meet this requirement, and the fact that the law provides alternative forms of identification and alternative methods of voting, the remaining 3% of voters are in no way burdened, much less unduly burdened.[22]   The DOJ's conclusory allegations

---

[22] *See* Georgia Voter Identification Requirements, Ga. Sec'y of State, bit.ly/3hNVXGd; *see also* Special Committee (Feb 18, 2021), 14:21-14:37, bit.ly/2UPKehk; *see also* Scott Detrow, *Georgia Elections Official Responds to Bills that Would Make Voting Harder*, NPR (Mar. 9, 2021), *available at* n.pr/3rmfbpI.

regarding verification are unsupported by plausible facts and are, therefore, legally insufficient.

### c) Prohibition on providing free food and drinks in voter line.

Perhaps the DOJ's silliest challenge is its claim that preventing political partisans or other ideological groups from providing free food and drinks to voters waiting in line[23] is racially discriminatory and violates the VRA. This rule,  like many of others like it around the country, applies equally to all racial groups and prohibits partisan groups of all stripes from improperly using incentives, such as providing food and drinks to voters standing in line, to either influence or harass voters as they wait to vote.

In apparent recognition that nothing in this provision has any racial element to it, the DOJ alleges that the supposed denial of free outside food and drinks disproportionately affects minorities because, according to the DOJ, those voters often stand in much longer lines to vote.  [ECF 1, Compl. at ¶ 75]. Even if these allegations were assumed to be true, such minimal disparate impact is simply insufficient to state a claim under *Brnovich*.  141 S. Ct. at 2338.  And while the DOJ's position that, in essence, a state-wide ban on partisan provision of free pizza and soda to voters waiting in line to vote is racial discrimination is absurd on its face, it also ignores important aspects of the new law.

---

[23] SB 202, § 33, ln. 1873-1875; 1887-1889.

First, SB 202 does not deprive voters of water since poll workers are still allowed to set up self-service water, and citizens are free to bring their own food and beverages with them to the polls. Additionally, even partisan and ideological groups who wish to offer free food and drinks to voters are still allowed to do so very near the polling site, just not to individuals actually standing in line to vote.[24]

Second, the actual issue here – long waits to vote – is already specifically addressed by SB 202. The law encourages people to vote in their proper precinct and imposes a new requirement that polling locations measure wait times and make real-time adjustments as needed to alleviate long lines.[25] In short, the DOJ's challenge to this provision is much ado about nothing.

### 3. *Strong State Interests Support SB 202.*

In addition to assessing a voting rule in the context of the state's entire voting system, *Brnovich* also instructs courts to examine the state interests underlying the election reforms. Election "[r]ules that are supported by strong state interests are less likely to violate §2 [and] [o]ne strong and entirely legitimate state interest is the prevention of fraud." *Brnovich*, 141 S. Ct. at 2340.

In § 2 of SB 202, the Georgia Legislature went to great lengths to articulate the important state interests that SB 202 addresses. Those state interests are to

---

[24] SB 202, § 33, ln. 1878-1883.

[25] SB 202, §18, ln. 721-734; §34, ln. 1902-1907 (2021).

"boost voter confidence"; "streamline … elections" by promoting "uniformity"; "reduce the burden on election officials"; prevent "improper interference, political pressure, or intimidation"; and make it "hard to cheat." SB 202, §2. These are all legitimate state interests that justify reasonable, non-discriminatory burdens on voters, *Brnovich*, 141 S. Ct. at 2321;  *Crawford*, 553 U.S. at 191-197, There is, therefore, a strong presumption of their legality that the DOJ's conclusory complaint has not remotely begun to impugn. *Brnovich*,141 S. Ct. at 2339-40.

4.   *The Totality of the Circumstances Establishes That Voting Remains Equally Open Under SB 202.*

The VRA § 2 analysis also "requires consideration of 'the totality of circumstances.' Any circumstance that has a logical bearing on whether voting is 'equally open' and affords equal 'opportunity' may be considered." *Brnovich*, 141 S. Ct. at 2338. DOJ's approach, which carves out for scrutiny only seven of SB 202's measures and then alleges that those seven provisions, viewed in isolation, have discriminatory impact, is a misapplication of the law. Instead, the proper analysis views Georgia's "entire system of voting when assessing the burden imposed by [the seven] challenged provision[s]." *Id.* at 2339.

An examination of SB 202 in its entirety demonstrates conclusively that the burden imposed upon Georgian voters is minimal, with many of the reforms *reducing* burdens that existed in past elections. Such reforms include setting a minimum number of hours that polls must be open in advance of elections (at

least eight, but up to twelve, hours per day), adding a required hour (from 9am-4pm to 9am-5pm), adding an additional Saturday to the voting period with the option to include Sundays, and reducing wait lines by requiring polling locations to measure wait times and make necessary adjustments.[26] Clearly, these reasonable reforms of SB 202 are designed to increase efficiency of elections and increase voter participation for all citizens. The DOJ has not and cannot plausibly allege that the *totality of the circumstances* arising from SB 202 has or will result in the Georgia voting system not being equally open to all citizens.  Its complaint, therefore, fails to state a claim and should be dismissed.

## II.   THIS DOJ TEST CASE INVOLVES SERIOUS FEDERALISM AND SEPARATION OF POWERS PRINCIPLES WITH NATIONAL IMPLICATIONS.

After the Supreme Court  struck down Section  4 of the VRA's preclearance formula as unconstitutional in *Shelby County,*[27] opponents of election integrity laws turned to Section 2 of the VRA to try to fill this void.[28] In *Brnovich,* the Supreme Court clarified that Section 2 cannot be distorted to serve these purposes, and yet this is precisely what the DOJ has attempted to do in this

---

[26] SB 202, §28, p. 59-60, ln. 1499-1512 & §18, p. 29, ln. 721-734 (2021), *available at* bit.ly/3wQIp0V.

[27] *Shelby Cnty., Ala. v. Holder*, 570 U.S. 529 (2013).

[28] Brief for States of Ohio, et al. as Amici Curiae, *Brnovich v. DNC*, No. 19-1257, 2020 WL 2999190, at *11 (S. Ct. 2021) (citing Daniel P. Tokaji, *Applying Section 2 to the New Vote Denial*, 50 HARV. C.R.-C.L. L. REV. 439, 440 (2015).

lawsuit.  Whether the DOJ is allowed to proceed with its partisan prosecution and usurpation of the sovereignty of the State of Georgia and the will of Georgia's citizens as expressed through their duly elected Legislature has important national implications both in and beyond this case.

### A. The DOJ's Lawsuit Is A Threat to Federalism.

Through this suit, the DOJ seeks to unmoor Section 2 of the VRA from its plain language and from constitutional restraints to centralize the power to control the country's voting rules in the federal government.  In essence, the DOJ seeks to use Section 2 to impose a new preclearance requirement that would force States to demonstrate the legitimacy of their interests and their voting rules to the DOJ's satisfaction before the State can regulate its own electoral process.  This perversion of Section 2 is contrary to its plain language and unconstitutional.

"[P]owers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. amend. X.  This "allocation of powers in our federal system preserves the integrity, dignity, and residual sovereignty of the States" and "secures to citizens the liberties that derive from the diffusion of sovereign power." *Shelby County*, 570 U.S. at 543 (quotations omitted). "[*T*]*he Framers of the Constitution intended the States to keep for themselves, as provided in the Tenth Amendment, the power to regulate elections,*'" and "*States have 'broad powers to*

determine the conditions under which the right of suffrage may be exercised.'" *Id.* (citations omitted) (emphasis added))

Applying Section 2 in this manner would also, as a practical matter, transfer "*much of the authority to regulate election procedures from the States to the federal courts,*" as it would invite, and perhaps require, the federal courts to analyze state election laws against hypothetical scenarios, leaving the federal court to decide which option is best. *Brnovich*, 141 S. Ct. at 2341. As *Brnovich* made clear, this result would be a clear violation of Separation of Powers. *Id.*

The DOJ's attempted rewriting and expansion of Section 2 is contrary to the statute's language, to the Constitution, and it ignores the Supreme Court's clear rejection of this application of Section 2 in *Brnovich*. This Court should follow the Court's guidance in *Brnovich* and dismiss the DOJ's complaint.

### B. The DOJ Would Be Incentivized to Continue to Weaponize Civil Rights Laws and Divert Taxpayer Resources for Improper Political Ends.

Several key facts suggest DOJ's political, rather than legal, motivation in filing this lawsuit against Georgia. First, on February 16, 2021, DOJ submitted a letter to the Supreme Court regarding the *Brnovich* case.[29] In the letter, DOJ

---

[29] Letter from E. Kneedler, Deputy Solicitor General, to S. Harris, Clerk of Court (Feb. 16, 2021), *available at* https://www.supremecourt.gov/DocketPDF/19/19-1257/169119/20210216164922124_Letter%20-%2019-1257%20and%2019-1258.pdf.

notified the Court that the brief previously filed by the DOJ under the Trump administration no longer represented the views of the United States. *Id.* The letter also stated that, although it no longer agreed with the reasoning in the earlier brief, the United States *agreed with the conclusion* that neither of the two Arizona voting measures at issue in *Brnovich* violated VRA § 2.

Given the similarities of the challenged Arizona laws to the challenged Georgia rules, it is virtually impossible to reconcile the DOJ's official position in *Brnovich* with its lawsuit against Georgia. This is especially true because the Georgia rule is *less* burdensome than the Arizona rule that DOJ conceded was not a violation of the civil rights law just four months ago and that the Supreme Court just upheld in *Brnovich*. Under SB 202, if a voter casts a provisional ballot in the wrong precinct after 5 p.m., that vote can still be counted; under the Arizona law, it will not. This logically inconsistent and abrupt change in the DOJ's position strongly suggests that its challenge to SB 202 has more to do with prevailing political winds than civil rights enforcement.

DOJ's decision to sue only Georgia when there are multiple Democrat-majority states with the same/similar election rules[30] also suggests a political motive. If the DOJ truly believes that these rules violate civil rights, why has it

---

[30] Such states include Connecticut, New York, Rhode Island, and of course, Delaware, the President's home state.

selectively only challenged the rules in the Republican State of Georgia?  The unfortunate but seemingly inevitable answer is improper political gamesmanship.

President Biden's comments less than 24 hours after Governor Kemp signed SB 202 into law serve only to exacerbate these concerns.  The White House released an official statement describing SB 202 as "Jim Crow in the 21st Century,"[31] a completely false[32] and insulting comparison to pre-civil rights movement voting restrictions (imposed, incidentally, by Democrats) that prevented people of color from voting in the South. *Id.* President Biden, of course, is the head of the Executive Branch, and the  DOJ is an Executive Agency.

Justice is supposed to be blind, and citizens are entitled to an impartial, apolitical Department of Justice.  All indicators are that the DOJ is not operating impartially or apolitically in this case; instead, it is being misused, and it is misusing the law, for purely partisan ends.  Dismissal of this meritless suit will send a clear message to the DOJ and politicians of both parties that such obvious abuse of power is improper and will not be tolerated by the courts.

---

[31] Statement by President Biden on the Attack on the Right to Vote in Georgia, White House Briefing Room (Mar. 26, 2021), bit.ly/3rjJUUn.

[32] Even the Washington Post gave the President four "Pinocchio's" for the blatant falsity of his statement, *available at* https://www.aol.com/news/wapo-fact-checkers-slam-biden-153036411.html.

**CONCLUSION**

For the foregoing reasons, FGA respectfully urges the Court to dismiss the

DOJ's lawsuit with prejudice.

Respectfully submitted,

PIERSON LAW LLC

*/s/ Holly A. Pierson*
Holly A. Pierson, Georgia Bar No. 579655
3127 Maple Drive NE
Atlanta, GA  30305
Telephone:  (404) 353-2316
Facsimile:  (470) 729-7018
Email:  hpierson@piersonlawllc.com

*/s/ Chase Martin*
Chase Martin, ME Bar #005358
Foundation for Government Accountability (FGA)
15275 Collier Blvd., Suite 201
Naples, FL 34119
(239) 244-8808
Chase@TheFGA.org

*pro hac vice pending*

*/s/ Stewart L. Whitson*
Stewart L. Whitson, MN Bar #0391405
Foundation for Government Accountability (FGA)
15275 Collier Blvd., Suite 201
Naples, FL 34119
(239) 244-8808
Stewart@TheFGA.org

*pro hac vice pending*

25

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 5th day of August, 2021, I electronically filed a true and correct copy of the foregoing BRIEF OF THE FOUNDATION FOR GOVERNMENT ACCOUNTABILITY AS *AMICUS CURIAE* with  the Clerk  of  the  Court  usingthe CM/ECF system, which will send notification of such filing to all counsel of record.

Respectfully submitted this 5th day of August, 2021

*/s/ Holly Pierson*
GA State Bar 579655

26

<u>CERTIFICATE OF COMPLIANCE</u>

I verify that the foregoing brief has been prepared in Century Schoolbook 13 font in compliance with Local Rule 5.1.

*/s/ Holly A. Pierson*
Holly A. Pierson
Georgia Bar No. 579655
PIERSON LAW LLC
3127 Maple Drive NE
Atlanta, GA 30305
Telephone:  404.353.2316
hpierson@piersonlawlllc.com
