IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        v.

THE STATE OF GEORGIA; *et al.*,

        Defendants,

THE REPUBLICAN NATIONAL
COMMITTEE; *et al.*,

        Intervenor-Defendants.

Civil Action No.
1:21-CV-2575-JPB

**OPPOSITION TO THE STATE'S AND INTERVENORS'
MOTIONS TO DISMISS**

# TABLE OF CONTENTS

I.     BACKGROUND ..........................................................................3

     A.    Section 2 of the Voting Rights Act .......................................3

     B.    Overview of the Facts Alleged in the United States' Complaint..........7

II.    LEGAL STANDARD UNDER FEDERAL RULE 12(B)(6)......................13

III.   ARGUMENT..............................................................................14

     A.    A Violation of Section 2 May Be Shown Based on Either a Discriminatory Purpose or a Discriminatory Result ...........................15

     B.    The United States Has Pled Sufficient Facts to Allege Discriminatory Purpose .................................................................22

     C.    Inferences of a Discriminatory Purpose Can Be Drawn from Facially-Neutral Laws .......................................................................41

IV.   CONCLUSION..........................................................................43

i

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez*,
    138 S. Ct. 2305 (2018)........................................................................42

*Ashcroft v. Iqbal*,
    556 U.S. 662(2009)..................................................................... 6, 14

*Belanger v. Salvation Army*,
    556 F.3d 1153 (11th Cir. 2009) ...........................................................14

*Bonner v. City of Prichard*,
    661 F.2d 1206, 1209 (11th Cir. 1981) ..................................................4

*Brnovich v. Democratic Nat'l Comm.*,
    141 S. Ct. 2321, 2349 (2021)..................................................... passim

*Brooks v. Miller*,
    158 F.3d 1230 (11th Cir. 1998) ...........................................................20

*Burton v. City of Belle Glade*,
    178 F.3d 1175, 1196-98 (11th Cir. 1999)..................................... 3, 22

*Celotex Corp. v. Catrett*,
    477 U.S. 317, 322 (1986)......................................................................3

*Chisom v. Roemer*,
    501 U.S. 380 (1991)..................................................................... 4, 17

*City of Mobile v. Bolden*,
    446 U.S. 55 (1980)..............................................................................15

*Ga. State Conf. of NAACP v. Fayette Cnty. Bd. of Comm'rs*,
    775 F.3d 1336 (11th Cir. 2015) ...........................................................14

*Garza v. Cnty. of Los Angeles*,
    918 F.2d 763 (9th Cir. 1990) ................................................. 6, 17, 34

*Georgia State Conf. of NAACP v. Georgia*,
  312 F. Supp. 3d 1357 (N.D. Ga. 2018) ............................................................29

*Greater Birmingham Ministries v. Sec'y of State of Ala.*,
  992 F.3d 1299, 1329 (11th Cir. 2021) ....................................... passim

*Hunt v. Cromartie*,
  526 U.S. 541 (1999).........................................................................................41

*Hunter v. Underwood*,
  471 U.S. 222, 228 (1985)....................................................................................6

*Johnson v. DeSoto Cnty Bd. of Comm'rs*,
  204 F.3d 1335 (11th Cir. 2000) .........................................................................20

*Johnson v. DeSoto Cnty. Bd. of Comm'rs*,
  72 F.3d 1556 (11th Cir. 1996) ...........................................................................19

*Johnson v. Governor of Fla.*,
  405 F.3d 1214 (11th Cir. 2005) ........................................... 16, 17, 18, 19

*Korematsu v. United States*,
  584 F. Supp. 1406 (N.D. Cal. 1984)..................................................................32

*League of United Latin American Citizens v. Perry*,
  548 U.S. 399 (2006).......................................................... 1, 6, 30, 34

*League of Women Voters of N.C. v. North Carolina*,
  769 F.3d 224 (4th Cir. 2014) .............................................................................19

*McMillan v. Escambia Cnty.*,
  748 F.2d 1037, 1046 (Former 5th Cir. 1984) .......................................... 4, 17, 18

*Metts v. Murphy*,
  363 F.3d 8 (1st Cir. 2004)..................................................................................15

*Miller v. Johnson*,
  515 U.S. 900 (1995)..........................................................................................42

*Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*,
   429 U.S. 274 (1977).....................................................................................6

*N.C. State Conf. of the NAACP v. McCrory*,
   831 F.3d 204 (4th Cir. 2016) ............................................... passim

*Rogers v. Lodge*,
   458 U.S. 613, 622 (1982).............................................................28

*Shelby Cnty. v. Holder*,
   570 U.S. 529, 557 (2013).................................................................3

*Smith v. Town of Clarkton*,
   682 F.2d 1055 (4th Cir. 1982) ....................................................42

*Solomon* v. *Liberty County*,
   166 F.3d 1135 (11th Cir. 1999) ...................................................40

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................ 14, 31

*Thornburg v. Gingles*,
   478 U.S. 30, 45 n.10 (1986)..................................................... passim

*United States v. Gillock*,
   445 U.S. 360, 373 (1980)...........................................................43

*United States v. Marengo Cnty. Comm'n*,
   731 F.2d 1546 (11th Cir. 1984) ....................................................18

*Veasey v. Abbott*,
   830 F.3d 216 (5th Cir. 2016) (en banc) ..................................... 5, 17

*Village of Arlington Heights v. Metropolitan Housing Development Corp.*,
   429 U.S. 252 (1977).................................................................. passim

*Washington v. Davis*,
   426 U.S. 229 (1976)....................................................................25

*White v. Regester,*
    412 U.S. 755, 765-70 (1973) .............................................................................28

*Wright v. Sumter Cnty. Bd. of Elections & Registration,*
    301 F. Supp. 3d 1297 (M.D. Ga. 2018) ...........................................................29

## Statutes

52 U.S.C. § 10301 ....................................................................................... 1, 3, 4

52 U.S.C. § 10303 ..............................................................................................3

52 U.S.C. § 10308(d) .......................................................................................18

O.C.G.A. § 21-2-414 (2017) ...........................................................................37

O.C.G.A. § 21-2-418 (2020) ...........................................................................27

O.C.G.A. § 21-2-419 (2020) ..................................................................... 11, 27

## Other Authorities

Fed. R. Civ. P. 12(b) ................................................................................... 2, 13

S. Rep. No. 417, 97th Cong., 2d Sess. 27,
    reprinted in 1982 U.S. Code Cong. & Ad. News 205 ................................ 16, 17

State Election Board Rule 183-1-14-0.6-.14 .........................................................37

On June 25, 2021, the United States brought suit against the State of Georgia for violating Section 2 of the Voting Rights Act ("VRA"), 52 U.S.C. § 10301 ("Section 2"), regarding new election provisions that the United States alleges were adopted with the purpose of denying or abridging the right to vote on account of race. *See* Compl. ¶¶ 159-165 (ECF No. 1). The Supreme Court recently reaffirmed that *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 265-68 (1977), provides the proper legal framework for addressing purpose-based claims of discrimination under Section 2. *See Brnovich v. Democratic Nat'l Comm.*, 141 S. Ct. 2321 (2021) (applying *Arlington Heights*).

The United States' complaint alleges a classic violation of Section 2. Against a backdrop of racial polarization in voting, the Georgia legislature adopted the challenged provisions of Georgia Senate Bill 202 (2021) ("SB 202") as Black voters had begun to exercise real political power in the state, and to exercise that power in ways that were at cross-purposes with the state legislative majority. "[I]ntentionally targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose" under Section 2. *N.C. State Conf. of the NAACP v. McCrory*, 831 F.3d 204, 222 (4th Cir. 2016); *see also League of United Latin American Citizens v. Perry*, 548 U.S. 399, 440 (2006) ("*LULAC*") (finding that a

State "took away . . . Latinos' opportunity [to elect] because Latinos were about to exercise it.  This bears the mark of intentional discrimination. . . .").

Yet in their respective motions to dismiss, the State Defendants and Intervenors never even acknowledge or apply the legal standard that actually governs this claim.[1]  *See* Defs.' Mot. to Dismiss Compl. (ECF No. 38); Intervenors' Mot. to Dismiss or Alternatively for Summ. J. (ECF No. 39) (together, "Motions to Dismiss").  Throughout its brief, the State raises factual disputes regarding the allegations in the United States' Complaint (inappropriately at the motion to dismiss stage of the proceedings), while ignoring how these same allegations fit within the *Arlington Heights* framework.  As detailed below, following the *Arlington Heights* framework, the United States has properly pled a claim under Section 2.  The Court should therefore deny the Motions to Dismiss.[2]

---

[1]   The State Defendants include the State of Georgia, the Georgia State Election Board, and Secretary of State Brad Raffensperger (collectively, "the State"). Defendant Intervenors are the Republican National Committee, the National Republican Senatorial Committee, and the Georgia Republican Party, Inc. (collectively, "Intervenors").

[2]   As a procedural matter, Intervenors' Motion to Dismiss (ECF No. 39) is improper and should not be considered.  Because Intervenors have already filed their responsive pleading, *see* Proposed Intervenor-Defendants' Answer, ECF No. 15-1 (July 6, 2021), they have forfeited their ability to seek dismissal.  *See* Fed. R. Civ. P. 12(b) (Motions to Dismiss "must be made before pleading if a responsive pleading is allowed.").  Moreover, Intervenors' alternative Motion for Summary

# I.  BACKGROUND

## A.  Section 2 of the Voting Rights Act

Section 2 of the VRA protects the right to vote and "prohibits all forms of voting discrimination." *Thornburg v. Gingles*, 478 U.S. 30, 45 n.10 (1986); *see also Brnovich*, 141 S. Ct. at 2333; *Burton v. City of Belle Glade*, 178 F.3d 1175, 1196-98 (11th Cir. 1999).  Section 2 imposes a "permanent, nationwide ban on racial discrimination in voting."  *Shelby Cnty. v. Holder*, 570 U.S. 529, 557 (2013). Section 2(a) prohibits any state or political subdivision from imposing or applying a "voting qualification," a "prerequisite to voting," or a "standard, practice, or procedure" that "results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color" or membership in a language minority group.  52 U.S.C. § 10301(a); *see also* 52 U.S.C. § 10303(f)(2).  Section 2(b) provides that a violation "is established if, based on the totality of circumstances, . . . the political process leading to nomination or election in the State or political subdivision are not equally open to participation by members of [a racial group] in that its members have less opportunity than other members of

---

Judgment is inappropriately premature because discovery has been stayed, and therefore no formal discovery has been conducted by the United States.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (A motion for summary judgment is only proper "after adequate time for discovery.").

the electorate to participate in the political process and to elect representatives of their choice."  52 U.S.C. § 10301(b).

As the Supreme Court's decision in *Brnovich* confirms, Section 2 prohibits both practices that have a discriminatory result, *Chisom v. Roemer*, 501 U.S. 380, 404 (1991); *see also Greater Birmingham Ministries v. Sec'y of State of Ala.*, 992 F.3d 1299, 1329 (11th Cir. 2021) ("*GBM"*), and those adopted with a discriminatory purpose, *see Chisom*, 501 U.S. at 394 n.21; *Brnovich*, 141 S. Ct. at 2334, 2348-49 (analyzing purpose claim separately from results claim).  A showing of discriminatory purpose "sufficient to constitute a violation of the [F]ourteenth [A]mendment" is also "sufficient to constitute a violation of [S]ection 2."  *McMillan v. Escambia Cnty.*, 748 F.2d 1037, 1046 (Former 5th Cir. 1984).[3] Section 2 purpose claims likewise rely on the assessment of "circumstantial and direct evidence of intent" relevant to constitutional cases.  *Arlington Heights*, 429 U.S. at 265-68; *see also Brnovich*, 141 S. Ct. at 2349; *Veasey v. Abbott*, 830 F.3d

---

[3]  In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent former Fifth Circuit decisions handed down by September 30, 1981.  *McMillan* was filed in 1977 over a challenged practice in Florida, *see* 748 F.2d at 1039; the 1984 decision is treated as a former Fifth Circuit case given prior proceedings in the case but also is binding Eleventh Circuit precedent.  *See Bonner*, 661 F.2d at 1207-08 (describing rules governing such cases).

216, 229-30 (5th Cir. 2016) (en banc); *McCrory*, 831 F.3d at 220-21.

In *Arlington Heights*, the Supreme Court articulated a non-exhaustive list of evidentiary factors that a court may consider to determine whether racially discriminatory purpose was a motivating factor, including: (1) whether the impact of the decision bears more heavily on one racial group than another; (2) the historical background of the decision; (3) the sequence of events leading up to the decision; (4) substantive and procedural departures from the normal decision-making practice; and (5) contemporary statements and actions of key legislators. *Arlington Heights*, 429 U.S. at 266-68. In the Eleventh Circuit, courts have also considered "(6) the foreseeability of the disparate impact; (7) knowledge of that impact, and (8) the availability of less discriminatory alternatives." *GBM*, 992 F.3d at 1321. To prevail on a claim of racially discriminatory purpose under Section 2, a plaintiff must show that such a purpose was one of the motivating factors; the evidence need not show "that the challenged action rested solely on racially discriminatory purposes" or even that the discriminatory purpose "was the 'dominant' or 'primary' one." *Arlington Heights*, 429 U.S. at 265; *see also McCrory*, 831 F.3d at 222 (holding that "targeting a particular race's access to the franchise because its members vote for a particular party, in a predictable manner, constitutes discriminatory purpose"); *Garza v. Cnty. of Los Angeles*, 918 F.2d 763,

771 (9th Cir. 1990) (affirming that fragmenting Hispanic population in pursuit of a non-racial objective was purposeful racial discrimination).  Moreover, establishing proof of discriminatory purpose does not require proof of invidious racial animus, but rather simply an intent to disadvantage minority citizens, for whatever reason. *McCrory*, 831 F.3d at 222-23; *Garza*, 918 F.2d at 778 & n.1 (Kozinski, J., concurring and dissenting in part); *see also LULAC*, 548 U.S. at 440.  That reason can include a simple desire by the challenged provision's proponents to "entrench themselves" in power.  *McCrory*, 831 F.3d at 222.

"Once racial discrimination is shown to have been a 'substantial' or 'motivating' factor behind enactment of the law, the burden shifts to the law's defenders to demonstrate that the law would have been enacted without this factor."  *Hunter v. Underwood*, 471 U.S. 222, 228 (1985) (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977)); *see also GBM*, 992 F.3d at 1321.  At this step, "courts must scrutinize the legislature's *actual* non-racial motivations to determine whether they *alone* can justify the legislature's choices."  *McCrory*, 831 F.3d at 221 (citing *Mt. Healthy*, 429 U.S. at 287).  As set forth in greater detail later, the United States has pled "sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citations and internal quotations marks omitted).

6

### B.      Overview of the Facts Alleged in the United States' Complaint

The 2020-2021 election cycle in Georgia saw heavily publicized Black voter mobilization efforts, a dramatic increase in Black voters' use of absentee voting, and marked successes by Black voters in electing candidates of choice state-wide. In the immediate aftermath of these events, in March 2021, the Georgia Legislature enacted an omnibus election bill, SB 202.  Compl. ¶¶ 1, 81-82, 88, 90-91, 96.

**SB 202's Historical Background.**  Black Georgians undertook substantial efforts in 2018 to harness their political power, encouraging participation by voters of color—including by absentee ballots—and ensuring that voters who waited in long lines (often voters of color) had food and water so they would not become too hungry to remain in line.  *Id.* ¶¶ 84-86.  Black turnout in Georgia rose in 2018, 2020, and in the 2021 runoff election for U.S. Senate.  *Id.* ¶ 83.

In 2020, amid the COVID-19 pandemic, the Secretary of State mailed absentee ballot applications to all active voters prior to the June primary, and absentee voting hit record levels.  *Id.* ¶¶ 36-37.  Georgia House Speaker David Ralston warned that mailing applications to all active registered voters would "drive up turnout" and that such increased turnout would be "extremely devastating" to election outcomes that he favored.  *Id.* ¶ 39.

Black-led mobilization efforts continued in 2020, leading to the popular

perception that Black voter turnout was increasing—driven in large part by absentee voting—and that increased turnout was providing Black voters with increased opportunities to elect candidates of their choice.  *Id*. ¶¶ 86, 88-90.  That perception was accurate:  The November 2020 and January 2021 runoff elections produced historic results, with Georgia electing its first Black U.S. Senator in history and giving its electoral votes to the first person of color to become Vice President.  *Id*. ¶¶ 91, 96.  This rise in Black political engagement occurred against a backdrop of virulent racial appeals, ranging from racial epithets directed at minority candidates, to death threats against a Black candidate for U.S. Senate, Reverend Raphael Warnock.  *Id*. ¶¶ 97-99, 106, 109-110.

The rise in the use of absentee balloting by Black voters was accompanied by unfounded accusations of fraud around the absentee voting process and tabulation of votes and an unprecedented effort to overturn the results of the presidential election.  *Id*. ¶¶ 102-05.  State and local election officials, including the Secretary of State, consistently debunked allegations of widespread fraud and conducted two statewide recounts pursuant to state law.  *Id*. ¶¶ 107-08.  A barrage of lawsuits alleging voter fraud, often focusing on counties with significant numbers of Black voters, were unsuccessful but became blueprints for several changes enacted through SB 202.  *Id*. ¶ 109.

**The Challenged Provisions.**  The United States challenges seven provisions of SB 202 that it alleges were adopted with the purpose of denying or abridging Black citizens' equal access to the political process, in violation of Section 2:

> (a). the ban on government entities mailing unsolicited absentee ballot request forms to voters (Section 25);
>
> (b). onerous fines on third party groups that distribute duplicate or follow-up absentee ballot request forms to voters (Section 25);
>
> (c). the requirement that voters who do not have a [Department of Driver Services] DDS-issued ID number associated with their voter registration record photocopy another form of ID in order to request an absentee ballot and are not permitted to use the last four digits of their Social Security number to verify their identity for such requests (Section 25);
>
> (d). the new deadline for requesting absentee ballots 11 days before Election Day (Section 25);
>
> (e). the cutback in the number of drop boxes permitted and the prohibition on using drop boxes after hours and in the days leading up to the election (Section 26);
>
> (f). the ban on groups providing food and water in a non-partisan way to voters facing long lines at the polls (Section 33); and
>
> (g). the prohibition on counting most out-of-precinct provisional ballots (Section 34).

*Id*. ¶ 161 (collectively, the "Challenged Provisions").

**Absentee voting.**  The first five of the Challenged Provisions make absentee voting more difficult.  Prior to 2018, Black voters in Georgia were historically less likely to vote absentee than white voters.  But Black voters' use of absentee voting

outpaced that of white voters starting in 2018 and continuing in the November

2020 and January 2021 elections.  *Id*. ¶¶ 21-22.  Black Georgians are also less

likely than white Georgians to have DDS-issued ID to request an absentee ballot,

and will instead have to provide a photocopy of another form of ID.  *Id*. ¶ 54.

Black voters have also been more likely than white voters to request an absentee

ballot between ten and four days before Election Day—a period now closed to

such requests under SB 202.  *Id*. ¶¶ 58-59.

Finally, the Challenged Provisions further limit absentee voting by curtailing

the availability of drop boxes, which were widely used by voters during the 2020-

2021 election cycle, particularly in the counties in the metro-Atlanta area, home to

the largest number of Black voters in the state.  *Id*. ¶¶ 60-71, 16-17.  For example,

in the November 2020 and January 2021 elections, Fulton County and Gwinnett

County had 38 and 23 drop box locations, respectively; under SB 202, Fulton

County will be limited to about eight drop boxes and Gwinnett County will be

limited to about six.  *Id*. ¶ 71.  For the 2020 and January 2021 elections, drop boxes

were available until the close of the polls on election day, and many were

accessible after business hours in the days leading up to the election; SB 202 limits

the use of drop boxes to those times and locations where voters could vote in

person (i.e., the registrar's office or an early voting site) and requires that drop

boxes close permanently at the end of the early voting period.  *Id*. ¶¶ 60-62, 68-70.

**In-person voting.**  The sixth and seventh Challenged Provisions target in-person voting.  SB 202 prohibits giving food and water to persons waiting in line to vote.  *Id*. ¶ 72; SB 202 § 33.  Long lines for in-person voting have disproportionately plagued polling places in majority-minority neighborhoods.  Before passage of SB 202, various groups—frequently Black-led community organizations—distributed food and water to persons waiting in long lines to vote.  Compl. ¶¶ 72-73.  SB 202 also prevents jurisdictions from counting provisional ballots cast before 5 p.m. on Election Day if voters finds themselves in precincts other than the one to which the voter has been assigned.  *Id*. ¶¶ 76-77; SB 202 § 34.  Prior to SB 202, for almost 20 years, if a voter cast a provisional ballot in the "wrong" precinct, election officials would count the ballot in any contests where the voter was in the correct district (including for all state-wide offices).  Compl. ¶ 76; O.C.G.A. § 21-2-419(c)(2) (2020).  Because of higher rates of residential mobility and less access to transportation, Black voters can be expected to cast disproportionately more of these rejected ballots than white voters.  Compl. ¶ 80.

**Enactment of SB 202.**  On January 7, 2021—just two days after now-Senator Warnock's historic election—the Georgia House Speaker announced a House Special Committee on Election Integrity.  *Id*. ¶ 113.  Rather than following

the usual process of referring election bills to the Governmental Affairs Committee, election bills would instead be referred to the Special Committee, chaired by Representative Barry Fleming.  *Id.*  In a November 2020 op-ed, Rep. Fleming had compared the "always suspect absentee balloting process," to the "shady part of town down near the docks you do not want to wander into because the chance of being shanghaied is significant." *Id.* ¶ 114.

SB 202 originated in the Senate as a three-page bill, introduced on February 17, 2021. *Id.* ¶ 115.  On March 3, 2021, the Senate Ethics committee held a hearing on SB 202, described by the committee chair as a "straightforward bill" to address confusion resulting from multiple absentee ballot applications being sent to voters. *Id.* ¶ 116.  SB 202—still only three pages—passed out of committee on March 3 and passed the Senate on March 8, with minimal floor debate. *Id.* ¶ 117.

On March 17, Rep. Fleming swapped in a new, 90-page omnibus version of SB 202 for the three-page original bill, at a hearing before his Special Committee, providing little time for review. *Id.* ¶ 118-122.  The Special Committee met again the next day, but the bill was still not publicly available on the General Assembly's website. *Id.* ¶¶ 121-122.  Most witnesses criticized its provisions, and some pointed to the harmful impact the bill would have on voters of color.  One county elections supervisor explained that SB 202 would render drop boxes useless. *Id.*

12

¶ 123.  Witnesses also identified procedural issues with the new bill, including that the bill was not available online and lacked a fiscal note, and that it was difficult to obtain permission to testify remotely.  *Id.* ¶ 124.  After the intervening weekend, the Special Committee met again on March 22 and, within an hour, voted in favor of the 90-page bill.  *Id.* ¶ 125.

Legislators continued to express concerns over the bill—including that the cap on the number of drop boxes would lead to long lines at the polls, especially in Fulton County—but the subsequent House floor debate three days later, on March 25, lasted less than two hours.  *Id.* ¶¶ 126-28.  Opponents explained that it would suppress the Black vote and that voter fraud concerns were pretextual.  *Id.* ¶ 128.  Representatives expressed concern that the process was too rushed to understand the fiscal and logistical impacts of the bill, but SB 202 passed the House.  Within that same day, the Senate passed the bill and Governor Kemp signed it.  *Id.* ¶¶ 129-33.  From introduction of the 90-page bill to enactment, the process for considering the full version of SB 202 took eight days.  Throughout the entire process, not a single Black legislator voted in favor of SB 202.  *Id.* ¶¶ 117-118, 128, 130-132.

## II.    LEGAL STANDARD UNDER FEDERAL RULE 12(b)(6)

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Iqbal*, 556 U.S. at 678 (internal citation and quotation marks omitted); *see also*

*Belanger v. Salvation Army*, 556 F.3d 1153, 1155 (11th Cir. 2009) (construing

allegations in a complaint "in the light most favorable to the plaintiff").  "A claim

has facial plausibility when the plaintiff pleads factual content that allows the court

to draw the reasonable inference that the defendant is liable."  *Iqbal*, 556 U.S. at

678.  Consideration of information outside the face of the complaint is limited to

"documents incorporated into the complaint by reference[] and matters of which a

court may take judicial notice."  *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551

U.S. 308, 322 (2007).  In short, a court addressing a motion to dismiss must

assume the factual allegations in the complaint are true, must draw all reasonable

inferences from those facts in favor of the plaintiff, and must ignore contrary

factual assertions made by the movant.

## III.    ARGUMENT

The United States' complaint alleges facts sufficient to state a claim under

Section 2.  The briefs supporting the motions to dismiss ignore long-established

Section 2 case law and fail to account for the facts pled in the United States'

Complaint.  Section 2 claims are generally ill-suited for resolution through motions

for summary judgment, after full discovery.  *See Ga. State Conf. of NAACP v.*

*Fayette Cnty. Bd. of Comm'rs*, 775 F.3d 1336, 1348 (11th Cir. 2015) ("Summary

14

judgment in these cases presents particular challenges due to the fact-driven nature of the legal tests."); *see also GBM*, 922 F.3d at 1322 n.33 (noting that "[t]he *Arlington Heights* factors require a fact intensive examination of the record").  It is even more true that voting rights claims are ill-suited for resolution through motions to dismiss.  *See Metts v. Murphy*, 363 F.3d 8, 11 (1st Cir. 2004) (en banc).

> ### A.    A Violation of Section 2 May Be Shown Based on Either a Discriminatory Purpose or a Discriminatory Result

Section 2, as amended in 1982, encompasses both a "purpose" claim and a "results" claim.  Longstanding jurisprudence interpreting the VRA refutes the State's attempts to persuade this Court otherwise.  *See*, *e.g.*, Defs.' Mot. 5 (arguing that "there is no such thing as an exclusively intentional-discrimination claim under Section 2.").  It also fatally undercuts the State's argument that a plaintiff bringing a "purpose" claim must also plead and prove all the elements of a "results" claim.

1. Section 2 has always prohibited, and continues to prohibit, purposeful racial discrimination.  Prior to its amendment in 1982, Section 2 prohibited the use of any voting practice or procedure that was enacted (or maintained) for a discriminatory purpose.  *See City of Mobile v. Bolden*, 446 U.S. 55, 60-62 (1980) (plurality opinion) (stating that the then-existing version of Section 2 was

coterminous with the Fifteenth Amendment, which is violated when a challenged

voting provision is "motivated by a discriminatory purpose").

The 1982 amendments to Section 2 responded to that holding in *City of*

*Mobile* by *expanding*, not *contracting*, the methods of proving a violation.

"Recognizing the subtle ways that states often denied racial minorities the right to

vote, in 1982, Congress amended Section 2 of the Voting Rights Act so that a

plaintiff could establish a violation without proving discriminatory intent." *See*

*Johnson v. Governor of Fla.*, 405 F.3d 1214, 1227 (11th Cir. 2005) (en banc).  The

amendments clarified that plaintiffs may bring claims under Section 2 based on a

discriminatory result, without having to prove a discriminatory purpose.  *Id.* at

1227.  The Senate Report on the 1982 amendments states:

> The amendment to the language of Section 2 is designed to make clear
> that plaintiffs need not prove a discriminatory purpose. . . . Plaintiffs
> must *either* prove such intent, *or alternatively*, must show that the
> challenged system or practice, in the context of all the circumstances in
> the jurisdiction in question, results in minorities being denied equal
> access to the political process.[4]

S. Rep. No. 417, 97th Cong., 2d Sess. 27, reprinted in 1982 U.S. Code Cong. &

Ad. News 205 (emphasis added; footnote omitted); *see Chisom*, 501 U.S. at 394

---

[4]  This report is "the authoritative source for legislative intent" concerning the
1982 amendments to the Voting Rights Act.  *Gingles*, 478 U.S. at 43 n.7; *see also*
*Brnovich*, 141 S. Ct. at 2332-33 (relying on the report).

n.21; *Johnson*, 405 F.3d at 1227.[5]

The caselaw, including the Supreme Court's most recent Section 2 decision, confirms that Section 2 continues to prohibit practices adopted or maintained for a racially discriminatory purpose. This Term, in *Brnovich*, the Supreme Court treated the plaintiffs' Section 2 results claim and their Section 2 purpose claim as distinct from one another, placing its discussion of the two claims in separate sections of its opinion. *Compare* 141 S. Ct. at 2346-48 (discussing the plaintiffs' results claim) *with id.* at 2648-50 (discussing the plaintiffs' purpose claim). And with respect to the purpose claim, the Court applied the longstanding *Arlington Heights* framework. *Id.* at 2334 (noting plaintiffs brought a discriminatory purpose claim under Section 2); *id.* at 2348-49 (discussing *Arlington Heights*); *see also McMillan*, 748 F.2d at 1046-47.[6]

---

[5]  Congress used the word "results" to make clear that the Section 2 standard was not intended to be equivalent to the existing retrogressive "effects" test of the preclearance provisions of Section 5. 1982 Senate Report at 68. *Cf.* Amicus Br. of Greater Georgia Action at 14 (ECF No. 40).

[6]  The United States has brought numerous challenges to voting practices for having a racial discriminatory purpose under Section 2 since 1982, and the courts have consistently recognized the ability to do so. *See, e.g.*, *Garza*, 918 F.2d at 766 ("Congress amended the Voting Rights Act in 1982 to add language indicating that the Act forbids not only intentional discrimination, but also any practice shown to have a disparate impact on minority voting strength"); *McCrory*, 831 F.3d at 233-235; *Veasey*, 830 F.3d at 230.

The Eleventh Circuit has long recognized that the 1982 amendments merely eliminated the *requirement* of proving discriminatory purpose in a Section 2 case. *See, e.g.*, *Johnson*, 405 F.3d at 1227.  As the court explained in *United States v. Marengo Cnty. Comm'n*, 731 F.2d 1546, 1553 (11th Cir. 1984), in 1982, "Congress redefined the scope of [S]ection 2 of the Act to forbid not only those voting practices directly prohibited by the Fifteenth Amendment but also any practice 'imposed or applied . . . in a manner which results in a denial or abridgement of the right . . . to vote on account of race or color.'" (emphasis omitted).  "Congress intended that fulfilling *either* the more restrictive intent test or the results test would be sufficient to show a violation of [S]ection 2." *McMillan*, 748 F.2d at 1046.

The State's argument to the contrary is illogical:  Since its passage in 1965, the VRA has expressly authorized the Attorney General to bring civil suits to enforce the Act, including Section 2.  52 U.S.C. § 10308(d).  It cannot be that, as the State asserts, Congress' efforts to strengthen the protections of the VRA in 1982 somehow stripped the Attorney General of his existing ability to prosecute intentional discrimination under the VRA.  *See* Defs.' Mot. 5; Amicus Br. of Greater Georgia Action at 13 (ECF No. 40-1).

2.  Plaintiffs who bring a Section 2 purpose claim need not also plead and prove a Section 2 results claim.  The State's assertion to the contrary, *see* Defs.' Mot. 5-6, misreads the case law.  The State's argument relies on an erroneous reading of *Johnson v. DeSoto Cnty. Bd. of Comm'rs*, 72 F.3d 1556 (11th Cir. 1996) ("*DeSoto County I*"), a vote dilution case decided at the merits stage.[7]  The principle of *DeSoto County I* and its progeny is not, as the State argues, that a Section 2 purpose claim is only cognizable if the complaint sets forth a Section 2 results claim at the pleadings stage.  Rather, *DeSoto County I* reflects the unremarkable proposition that private plaintiffs must prove a redressable injury to sustain a Section 2 claim.  *See id.* at 1565 ("For example, where statewide legislation is involved, the legislators may have intended to affect as many county school board elections as possible, but the maximum effect that legislation can have in a particular county will depend upon the racial composition of the county's

---

[7]  Courts have recognized two categories of Section 2 claims.  *See Brnovich*, 141 S. Ct. at 2331, 2333 (discussing vote dilution claims and claims about "time, place, or manner voting rules"); *see also Johnson*, 405 F.3d at 1227 n.26 (describing vote dilution and "vote denial" claims).  Vote dilution claims challenge methods of election (such as at-large election systems or a redistricting plan) that dilute the ability of minority voters to elect candidates of choice.  *See, e.g.*, *Gingles*, 478 U.S. at 47.  Claims about vote denial address practices or procedures that are alleged to throw roadblocks in the way of minority voters who seek to participate in the electoral process.  *See e.g.*, *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 245 (4th Cir. 2014).  The United States' claim here is vote denial.

electorate and other factors."). In the context of a *vote dilution* claim, the Eleventh Circuit held that a redressable injury requires proof of the first *Gingles* precondition—i.e., that the minority group "is sufficiently large and geographically compact to constitute a majority in a single-member district." *Gingles*, 478 U.S. at 50; *see also Johnson v. DeSoto Cnty Bd. of Comm'rs*, 204 F.3d 1335, 1343 (11th Cir. 2000) ("*DeSoto County II*") (affirming the district court's holding that, although the challenged electoral scheme was adopted with discriminatory intent, plaintiffs failed to establish the first precondition). The court required proof of the first *Gingles* precondition because, in a vote dilution case, "[u]nless minority voters possess the potential to elect representatives in the absence of the challenged structure or practice, they cannot claim to have been injured by that structure or practice." *Gingles*, 478 U.S. at 50 n.17.

The State's reliance on *Brooks v. Miller*, 158 F.3d 1230, 1237 (11th Cir. 1998), fares no better. Like *DeSoto County I*, *Brooks* presents a case where claims of intentional vote dilution failed due to the plaintiffs' failure to satisfy the first *Gingles* precondition at the merits stage. Def. Mot. 6. Again, these vote dilution cases are wholly distinct from the vote denial claim brought here. The injury in a vote dilution case is the lack of ability to elect representatives of choice on account of the challenged method of election, *see Gingles*, 478 U.S. at 50 n.17, and

analysis of vote dilution claims is anchored in the three *Gingles* preconditions, *see*

*Brnovich*, 141 S. Ct. at 2337.[8]

In contrast, vote denial claims allege injuries in accessing "the political

processes leading to nomination or election," and when, as here, discriminatory

purpose is alleged, they are analyzed under the *Arlington Heights* framework.  *See*

*Brnovich*, 141 S. Ct. at 2337-38, 2348-49.  Here, the United States has alleged that

SB 202 erects barriers that will impede many Black voters' efforts to cast a ballot

and have that ballot counted.  As discussed further below, because of SB 202's

restrictions on absentee voting, some voters will encounter new obstacles to

obtaining, timely completing, and returning an absentee ballot.  Likewise, due to

SB 202, others who seek to vote in person will endure long lines without aid in the

form of food or water, and some voters who appear at the wrong precinct will be

disenfranchised because they are unable to travel to the correct precinct.  *See*

Section III.B *infra*.  Taking the allegations in the Complaint as true, as this Court

must, the United States has sufficiently pled that SB 202, enacted with

discriminatory purpose, would by design have a profound discriminatory effect on

---

[8] Indeed, nowhere do *DeSoto I, DeSoto II,* and *Brooks* even cite to *Marengo County,* let alone reject its conclusion that Section 2 encompasses both purpose and results claims.  *See* 731 F.2d at 1553.

minority voters.  And that injury is redressable through the relief sought in the

Complaint (for example, by enjoining the discriminatory provisions).

### B.   The United States Has Pled Sufficient Facts to Allege Discriminatory Purpose

The Court in *Brnovich* recently reaffirmed that the framework for analyzing

a claim of discriminatory purpose is still "the familiar approach outlined in

*Arlington Heights*," *Brnovich*, 141 S. Ct. at 2349; *see also GBM*, 992 F.3d at 1321,

which requires a "sensitive inquiry into such circumstantial and direct evidence of

intent as may be available." *Arlington Heights*, 429 U.S. at 266.  Courts in this

inquiry "evaluate all available direct and circumstantial evidence of intent in

determining whether a discriminatory purpose was a motivating factor in a

particular decision." *City of Belle Glade*, 178 F.3d at 1189.  Notably, neither of the

Motions to Dismiss apply *Arlington Heights* to the facts alleged in the Complaint.

Rather, both briefs quote, out of context, a phrase from *Brnovich* noting that the

District Court had not found evidence that "the legislature as a whole" was

motivated by a discriminatory purpose.  This phrase did not announce a new

standard; rather, it was simply the Court's shorthand way of describing the District

Court's conclusion, after it had applied the *Arlington Heights* framework, that

Arizona's law was not enacted with a discriminatory purpose.  *Brnovich*, 141 S. Ct.

at 2349.  In that case, the District Court had found that, on balance, certain

discriminatory statements were outweighed by other factors, and the Supreme

Court held that that finding was not clearly erroneous.  *Id.* at 2248-49.

　　　As outlined below, the Complaint identifies facts relevant to each of the

elements identified in *Arlington Heights* as instructive on whether racially

discriminatory purpose played a part in a law's enactment:  the impact of the

Challenged Provisions on Black voters, the historical background and sequence of

events leading up to SB 202, substantive and procedural departures during the

legislative process, and contemporary statements and actions of key legislators.

*Arlington Heights*, 429 U.S. at 266-68.  The Complaint also makes detailed

allegations as to additional factors identified by the Eleventh Circuit as instructive:

the foreseeability of the disparate impact, the knowledge of that impact, and the

availability of less discriminatory alternatives.  *GBM*, 992 F.3d at 1322.

### 1.　　The Challenged Provisions of SB 202 Will Have a Discriminatory Impact on Black Voters.

　　　The five Challenged Provisions related to absentee voting introduce new

impediments at every step of the process:  obtaining an application, completing and

timely submitting the application, and timely returning a completed ballot.  These

changes were adopted only after Black voters began disproportionately using

absentee voting, and Black voters will be disproportionately impacted by these restrictions, individually and collectively.  *See, e.g.,* Compl. ¶¶ 140-146.  Black voters are less likely to have the required ID to request an absentee ballot; are more likely to request an absentee ballot during the eliminated period of time to do so; and are disproportionately likely to cast late ballots, so are particularly harmed by the limitations on drop-boxes—especially given the decrease in drop boxes allowed in the metro-Atlanta counties.  *See id.* ¶¶ 36-71, 140-146; *see also McCrory*, 831 F.3d at 216 (law that "required in-person voters to show certain photo IDs … which African Americans disproportionately lacked, and eliminated or reduced registration and voting tools that African Americans disproportionately used" found to be enacted with discriminatory purpose).

The limitations on distributing food and water and the prohibition on counting out-of-precinct provisional ballots will also disproportionately harm Black voters, who are more likely to face long lines at their polling places and are more likely to cast an out-of-precinct ballot.  Compl. ¶¶ 72-80.  These burdens will be compounded by the new restrictions on absentee voting, which will force more Black voters to vote in-person, where they will be more likely than white voters to endure long lines, at the end of which they may find themselves at the wrong precinct and unable to cast a ballot that will be counted because they lack the time

24

or resources required to go to another precinct.  *Id.* ¶ 145.

The burdens of SB 202 also weigh more heavily on Black voters because of socioeconomic conditions linked to past and present race discrimination.  Compl. ¶ 146.  For example, Black voters are more likely to live in poverty and less likely to have access to the internet and a vehicle than white voters, so it is more difficult for Black voters to access online options for requesting an absentee ballot or to travel to a registrar's office to obtain an absentee ballot application in person.  *Id.* ¶ 147.  Similarly, it will be disproportionately burdensome for Black voters to travel to the correct precinct after waiting in line at an incorrect precinct.[9]

Citing *Brnovich*, the State dismisses these problems caused by SB 202 as constituting "the usual burdens of voting" and argues that its electoral system is

---

[9]  The United States is *not* relying solely on the impact these provisions will have on Black voters to make its case.  Rather, as the Supreme Court has recognized, "[t]he impact of the official action—whether it 'bears more heavily on one race than another' . . . may provide an important starting point" in analyzing whether an "invidious discriminatory purpose was a motivating factor" in the action.  *See Arlington Heights*, 429 U.S. at 266 (quoting *Washington v. Davis*, 426 U.S. 229, 242 (1976)).  Ironically, at least one amicus brief ignores the standard in *Arlington Heights* yet asserts that the Complaint's description of the law's negative impact on Black voters, in light of a history of discrimination and attendant socio-economic disparities, is somehow "offensive."  ECF No. 48-1 at 15 n.21.

"equally open" to all.[10]  Defs.' Mot. 4.  But SB 202 differs markedly from the laws that were challenged in Arizona, in that SB 202 constitutes a concerted, multiprong attack on the ways Black voters cast their ballots:

- By requiring forms of identification for absentee voting that Black voters are less likely to have.  Compl. ¶ 54.

- By cutting off days which Black voters have been more likely than white voters to use to request absentee ballots.  Compl. ¶¶ 58-59.

- By forbidding officials from mailing absentee ballot request forms to all voters after Black voters had started disproportionately using absentee voting and after the Speaker of the House warned that increased turnout would lead to political outcomes he opposed. Compl. ¶¶ 36-42, 90.

- By needlessly and dramatically cutting the number of drop boxes allowed in counties with large Black populations. Compl. ¶¶ 69-71.

---

[10]  In *Brnovich*, the Supreme Court declined "to announce a test to govern all VRA §2 claims involving rules . . . that specify the time, place, and manner for casting ballots."  141 S. Ct. at 2336.  Instead, the Court offered "certain guideposts," *id.*, which it applied in examining the plaintiffs' Section 2 results claim, *id.* at 2336, 2343-48.  The Court examined the District Court's rejection of a Section 2 intentional discrimination claim under the *Arlington Heights* framework.  *Id.* at 2348.  Therefore, the State's assumption that these results claim guideposts all must apply to an intent claim, as well, *see*, *e.g.*, Defs.' Mot. 23, contradicts what the Supreme Court in *Brnovich* actually did when analyzing an intent claim.

- By targeting mobilization efforts encouraging Black participation (whether by sending out absentee ballot request forms or by offering food and water to voters faced with long lines).  Compl. ¶¶ 72-75.

- By forbidding voters to cast most out-of-precinct provisional ballots after allowing it for almost two decades. Compl. ¶¶ 76-80.

The cumulative effect of these multiple impacts on Black voters presents a markedly different picture than the two discrete Arizona provisions at issue in *Brnovich*, and these Georgia provisions will work together to have a negative cumulative effect on Black voters.  Compl. ¶¶ 139-149, 161-162; *see also Arlington Heights*, 429 U.S. at 266 (considering whether the "impact of the official action" bears more heavily "on one race than another").

Take the example of refusals to count out-of-precinct ballots.  Georgia permitted out-of-precinct voting for almost two decades, Compl. ¶ 76, Georgia Act 769 (2002); O.C.G.A. §§ 21-2-418, 21-2-419 (2020), providing thousands of voters with an important fail-safe if they found themselves in the wrong precinct. In contrast, the Arizona law examined in *Brnovich* was a longstanding ban on counting out-of-precinct provisional ballots.  *Brnovich*, 141 S. Ct. at 2334 (describing Arizona law and noting that some Arizona voters cast ballots in "vote centers" that are not subject to this rule).  It is true the Supreme Court upheld a

finding that Arizona's ban did not violate Section 2's results test, and that the

United States agreed that there was not a violation of Section 2 based on the factual

record in that Arizona case.  *Id.* at 2336.  *Brnovich*, however, does not foreclose a

challenge to Georgia's cutback of its long-standing allowance of the counting of

out-of-precinct ballots.  And it certainly does not do so at the pleadings stage when

the Complaint plausibly alleges that the ban is the product of a racially

discriminatory purpose.  Under Section 2, the relevant analysis is intensely local,

*Gingles*, 478 U.S. at 79, and the factual circumstances in different states can lead

to different outcomes.[11]

---

[11]   The motions to dismiss argue that SB 202 is similar to laws enacted in other
states, *see* Defs.' Mot. 23; Intervenors' Mot. 7, but ignore that liability depends on
"an intensely local appraisal of the design and impact" of the unique factual
circumstances of each case.  *See Gingles*, 478 U.S. at 79 (quoting *Rogers v. Lodge*,
458 U.S. 613, 622 (1982)).  Indeed, a law may be enacted with discriminatory
purpose in one state—and have its intended effect there—while the same law could
be enacted in another state both with no discriminatory purpose and no such effect.
*See, e.g., White v. Regester*, 412 U.S. 755, 765-70 (1973) (striking down multi-
member districts in Texas despite allowing such multi-member districts in Indiana
in another case because of the different factual circumstances in the different
states).  Moreover, "*removing* voting tools that have been disproportionately used
by African Americans meaningfully differs from not initially implementing such
tools."  *McCrory*, 831 F.3d at 232; *see, e.g.*, Compl. ¶¶ 39-40, 43-44, 54, 58-59,
69-71, 75, 79-80.  The United States routinely brings lawsuits under its statutes, in
a wide range of states, where the unique factual circumstances warrant it.  *See*
https://www.justice.gov/crt/voting-section-litigation#sec2cases; *see also* Compl.,

2.      **The Historical Background and Sequence of Events**
        **Leading to the Passage of SB 202 Provide Evidence of**
        **Discriminatory Purpose.**

The history of discrimination against Black citizens in Georgia is well-documented and recognized by federal courts, as recently as 2018.  *See, e.g.,*
*Wright v. Sumter Cnty. Bd. of Elections & Registration*, 301 F. Supp. 3d 1297,
1323-24 (M.D. Ga. 2018); Compl. ¶¶ 30-34.  Georgia also has an extensive and
judicially recognized history of racially polarized voting, which continues today.
Compl. ¶ 136(b); *Georgia State Conf. of NAACP v. Georgia*, 312 F. Supp. 3d
1357, 1360 (N.D. Ga. 2018) ("voting in Georgia is highly racially polarized").
This is a "critical background fact" in a "[Section] 2 discriminatory intent analysis"
because racially polarized voting "provide[s] an incentive for intentional
discrimination in the regulation of elections."[12]  *McCrory*, 831 F.3d at 221-22.

SB 202 was passed in the wake of historic success by Black Georgians in
turning out to vote and in electing their candidates of choice.  In recent years,

---

*United States v. Oneida Cnty. Bd. of Elect.*, 6:21-cv-00793 (N.D.N.Y. July 12,
2021) (National Voter Registration Act and Help America Vote Act claims).

[12]  As a result of this history, Black Georgians continue to suffer the effects of
official discrimination, including markedly lower socioeconomic conditions
relative to white citizens in areas such as income, education, and access to
vehicles.  Compl. ¶¶ 23-29, 136.

Black voters had become disproportionately more likely to vote absentee than white voters and Black-led voter mobilization efforts (including the increased use of absentee ballots and efforts to encourage hungry voters to stay in long lines) had received prominent press coverage.  Compl. ¶¶ 72, 83-86,145.  It is exactly those "precise circumstances," Intervenors' Mem. 6 (quoting *GBM*, 992 F.3d at 1325), leading up to SB 202's passage that provide a basis for finding a discriminatory purpose behind the sweeping changes, each of which is more likely to affect Black voters than their white compatriots.  *See LULAC*, 548 U.S. at 440 (taking away minority voters' electoral opportunity just as they were about to exercise it "bears the mark of intentional discrimination"); *McCrory*, 831 F.3d at 226 (finding discriminatory purpose where the legislature enacted voting restrictions "in the immediate aftermath of unprecedented African American voter participation in a state with a troubled racial history and racially polarized voting").

Other circumstances leading to the passage of SB 202 that the State and Intervenors largely ignore include an unprecedented campaign to overturn the November 2020 election results, violent threats against election workers, and countless unsuccessful lawsuits, all premised on unfounded accusations of fraud. Compl. ¶¶ 103-111.  Legislators who supported SB 202 used voter fraud as a justification for many of its provisions, in the face of warnings about the

disproportionate effects the bill would have on Black voters.  The history of SB

202 differs greatly from the photo ID bill at issue in *Greater Birmingham*

*Ministries*, 992 F.3d at 1305, for example, where the historical background

included actual, public cases of voter fraud and lacked the very public campaign to

overturn the results of an election based on false information.

   *Brnovich*'s acknowledgement that voter fraud prevention is a legitimate state

interest provides no basis to dismiss the Complaint.  *See* Defs.' Mot. 3,

Intervenors' Mot. 8.  The issue before this Court is not whether fraud prevention

*can* provide a legitimate basis for a challenged provision; it is whether, *in this case*,

it does.  This Court, like the Arizona district court, cannot assess whether the

invocation of fraud prevention is "sincere" absent considering the credibility of

documentary evidence and witnesses.  *Brnovich*, 141 S. Ct. at 2349.  The United

States has alleged that state-led investigations squarely disproved any basis for

believing widespread fraud in Georgia required enacting the provisions in SB 202.

Moreover, the results in several lawsuits alleging voter fraud further demonstrated

the security of mail-in voting in Georgia.  Compl. ¶¶ 102-105, 109-110.

   The State's and Intervenors' reliance on state legislative findings, *see, e.g.*,

Intervenors' Mot. 7, cannot rebut the allegations of the Complaint at this stage.

*See Tellabs, Inc.*, 551 U.S. at 322; *Korematsu v. United States*, 584 F. Supp. 1406,

1415 (N.D. Cal. 1984) (declining to take "judicial notice of the actual findings of [a federal] Commission"). Whether the provisions of SB 202 actually prevent fraud or are mere pretext for discrimination is a factual question for resolution at trial after full discovery.[13]

### 3.   Procedural and Substantive Departures and Statements or Actions of Legislators Provide Evidence of Discriminatory Purpose.

The General Assembly departed from its normal procedure in passing SB 202 by stripping consideration of election bills from the usual standing House committee and giving it to a Special Committee. Compl. ¶ 157. House Speaker David Ralston, who had expressed concerns that mailing absentee applications to all voters would "drive up turnout" and be "extremely devastating" to election outcomes he favored, announced the formation of the Special Committee. *Id.* ¶ 39. The chair of the Special Committee, Representative Fleming, had publicly recognized his goal of making absentee voting harder just after Black voters had

---

[13]   One straw-man argument raised by the State is that finding for the United States would somehow prevent laws to remedy voter fraud. To the contrary, legislatures can act to prevent voter fraud, but they cannot use voter fraud as a pretext to enact racially discriminatory provisions that needlessly throw roadblocks in the way of minority voter participation. The dispute in a Section 2 purpose case is not about fraud or measures that might address fraud in the abstract, but about the purposes for which very specific provisions of this bill came to be, and what effect they will have, in the relevant jurisdiction.

begun to use absentee voting at higher rates than white voters and electing candidates of choice.  Other legislators, like Representative Chuck Martin, suggested that the absentee process had become susceptible to "foolishness." *Id.* ¶¶ 114, 122; *see Arlington Heights*, 429 U.S. at 267 (noting that a sudden change in longstanding policy in the face of shifting racial demographics may suggest a discriminatory purpose); *see also McCrory*, 831 F.3d at 222-23; Compl. ¶¶ 136, 154, 164 (noting absence of voter fraud).[14]

The Special Committee received a three-page bill version of SB 202 that involved only duplicate absentee ballot applications and turned it into a 90-page omnibus bill, with little notice to the public or other representatives.  Compl. ¶¶ 118-120.  Debate on the 90-page bill began before it was publicly available on the legislature's website, *id.* ¶ 121, and the bill's original sponsor flouted standard practice by not presenting the significant changes in the substitute bill, *id.* ¶ 157. Despite concerns expressed regarding procedural issues, the lack of a fiscal note

---

[14]   Despite Intervernors' arguments to the contrary, ECF No. 39-1 at 7, the Complaint does discuss the statements of sitting Georgia legislators during Committee hearings and floor debates regarding SB 202.  *See, e.g.*, Compl. ¶¶ 119, 122, 126, 127.  Other legislative statements cited in the complaint, *see, e.g.*, Compl. ¶¶ 105, 110-111, 114, were made just before the 2021-2022 Legislative Session and remain connected "to the passage of the actual law in question."  *See GBM*, 992 F.3d at 1324.

(despite the inevitable expenditures the bill would entail), and the impact the bill would have on voters of color, SB 202 passed out of the Special Committee five days later. *Id.* ¶¶ 123-127.  Two days later, after less than two hours of floor debate in the House, SB 202 passed out of the House, and then was quickly passed in the Senate. *Id.* ¶¶ 128-132.  The governor signed it only eight days after the 90-page version was first introduced and less than a week after it became publicly available on the General Assembly's website.  Compl. ¶¶ 118-133; *see McCrory*, 831 F.3d at 228 (moving a 57-page bill through the legislature in three days "strongly suggests an attempt to avoid in-depth scrutiny").[15]

---

[15]   Ohio's amicus brief faults the United States for pointing out that SB 202 had no support among Black legislators.  ECF No 46-1 at 29.  But again, examining the totality of the circumstances surrounding a decision is relevant for the "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Arlington Heights*, 429 U.S. at 266.  The relevant facts include those who supported and opposed the bill in question.  Likewise, multiple briefs incorrectly suggest that the United States has alleged that Georgia legislators are "racist," but such allegations are not required.  *McCrory*, 831 F.3d at 222-23; *Garza*, 918 F.2d at 778 & n.1 (Kozinski, J., concurring and dissenting in part); *see also LULAC*, 548 U.S. at 440.  Indeed, Supreme Court precedent "does not require a plaintiff to prove that the challenged action rested solely on racially discriminatory purposes" but rather that a discriminatory purpose was "a motivating factor." *Arlington Heights*, 428 U.S. at 265-66.

**4.  The Disparate Impact of the Challenged Provisions Was Foreseeable, the Legislature Knew of this Impact, and the Legislature Could Have Chosen Less Discriminatory Alternatives.**

The United States has also sufficiently pled the additional factors considered by the Eleventh Circuit for intentional discrimination claims.  *See GBM*, 992 F.3d at 1322.  Given that Black voters use absentee voting at a disproportionately higher rate than white voters, SB 202's limitation on absentee voting will have the foreseeable effect of having a disparate impact on Black voters.  Compl. ¶¶ 152, 163.  This foreseeable effect is heightened because Black voters are less likely than white voters to have the identification required under SB 202 to apply for an absentee ballot (absent a photocopy of another ID), *id.* ¶ 143; have been more likely than white voters to request an absentee ballot during days now eliminated for requests, *id.* ¶¶ 56-58; and are more likely to be impacted by draconian cuts to drop boxes in the metro-Atlanta area, *id.* ¶¶ 60-71.  Similarly, given that efforts to distribute water and food to persons waiting in long lines to vote were frequently run by Black-led community organizations to aid voters at majority-minority polling places, it is foreseeable that a ban on providing such aid would disproportionately affect Black voters.  *Id.* ¶¶ 72-73, 135, 138.  And given that Black voters have higher rates of residential mobility and less access to

35

transportation, *id.* ¶ 80, it is also foreseeable that Black voters would be disproportionately impacted by the ban on counting most out-of-precinct provisional ballots, *id.* ¶ 145.

The General Assembly knew of the disparate impact the challenged provisions would have.  Black-led mobilization efforts in Georgia that encouraged absentee voting and provided food and water to voters waiting in line were well publicized, and it is reasonable to infer that the General Assembly was aware of these efforts.  Compl. ¶¶ 1, 72-75, 81, 85-86.  The House Speaker's prediction that an increase in absentee voting would "drive up turnout," which would be "extremely devastating" to election outcomes he favored shows as much.  *Id.* ¶ 39.  Several witnesses also testified during hearings on SB 202 that the bill would harm Black voters.  *Id.* ¶¶ 123, 127-128.

In addition, the legislature had less discriminatory alternatives available to achieve its purported ends.  For example, if the State were concerned about ensuring voters' identity, it could have permitted voters to print the last four digits of their social security numbers if they do not have a DDS-issued ID.  Compl. ¶¶ 48-49.  But it did not.  And supporters of SB 202 did not explain during the debate why the use of the last four digits of a voter's social security number was sufficient to verify identity for returning a completed absentee ballot, but not

sufficient to verify identity for requesting an absentee ballot.  *Id.* ¶¶ 52, 143.  The failure to allow the social security number as an alternative at the absentee ballot application stage can be a consequential choice since it would be widely and easily available to many voters and could mitigate a discriminatory effect.

Similarly, SB 202 dramatically and needlessly cut back the number of drop boxes available in counties in the metro Atlanta area, Compl. ¶¶ 63-71, when the legislature could have chosen a formula for assigning drop boxes that did not result in dramatic cuts, or it could have permitted drop boxes to remain open after business hours up until Election Day as needed, with cameras to address security concerns.  *See* State Election Board Rule 183-1-14-0.6-.14; Compl. ¶ 60.  The broad prohibition on offering food and water to voters in line could have easily been narrowed to focus on electioneering by prohibiting food or water *in exchange for votes or support for a candidate or party.*  Indeed, state law already prohibited soliciting votes "in any manner or by any means or method" within 150 feet of a polling place, which presumably would have covered offering food or water in exchange for voting a certain way.  O.C.G.A. § 21-2-414 (2017).  But making it illegal for Black-led organizations to provide food and water to encourage people to stay in hours-long lines to vote in Black communities, without advocating for any partisan campaign, *see* Compl. ¶ 75, goes much farther than needed to advance

the State's interest.[16]

###### 5.    The Totality of the Circumstances Support a Finding of Discriminatory Purpose.

The State alleges that the United States has not adequately pled the totality

of the circumstances, but an examination of the Complaint shows otherwise.  In

addition to the *Arlington Heights* factors, the Supreme Court held in *Rogers v.*

*Lodge* that courts can rely on the evidentiary factors later listed in the 1982 Senate

Report to find that a challenged practice has been adopted or maintained for a

racially discriminatory purpose.[17]  *See* 458 U.S. 613, 620-21 (1982).  Several

---

[16]  In the same vein, the legislature could have addressed duplicate ballot applications without onerous fines of up to $100 per violation, which will chill political mobilization efforts among Black voters, Compl. ¶¶ 35, 43-44, 161, and it could have allowed more time for absentee ballot requests to be processed without stopping all absentee ballot requests 11 days before the election.  *Id.* ¶¶ 57-59.  Indeed, the dramatic restrictions on drop boxes will only increase the number of late-arriving absentee ballots that will not be counted, *id.* ¶¶ 65-70, which is ostensibly the rationale for the 11-day restriction.

[17]  The "Senate Factors," as listed in *Gingles*, 478 U.S. at 44-45, are:

> 1.    The extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

> 2.    The extent to which voting in the elections of the state or political subdivision is racially polarized;

> 3.    The extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot

Senate Factors, as alleged in the Complaint, support a finding of discriminatory

purpose.  As already explained, *see* Section III.B.2, *supra*, Georgia's history of

discrimination against minorities is long standing and well documented (Senate

Factor 1), Compl. ¶¶ 30-34, and voting in Georgia continues to be racially

polarized (Senate Factor 2), Compl. ¶ 136.  "It is the political cohesiveness of the

minority groups that provides the political payoff for legislators who seek to dilute

---

provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

4.      If there is a candidate slating process, whether the members of the minority group have been denied access to that process;

5.      The extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

6.      Whether political campaigns have been characterized by overt or subtle racial appeals; [and]

7.      The extent to which members of the minority group have been elected to public office in the jurisdiction.

Two additional factors are (1) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and (2) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous.  *Id.* at 45.

or limit the minority vote."[18]  *McCrory*, 831 F.3d at 222.

The Complaint also alleges that Black Georgians bear the effects of discrimination in various socio-economic areas (Senate Factor 5).  Compl. ¶¶ 23-29.  In the Eleventh Circuit, it is well-established that "when there is clear evidence of present socioeconomic or political disadvantage resulting from past discrimination . . . the burden is not on the plaintiffs to prove that this disadvantage is causing reduced political participation, but rather is on those who deny the causal nexus to show that the cause is something else."  *Solomon* v. *Liberty County*, 166 F.3d 1135, 1147 (11th Cir. 1999), *vacated on other grounds*, 206 F.3d 1054 (11th Cir. 2000) (en banc) (citing *Marengo County Comm'n*, 731 F.2d at 1569 (collecting cases)).  The Complaint further alleges that recent contests for statewide and national office in Georgia—including the recent elections preceding passage of SB 202—have included overt and subtle racial appeals (Senate Factor 6).  Compl. ¶¶ 97-99.  These factors, combined with the *Arlington Heights* framework, can form the basis of a finding of intentional discrimination.

---

[18]   In the context of a results claim for vote denial, *Brnovich* observed that not all of the Senate Factors might be as relevant as they would be in a vote dilution case, but some of the factors, such as racially polarized voting, bear on whether the "minority group members suffered discrimination in the past (factor one) and that effects of that discrimination persist (factor five)."  141 S. Ct. at 2340.

### C.   Inferences of a Discriminatory Purpose Can Be Drawn from Facially-Neutral Laws

The State and Intervenors argue that because SB 202 is race-neutral on its face, the challenged provisions of SB 202 constitute legitimate, non-discriminatory election administration policies that states are free to pursue without violating Section 2. *See* Defs.' Mot. 14-17; Intervenors' Mot. 7-8, 14-15.  That has never been the law.  The very purpose of the *Arlington Heights* approach is to determine whether inferences of a discriminatory purpose render a facially neutral law invalid.  *Arlington Heights*, 429 U.S. at 265-70.

Nor is this Court restricted to the statements of legislative purpose contained in the text of SB 202 in examining discriminatory purpose.  *Contra* Defs.' Mot. 14; Intervenors' Mot. 7-8.  If that were the case, lawmakers would be free to enact laws with a discriminatory purpose simply by claiming otherwise.  "In instructing courts to consider the broader context surrounding the passage of legislation, the [Supreme] Court has recognized that '[o]utright admissions of impermissible racial motivation are infrequent and plaintiffs must rely on other evidence.'"  *McCrory*, 831 F.3d at 221 (quoting *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999)).  No halfway adept legislator motivated by a discriminatory purpose would announce that purpose publicly, so public statements by legislative proponents articulating an

41

ostensibly permissible intent should not be accorded any special weight. *Smith v. Town of Clarkton*, 682 F.2d 1055, 1064 (4th Cir. 1982).

Moreover, as the Supreme Court recognized in *Arlington Heights*, legislators routinely make decisions that are motivated by multiple concerns, and the evidence need not show "that the challenged action rested solely on racially discriminatory purposes" or even that the discriminatory purpose "was the 'dominant' or 'primary' one." 429 U.S. at 265. "When there is proof that a discriminatory purpose has been a motivating factor in [a] decision," judicial deference to legislators' policy choices "is no longer justified." *Id.* at 265-66. As set forth in the Complaint, the scope and extent of the restrictions the State imposed here—immediately after historic wins by Black-preferred candidates and a dramatic increase in absentee voting among Black voters—further points to discriminatory motives. Compl. ¶¶ 81-100. At this stage of the litigation, these allegations must be taken as true and inferences drawn in the United States' favor.

Whether sufficient evidence exists to overcome any alleged "presumption of legislative good faith," Intervenors' Mot. 5, is an inherently fact-based question best suited for the merits stage of litigation. *See Miller v. Johnson*, 515 U.S. 900, 915-17 (1995); *Abbott v. Perez*, 138 S. Ct. 2305, 2325 (2018). Moreover, a very great part of the relevant facts about elections and this bill are uniquely in the

42

possession of the State, its counties, and its governmental actors.  The United States has adequately pled and is entitled to discovery on those claims.[19]

## IV.   CONCLUSION

As set forth above, the United States has stated a claim upon which relief can be granted pursuant to Section 2 of the VRA, 52 U.S.C. § 10301.  Accordingly, the Motions to Dismiss should be denied.

---

[19]  That state legislators may attempt to invoke legislative privilege, *see* Intervenors' Mot. 9, does not foreclose the United States' claim.  A state legislator's assertion of legislative privilege is not absolute, particularly where, as here, a compelling federal interest is at stake.  *See United States v. Gillock*, 445 U.S. 360, 373 (1980).

Respectfully submitted, this 11th day of August, 2021.

KURT R. ERSKINE
Acting United States Attorney
Northern District of Georgia

LORI BERANEK
Civil Chief, Civil Division
Northern District of Georgia

*/s/ Aileen Bell Hughes*
_____
AILEEN BELL HUGHES
Georgia Bar No. 375505
Assistant U.S. Attorney
Office of the United States Attorney
600 U.S. Courthouse
75 Ted Turner Drive, SW
Atlanta, GA 30303
Phone: (404) 581-6000
Fax: (404) 581-6181

KRISTEN CLARKE
Assistant Attorney General
Civil Rights Division

PAMELA S. KARLAN
Principal Deputy Assistant
Attorney General

*/s/  Rachel R. Evans*
_____
T. CHRISTIAN HERREN, JR.
JOHN A. RUSS IV
JASMYN G. RICHARDSON
RACHEL R. EVANS
ERNEST A. MCFARLAND
MAURA EILEEN O'CONNOR
ELIZABETH M. RYAN
Attorneys, Voting Section
Civil Rights Division
U.S. Department of Justice
4 Constitution Square
150 M Street NE, Room 8.923
Washington, D.C. 20530
Phone: (800) 253-3931
Fax: (202) 307-3961
john.russ@usdoj.gov
jasmyn.richardson@usdoj.gov

## CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1(D)

Pursuant to Local Rule 7.1(D), I certify that the foregoing document was prepared in Times New Roman 14-point font in compliance with Local Rule 5.1(C).

*/s/ Rachel R. Evans*
RACHEL R. EVANS
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice

# CERTIFICATE OF SERVICE

I hereby certify that on August 11, 2021, I electronically filed the foregoing

with the clerk of the court using the CM/ECF system, which will send notification

of this filing to counsel of record.

*/s/ Rachel R. Evans*
RACHEL R. EVANS
Attorney, Voting Section
Civil Rights Division
U.S. Department of Justice