# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF GEORGIA
# ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>*Plaintiff*,<br><br>v.<br><br>THE STATE OF GEORGIA; et al.,<br>*Defendants*,<br><br>REPUBLICAN NATIONAL COMMITTEE; et al.,<br>*Intervenor-Defendants*. | No. 1:21-cv-2575-JPB |

## INTERVENORS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS OR ALTERNATIVELY FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

Introduction ............................................................................................... 1
Argument .................................................................................................... 2
    I.    Intervenors can file a motion to dismiss. ..................................... 2
    II.   The Government's intentional-discrimination claim fails at the pleading stage. ............................................................................... 5
Conclusion ................................................................................................ 14
Certificate of Compliance ........................................................................ 15
Certificate of Service ............................................................................... 15

## INTRODUCTION

The Government admits that SB 202 would be perfectly lawful—if only it weren't passed *by Georgia. See* Opp. (Doc. 58) 28 & n.11, 31. "But the Supreme Court foresaw this line of argument in *Shelby County*, emphasizing 'the fundamental principle of equal sovereignty.'" *Greater Birmingham Ministries v. Sec'y of State for Ala.*, 992 F.3d 1299, 1325 (11th Cir. 2021). Equal sovereignty stopped the Government from targeting Georgia under section 5, forcing the State to spend substantial time and resources preclearing laws that others were free to enact. Equal sovereignty should also stop the Government from targeting Georgia under section 2, forcing the State to undergo "full discovery" and a "trial" whenever the Government files a complaint alleging intentional racial discrimination. Opp. 32. If the Government is going to level these contemptible charges against one of the United States, it should come forward with more than conclusory allegations, irrelevant facts, and inapplicable law.

The Government's complaint is not a "classic" charge of intentional discrimination. Opp. 1. It is a policy disagreement "'sullied by *ad hominem* rhetoric'" against a sovereign State. *Greater Birmingham*, 992 F.3d at 1326. That the Government was "left with" no other claim after *Shelby County* does not make this claim valid or plausible. Garland, *It Is Time for Congress to Act Again to Protect the Right to Vote*, Wash. Post (Aug. 5, 2021), wapo.st/3CRpsiZ. It should be dismissed.

## ARGUMENT

Before responding on the merits, the Government raises a "procedural" objection to Intervenors' right to file a motion to dismiss. Opp. 2 n.2. The Government's undeveloped procedural objection—raised only in a footnote—is itself procedurally improper. And all the Government's arguments fail under the governing law. This Court should grant Intervenors' motion to dismiss.

### I. Intervenors can file a motion to dismiss.

In a footnote, without responding to any of Intervenors' authorities, the Government contends that Intervenors "forfeited" their right to file a motion to dismiss. Opp. 2 n.2. The Government notes that Intervenors attached a proposed pleading to their motion to intervene, *see* Proposed Answer (Doc. 15-1), and it cites the general rule that motions to dismiss are untimely unless they are filed "before pleading," Fed. R. Civ. P. 12(b).

But this sequencing rule does not affect a court's *power* to entertain a motion to dismiss. Plaintiffs can forfeit or waive this argument, and courts can choose to entertain post-answer motions. *See* 5C Fed. Prac. & Proc. Civ. §1361 & n.7 (3d ed.) (collecting cases where "federal courts have allowed" post-answer motions to dismiss); *Doty v. United States*, 2016 WL 3398579, at *2 (D.N.J. June 15) (considering a post-answer motion to dismiss because the plaintiff noted its timeliness objection only "in a footnote"). Here, the Government forfeited the argument by cursorily raising it in a footnote. *See Futrell v. Southeastrans, Inc.*, 2021 WL 2547660, at *4 (N.D. Ga. Apr. 1), *adopted*, 2021 WL 2548697 (N.D. Ga. Apr. 22); *Julien v. Battle*, 2021 WL 3076415, at *4 (N.D. Ga. Feb. 23).

Even if the argument had been preserved, this Court should exercise its discretion to allow Intervenors to file a motion to dismiss. (It should also allow Intervenors to join the State's motion—something the Government does not appear to challenge. *See* Opp. 2 n.2.) This Court should exercise its discretion to allow Intervenors' post-answer motion for several reasons.

First, it is "unclear" how Rule 12(b)'s sequencing requirement applies "in the intervener context." *Vivid Ent., LLC v. Fielding*, 965 F. Supp. 2d 1113, 1122 n.1 (C.D. Cal. 2013). The intervention rules require movants to attach a proposed pleading to their motion. Fed. R. Civ. P. 24(c); *cf. Landry's, Inc. v. Sandoval*, 2016 WL 1239254, at *3 (D. Nev. Mar. 28) (a motion to dismiss is not the "pleading" required by Rule 24(c)). But nothing in the Rules suggests that a *proposed* pleading is the kind of "pleading" discussed in Rule 12(b), or that the rulemakers wanted to force successful intervenors to forgo their right to file a motion to dismiss. This Court should avoid that conclusion, as it would contradict the principle that intervenors have "equal standing with the original parties." *Marcaida v. Rascoe*, 569 F.2d 828, 831 (5th Cir. 1978).

Second, allowing Intervenors to raise their arguments in a motion to dismiss could not prejudice anyone. Intervenors' motion raises the same "affirmative defense of failure to state a claim" that they pleaded in their proposed answer. *Resol. Tr. Corp. v. Holland & Knight*, 832 F. Supp. 1528, 1529 n.2 (S.D. Fla. 1993); *see* Proposed Answer 16 ¶1. The Government "does not allege any prejudice" from Intervenors' motion. *Doty*, 2016 WL 3398579, at *2. Nor could it. This Court has already allowed Intervenors to file motions to dismiss in the

related cases, several of which involve similar allegations of intentional discrimination. And the Government must respond to the State's motion anyway.

Third, barring Intervenors from filing a motion to dismiss is inefficient. If Intervenors can't file a motion to dismiss, then they can raise the same arguments "again later, with any effort spent on this issue between now and then wasted." *Green v. Henry Cty. Comm'n*, 2020 WL 974388, at *3 (M.D. Ala. Feb. 28). This Court would still have to consider Intervenors' arguments in a Rule 12(c) motion for judgment on the pleadings, a Rule 56 motion for summary judgment, or a Rule 12(i) motion for disposition before trial. *Id.* at *2-3. Because the legal standard under all three motions is the same, courts presented with purely legal defenses do not fret over labels; they simply resolve the defenses.[1] The Government has convinced courts to do just that. *E.g.*, *Puckett v. United States*, 82 F. Supp. 2d 660, 663 (S.D. Tex. 1999) (allowing the United States to file a post-answer motion to dismiss). This Court should similarly decide the arguments in Intervenors' motion, in line with the Rules' "preference … for resolving disputes on their merits." *Krupski v. Costa Crociere S.p.A.*, 560 U.S. 538, 550 (2010).

---

[1] *E.g.*, *Virginia v. Ferriero*, 2021 WL 848706, at *3 n.1 (D.D.C. Mar. 5) (treating a summary-judgment motion as a late 12(b)(6) motion); *Prade v. City of Akron*, 2015 WL 2169975, at *1-2 (N.D. Ohio May 8) (treating a 12(c) motion as a late 12(b)(6) motion); *Resol. Tr.*, 832 F. Supp. at 1529 n.2 (treating a late 12(b)(6) motion as a motion for disposition before trial); *Crase v. Sei Sols., LLC*, 2020 WL 2041750, at *2 (N.D. Ind. Apr. 28) (treating a late 12(b)(6) motion as a 12(c) motion).

In all events, the Government's procedural objection is irrelevant because Intervenors alternatively sought summary judgment. The Government does not deny that, with an exception not relevant here, summary judgment can be sought "at any time." Fed. R. Civ. P. 56(b). In fact, this Court encourages summary judgment "as soon as possible." Civil LR 56.1(D). While the Government objects that no discovery has occurred, Opp. 2-3 n.2, the suggestion "that it is *per se* improper to grant summary judgment without providing … an opportunity to conduct discovery is without merit." *Reflectone, Inc. v. Farrand Optical Co.*, 862 F.2d 841, 844 (11th Cir. 1989).

Discovery is unnecessary when a summary-judgment motion presents "'pure questions of law.'" *Youngblood-W. v. Aflac Inc.*, 2019 WL 1601370, at *2 (M.D. Ga. Apr. 12), *aff'd*, 796 F. App'x 985, 992-93 (11th Cir. 2019); *see Virgilio v. Ryland Grp., Inc.*, 680 F.3d 1329, 1339 (11th Cir. 2012) (discovery unnecessary when issue is "purely legal"); *Kelsey v. Withers*, 718 F. App'x 817, 821 (11th Cir. 2017) (discovery may be avoided if summary-judgment motion "accept[s] the facts pled in the complaint as true"). Because Intervenors' motion "raises only questions of law," resolving it after discovery "would in itself be an abuse of discretion." *World Holdings, LLC v. Fed. Republic of Germany*, 701 F.3d 641, 655 (11th Cir. 2012). The Court should resolve these questions now.

## II. The Government's intentional-discrimination claim fails at the pleading stage.

Plaintiffs alleging intentional discrimination always cite *Arlington Heights*, and they always insist that their claims cannot be resolved at the pleading stage. But these claims are dismissed all the time, often at the

5

Government's behest. Mot. (Doc. 39-1) 4-5. *Iqbal* itself was a complaint against the Government that failed to plausibly allege discriminatory intent. *Ashcroft v. Iqbal*, 556 U.S. 662, 680-87 (2009). The Government's suggestion that "voting" cases are somehow different makes little sense. Opp. 14-15. The Federal Rules are trans-substantive: They apply the same way "'in all civil actions,'" no matter the claim alleged or the plaintiff alleging it. *Iqbal*, 556 U.S. at 684.

The Government's complaint should be dismissed because it fails the plausibility standard from *Twombly* and *Iqbal*. That should be unsurprising, as the Government has accepted the "problematic and near-impossible challenge" of proving that an entire "legislature" had the "intent" to discriminate against its citizens based on their skin color. *Greater Birmingham*, 992 F.3d at 1324. Three points about the Government's implausible allegations bear further emphasis: the presumption of legislative good faith, the pitfalls of following the Fourth Circuit's decision in *McCrory*, and the Government's failure to account for legal developments since *Arlington Heights*.

\*

First, the Government does not deny that Georgia is entitled to "the presumption of legislative good faith." *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). While the Government suggests that this presumption plays no role at the pleading stage, the case that it cites says the opposite. Opp. 42 (citing *Miller v. Johnson*, 515 U.S. 900, 915-17 (1995)). *Miller* explains that the legal "principles" governing claims of intentional discrimination—including "the presumption of good faith that must be accorded legislative enactments"—

6

affect more than "the plaintiff's burden of proof at trial." 515 U.S. at 916. Courts must apply them "when assessing … the adequacy of a plaintiff's showing at the various stages of litigation," including when "determining whether to permit discovery" under Rule "12(b)." *Id.* at 916-17. Here, for example, several of the negative inferences that the Government tries to draw are impermissible in light of the presumption of good faith. *E.g.*, *Abbott*, 138 S. Ct. at 2324-25, 2328-29 (presumption not displaced by "past discrimination" or "the brevity of the legislative process").

\* \*

Second, when the Government gets in a pinch, it cites the Fourth Circuit's dubious decision in *N.C. State Conference of the NAACP v. McCrory*, 831 F.3d 204 (4th Cir. 2016). The Government cites *McCrory* on nearly every page of its argument, and *McCrory* is the *only* cite that the Government gives for several points of law. Of course, *McCrory* is an out-of-circuit decision, with highly distinguishable facts, that does not bind this Court. *Cf. Greater Birmingham Ministries v. Merrill*, 284 F. Supp. 3d 1253, 1278-79 (N.D. Ala. 2018) (stressing the unusual facts of *McCrory*); *Lee v. Va. State Bd. of Elections*, 843 F.3d 592, 603-04 (4th Cir. 2016) (same).

But this Court should not even treat *McCrory* as persuasive authority. Four Justices (on an eight-Justice Court) voted to stay the Fourth Circuit's decision in that case. *See* 137 S. Ct. 27, 28 (2016). The Supreme Court later denied certiorari, but only after North Carolina's new governor and attorney general tried to withdraw the State's petition for certiorari—something Chief

Justice Roberts made a point to emphasize. *See* 137 S. Ct. 1399, 1399-1400 (2017) (Roberts, C.J., respecting the denial of certiorari). Plus, the Fourth Circuit's finding of discriminatory intent—which overrode a contrary finding by the district court, *see id.* at 1399—did not age well. After the Fourth Circuit invalidated the legislature's voter-ID law, the people of North Carolina passed a constitutional amendment *requiring* the legislature to adopt voter ID. Unable to maintain that most legislators *and most voters* harbored racist intent, the Fourth Circuit let the new law stand. *See generally N.C. State Conf. of the NAACP v. Raymond*, 981 F.3d 295 (4th Cir. 2020).

Much of what *McCrory* said about the law, too, was contradicted by later precedents—precedents that, unlike *McCrory*, bind this Court. For example, *McCrory* deemed the so-called *Gingles* factors to be a "critical" part of its analysis. 831 F.3d at 221. But the Eleventh Circuit later held that these vote-dilution factors "cannot" be applied in vote-denial cases like this one. *Greater Birmingham*, 992 F.3d at 1332; *accord Brnovich v. DNC*, 141 S. Ct. 2321, 2340 (2021).[2] The Fourth Circuit also relied on historical discrimination and other events that were not directly connected to the passage of the challenged law, *McCrory*, 831 F.3d at 223-25—evidence that the Eleventh Circuit later ruled out in *Greater Birmingham*, 992 F.3d at 1324-26. The Fourth Circuit also declined to mention or apply the presumption of legislative good faith. *Compare*

---

[2] The Government cannot make up its mind on *Gingles*. At one point, it insists that "vote dilution cases are wholly distinct from the vote denial claim brought here," which is judged "under the *Arlington Heights* framework" instead of "*Gingles*." Opp. 19-21. At another point, it urges this Court—based on a vote-*dilution* case—to apply *Gingles*. Opp. 38-40.

8

*McCrory*, 831 F.3d at 226, 228, *with Abbott*, 138 S. Ct. at 2328-29, *and Greater Birmingham*, 992 F.3d at 1326. This Court should not repeat *McCrory*'s errors.

\* \* \*

Third, the Government faults Intervenors for not separately analyzing each of the factors from *Arlington Heights*. Opp. 22. That criticism is odd. As the Government admits, *Arlington Heights* is just a "non-exhaustive list" of evidence that may or may not be present in a given case. Opp. 5; *accord His House Recovery Residence, Inc. v. Cobb Cty.*, 806 F. App'x 780, 784 n.3 (11th Cir. 2020) (rejecting the argument that courts must "apply the [*Arlington Factors*] factors"). And the law on intentional discrimination did not end with *Arlington Heights*. Several cases have since clarified what evidence counts, what weight to give certain kinds of evidence, and whether certain evidence is sufficient to raise an inference of discriminatory intent. *See* Mot. 6-14.

Instead of artificially focusing on one list of nonexhaustive factors, Intervenors evaluated the allegations *in the Government's complaint*. While the Government spends a lot of time repeating those allegations, it spends little time proving their legal relevance. And it spends little time explaining how they raise a plausible inference of intentional discrimination by the legislature as a whole, especially given the presumption of good faith. The Government's allegations fall short of the plausibility threshold, both individually and collectively.

**History**: The Government simply restates that Georgia has a "history of discrimination," without bothering to explain the relevance of that allegation

under *Greater Birmingham*. Opp. 29. *Greater Birmingham* limits a court's analysis to "the precise circumstances surrounding the passing of the [challenged] law." 992 F.3d at 1325. Evidence of historical discrimination, the Eleventh Circuit held, is irrelevant under *Arlington Heights*, insufficient under *Abbott*, and impermissible under *Shelby County*. *See id.* at 1325-26.

Quickly pivoting to more recent events, the Government notes that SB 202 was enacted in 2021, months after Democrats won three statewide races in Georgia. Opp. 29-30. That allegation might be "consistent with" an intent to discriminate (albeit lawfully against Democrats, rather than unlawfully against African Americans). *Iqbal*, 556 U.S. at 681. "But given more likely explanations," it does "not plausibly establish this purpose." *Id.* Far more salient than three razor-thin Democratic victories, Georgia's election system had just undergone an unprecedented stress test from a global pandemic, a surge of absentee voting, and a deluge of litigation both before and after the election. *See* Mot. 13.

Election reforms were considered after the 2020 elections because the 2020 elections exposed a need for election reforms. That's why several other States have recently passed or are currently considering election reforms, including States like Florida, Iowa, and Texas where Republicans dominated in 2020. Mot. 13. That's why Georgia did not enact SB 202 after the 2008 or 2012 elections, when African-American turnout was higher. Mot. 13 n.*. And that's why SB 202 includes provisions that both improve election integrity *and* make

it easier to vote. Mot. 15. The Government never tries to reconcile its theory with these undisputed matters of public record.

**Statements**: The Government does not defend the stray statements in its complaint from political campaigns, nonlegislators, contexts other than the passage of SB 202, or the bill's opponents. *See* Mot. 6-7, 11. Wisely so, as these statements do not come from "the precise circumstances surrounding the passing of [SB 202]" or reflect the "intent of the entire body of the [Georgia] legislature." *Greater Birmingham*, 992 F.3d at 1325. As for statements "made by legislators during or about the legislation's passage," the Government continues to identify zero "discriminatory remarks." *Raymond*, 981 F.3d at 309.

While the Government insists that it cited one statement from one proponent of SB 202 during one committee hearing, Opp. 33 n.14; *see* Compl. ¶122, that isolated and innocent statement creates no plausible "'inference of discriminatory motive.'" *DHS v. Regents of Univ. of Calif.*, 140 S. Ct. 1891, 1916 (2020). The legislator's expressed concern about absentee-voting fraud is a "valid neutral justification[]" that *disproves* discriminatory intent, not the opposite. *Greater Birmingham*, 992 F.3d at 1327. This same concern cannot be sinister when raised by a Georgia legislator, but valid when raised by Jimmy Carter, John Paul Stevens, and Richard Posner. *See Brnovich*, 141 S. Ct. at 2347 (citing the Carter-Baker Commission); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 195-96 (2008) (op. of Stevens, J.); *Griffin v. Roupas*, 385 F.3d 1128, 1130-31 (7th Cir. 2004) (Posner, J.).

Ultimately, the Government admits that "fraud prevention *can* provide a legitimate basis" for election reforms. Opp. 31. Then it immediately shifts the goalposts by insisting that Georgia had no *proof* of "*widespread* fraud *in Georgia*" in *2020*. Opp. 31 (emphases added). But time and again, courts have held that States can enact election reforms without proof of fraud, proof of widespread fraud, or proof of widespread fraud in their State. *See* Mot. 8-9.

The Government does not explain how fraud prevention morphs from a "legitimate" interest into "pretext for discrimination" whenever the legislature fails to collect evidence that the law doesn't require. Opp. 31-32; *see Greater Birmingham*, 992 F.3d at 1334; *DNC v. Reagan*, 904 F.3d 686, 719 (9th Cir. 2018). The Government's pretext argument rings particularly hollow because it does not dispute that SB 202 *actually does* further the State's interest in deterring fraud. And the Government says nothing about the legislature's "additional justifications" for SB 202, including "increasing confidence in elections and modernizing [Georgia's] elections procedures," which are themselves "valid neutral justifications." *Greater Birmingham*, 992 F.3d at 1334 n.47, 1327. A majority of the legislature confirmed all these neutral purposes in SB 202's formal legislative findings. *See* Mot. 7-8. Those findings might not be dispositive, but they should certainly "count for something," particularly given the presumption of good faith and the dearth of any other evidence reflecting the intent of the legislature as a whole. *Raymond*, 981 F.3d at 308.

**Departures**: The Government repeats its procedural quibbles with SB 202's committee assignment, speed of passage, and vote count. *See* Opp. 32-34.

12

Those supposed irregularities do not impress in their own right. *See* Mot. 10; FGA Amicus Br. (Doc. 48-1) 7-10. But even accepting them at face value, the Government does not explain their legal relevance. "[P]rocedural violations" do not plausibly suggest "invidious intent" unless the plaintiff explains how the deviations helped "accomplish [the] discriminatory goal." *Rollerson v. Brazos River Harbor Navigation Dist. of Brazoria Cty.*, -- F.4th ---, 2021 WL 3205481, at *4 (5th Cir. July 29). The Government failed to allege that missing piece here. Mot. 10-11. And it failed to plausibly "exclude" obvious "benign purposes" for the legislature's procedures. *Rollerson*, 2021 WL 3205481, at *4. Most obviously, the legislature moved quickly because it needed to pass the law, and get "any litigation … wrapped up," "well before the 2022 midterms." States' Amicus Br. (Doc. 46-1) 33-34.

**Impact**: In the end, all that's left is the Government's conclusory and unquantified assertion of disparate impacts. Even if the Government had plausibly pleaded disparate impacts, neither the existence of those impacts nor the legislature's knowledge of them would be sufficient to prove discriminatory intent. *See* Mot. 11-12. The Government agrees. *See* Opp. 25 n.9 ("The United States is *not* relying solely on [disparate] impact"). If the Government thought this evidence was enough, after all, it would have brought a section 2 "results" claim in its complaint.

In addition to not being dispositive, disparate impacts are not even a "'starting point'" here. *Cf.* Opp. 25 n.9. The Government does not quantify, to any degree, any disparate impact; so it's impossible to tell whether the alleged

impacts are meaningful, small, or statistical manipulations. Mot. 12. The Government's omissions are especially notable given the inherent implausibility of its logic. The Government uses the fact that African-American voters *complied* with Georgia's prior election laws to assume that they "will fail or refuse" to comply with SB 202. States' Amicus Br. 27; *see* Mot. 12. And the Government "fail[s] to adequately consider" how any disparate impacts would be offset by SB 202's "mitigating provisions"—*i.e.*, the several provisions that indisputably make it easier to vote absentee, early, and in person. *Raymond*, 981 F.3d at 309; *see* Mot. 15. It's also impossible to say that the legislature *knew* about impacts that the Government itself cannot identify. Mot. 12. And the legislature had no duty to rely on impacts predicted by SB 202's opponents. Mot. 11. Importantly, the Government alleges nothing suggesting "that the [Georgia] legislators *who supported the law* intended the law to have a discriminatory impact or believed that the law would have such an effect." *Greater Birmingham*, 992 F.3d at 1326 (emphasis added). And that's what matters.

## CONCLUSION

For all these reasons and the reasons in the State's briefs (which Intervenors join), this Court should dismiss the Government's complaint with prejudice.

14

Respectfully submitted,

Dated: August 18, 2021 /s/ *Tyler R. Green*

| | |
|---|---|
| John E. Hall, Jr. | Tyler R. Green (*pro hac vice*) |
|   Georgia Bar No. 319090 | Cameron T. Norris (*pro hac vice*) |
| William Bradley Carver, Sr. | Steven C. Begakis (*pro hac vice*) |
|   Georgia Bar No. 115529 | CONSOVOY MCCARTHY PLLC |
| W. Dowdy White | 1600 Wilson Blvd., Ste. 700 |
|   Georgia Bar No. 320879 | Arlington, VA 22209 |
| HALL BOOTH SMITH, P.C. | (703) 243-9423 |
| 191 Peachtree St. NE, Ste. 2900 | tyler@consovoymccarthy.com |
| Atlanta, GA 30303 | cam@consovoymccarthy.com |
| (404) 954-6967 | steven@consovoymccarthy.com |

*Counsel for Intervenor-Defendants*

## CERTIFICATE OF COMPLIANCE

I certify that this document complies with Local Rule 5.1(B) because it uses 13-point Century Schoolbook.

/s/ *Tyler R. Green*

## CERTIFICATE OF SERVICE

On August 18, 2021, I e-filed this document on ECF, which will serve everyone requiring service.

/s/ *Tyler R. Green*